STATE OF FLORIDA
DIVISION OF ADMINISTRATIVE HEARINGS

███,                                    )
                                        )
       Petitioner,                      )
                                        )   Case No. 10-10485E
vs.                                     )
                                        )
JACKSON COUNTY SCHOOL BOARD,            )
                                        )
       Respondent.                      )
_____)

FINAL ORDER

Pursuant to notice, the Division of Administrative

Hearings, by its duly-designated Administrative Law Judge, Diane

Cleavinger, held a formal hearing in the above-styled case on

September 19 through 22, 2011, and March 6 through April 5,

2012, in Marianna, Florida.

APPEARANCES

For Petitioner:   Rosemary N. Palmer, Esquire
                  5260 Pimlico Drive
                  Tallahassee, Florida  32309

For Respondent:   Bob Harris, Esquire
                  Denay Brown, Esquire
                  Richard Akin, Esquire
                  Messer, Caparello & Self, P.A.
                  Post Office Box 15579
                  Tallahassee, Florida  32317

                  and

                  Frank Bondurant, Esquire
                  Bondurant & Floyd, P.A.
                  Post Office Box 1508
                  Marianna, Florida  32447-5508

EXHIBIT A

<u>STATEMENT OF THE ISSUE</u>

The issue in this case is whether the Jackson County School Board (Respondent, JCSB, or School Board), provided ████(Petitioner) with a free and appropriate public education (FAPE) during the school years beginning November 24, 2008, and ending November 24, 2010, as required by the Individual with Disabilities Education Act, 20 U.S.C. § 1400, <u>et</u> <u>seq.</u> (IDEA).

<u>PRELIMINARY STATEMENT</u>

On June 7 and 21, 2010, an Individual Education Plan (IEP) was developed for ████ The IEP placed ████ in regular education classes with some accommodations, services, and supports. However, due to a variety of issues, on November 17, 2010, a second IEP was developed that again placed ████ in regular education classes, but with additional interventions and services.  On November 24, 2010, prior to the implementation of the November 17th IEP, Petitioner's parent, ████., who disagreed with all of Petitioner's IEPs, filed a request for due process against the Jackson County School Board.  As a consequence, the November 17, 2010, IEP did not take effect and the June IEP became the stay-put IEP for ████ pursuant to the automatic stay provisions of IDEA.  On December 3, 2010, the case was referred to the Division of Administrative Hearings and assigned to Administrative Law Judge Lawrence P. Stevenson.

2

Thereafter, a resolution conference was scheduled for December 13, 2010.  Additionally, formal mediation was scheduled for December 15, 2010.  Both the resolution conference and mediation were cancelled with the consent of all the parties in order to allow the parent of ███ time to amend Petitioner's request for a due process hearing.  The parties also agreed that the time during which the IDEA process occurred would restart once the amended due process request was filed.

On February 17, 2011, Judge Lawrence Stevenson entered an Order to Show Cause why the proceeding should not be dismissed for lack of record activity in the case.  Based on the parties' responses, further time was permitted to the parent to file an amended due process request.

On March 15, 2011, Petitioner, through Petitioner's attorney, filed a 35-page Verified Amended Request for Impartial Due Process against the School Board; 15 individuals, consisting of school administrators and teachers; and the Florida Department of Education.  The request alleged that the parties failed to provide a free appropriate public education as required by IDEA to Petitioner, beginning in the 2007-2008 school year.  The amended due process request also alleged that an ever-changing panoply of named parties violated Petitioner's rights under the Rehabilitation Act of 1973, 20 U.S.C. § 790 et seq. (section 504 or 504) and the Americans with Disabilities

3

Act, 42 U.S.C. § 12101 (ADA) by discriminating against
Petitioner or Petitioner's parent.

Between April 7, 2011 and May 4, 2011, 13 motions and
responses were filed by the parties.  On May 5, 2011, Judge
Stevenson held a pre-hearing conference.  Both parties and their
attorneys participated in the hearing.  The conference was not
completed; and therefore, only addressed some of the motions
that had been filed.  Thereafter, based on the conference and
the record, Judge Stevenson, on May 6, 2011, entered an Order
dismissing all of the individual Respondents as parties.
Additionally, on May 10, 2011, Judge Stevenson entered Orders
denying Respondents' Motion for Protective Order and
Petitioner's Motion to Compel.  Discovery between the parties
proceeded, albeit acrimoniously.

Between May 13, 2011 and May 19, 2011, inclusive, 10
motions and responses were filed by the parties.  A second pre-
hearing conference was held on May 19, 2011.  Both parties and
their attorneys participated in the hearing.  After the
conference, Petitioner filed written responses to all of
Respondents' pending motions on May 24, 2011.

On May 26, 2011, Judge Stevenson entered an Order striking
all of Petitioner's section 504 and ADA claims, as well as
claims for relief that occurred more than two years prior to the
date of the original request for due process that was filed on

4

November 24, 2010.  Evidence that was relevant to the remaining IDEA issues was not excluded from presentation at the hearing irrespective of the time period in which it occurred.  Judge Stevenson, also, entered separate Orders denying Respondents' Motion for Protective Order and granting Respondents' Motion to Serve Additional Interrogatories.  Additionally, on the same date, a Pre-hearing Order and Notice of Hearing were entered. The final hearing in this matter was set for a two-week period, commencing on June 13, 2011, in Marianna, Florida.  All times were extended under IDEA.

Between May 27, 2011, and June 6, 2011, inclusive, eight motions and responses were filed by the parties.  During a telephone hearing on the motions, held June 6, 2011, the parties agreed, and the complexity of this case required, that a continuance of the June final hearing was necessary to facilitate due process and an orderly discovery process.  The parties agreed to continue the final hearing to a two-week period commencing September 19, 2011.  Again, all times were extended under IDEA.

On August 19, 2011, the case was transferred to the undersigned.  Between September 2, 2011 and September 14, 2011, inclusive, 11 motions and responses were filed.  A telephone hearing was held on the pending motions on September 14, 2011. Both parties and their attorneys participated in the hearing.

An Order dismissing the Florida Department of Education was entered.

On September 15, 2011, an Order was entered denying Petitioners' Motion to Move the Hearing Location Out of School Board Location; Petitioners' Motion for Protective Order to Prevent Respondents' Disclosure or Use of Medical Records in this Matter; Petitioners' Motion to Strike Tina Smith's Deposition; Respondents' Motion in Limine; and Respondents' Motion to Exclude Witness Testimony. Additionally, an Order was entered establishing a process during the hearing to determine each day's witnesses and facilitate the presence of those witnesses at the hearing.

After two weeks, the final hearing was not completed. The parties provided dates for rescheduling the hearing and the case was set for an additional four-week period, commencing March 12, 2012. The hearing concluded on April 5, 2012.

During the hearing, Petitioner testified in Petitioner's own behalf and, also, presented the testimony of 63 witnesses. Additionally, Petitioner introduced 197 exhibits into evidence and proffered 24 exhibits that were not admitted. Respondent presented the testimony of 20 witnesses and introduced 175 exhibits into evidence.

At the conclusion of the hearing, the parties discussed the amount of time necessary to obtain the transcript; review the

extensive transcript and evidence; and prepare proposed orders based on that review.  The court reporter estimated that preparation of the transcript would not be completed until mid-July.  The court reporter's estimate was reasonable based on the length of the hearing and the estimated 5000 pages of testimony to be transcribed.  The parties requested 30 days from the filing of the transcript to file proposed final orders in this matter.  Given the length of the hearing and the amount of evidence adduced at the hearing, due process required that the parties' reasonable request be granted.  Provision of the transcript in electronic form was not requested by either party.

On July 23, 2012, the written Transcript of the hearing, consisting of 30 volumes of testimony and 17 volumes of Exhibits and index, was filed with the Division of Administrative Hearings.  At about the same time, Petitioner was advised that a copy of the Transcript was available for delivery.  On July 24, 2012, Petitioner filed a Motion to Compel Provision of Electronic Transcript.  The motion was the first time Petitioner requested an electronic version of the Transcript instead of the regular written version of the same.  Due to the lateness of the request and the fact that the Transcript had already been provided and paid for in the standard written form, Petitioner's motion was denied on July 25, 2012.  Thereafter, Petitioner filed a Proposed Final Order on August 23, 2012, and a second

7

Proposed Final Order on August 27, 2012.  Respondent filed a
Proposed Final Order on August 22, 2012.  Respondent's motions
regarding striking Petitioner's Proposed Final Order and second
Proposed Final Order were denied.

<u>FINDINGS OF FACT</u>

1.  Respondent, the Jackson County School Board, is the
entity that operates the Jackson County School District.  At the
times relevant to this proceeding, it was responsible for
providing a system of public education that complied with
Florida and federal law.

2.  In order to effectuate its duties, JCSB was required to
and continues to be required to, provide instruction that meets
the requirements of the Sunshine State Standards or the Next
Generation Sunshine State Standards.  <u>See</u> §§ 1001.10(6) and
1006.28, Fla. Stat.  These standards were peer-reviewed and
researched sets of criteria for school courses that were
developed by the Florida Department of Education.  <u>See</u>
§ 1003.41, Fla. Stat.

3.  Towards that end, JCSB was required and does provide
instruction from curriculum materials and texts which were
reviewed and approved for each area of instruction under the
applicable Sunshine Standards through a State process
coordinated by the Florida Department of Education.  The
specifications for these materials were based on criteria

developed from scientific research on effective educational strategies and materials.  Further, these curriculum materials and texts were peer-reviewed for compliance with these state specifications.  See §§ 1001.06, 1001.10, and 1001.215, Fla. Stat.

4.  As such, the JCSB curriculum and materials complied with the requirements of IDEA and were provided to Petitioner in this case.  Given this compliance, the School Board was not required under IDEA to function as a private research agency for the parent of a student in Jackson County public schools in order to provide peer-reviewed or scientific research or proof of such research to that parent.  Such information was and is maintained by other state and federal agencies, as well as the publishers of such material, and those agencies and publishers were where such parental inquiries should be directed.

5.  Additionally, in order to provide public education in Jackson County, Respondent hired licensed and certified teachers to teach the courses required to be taught by the State through the use of approved curriculum and instructional material. These teachers were trained in scientifically-researched teaching techniques and strategies in order to receive their teaching certificates and/or certifications.  See § 1012.56, Fla. Stat.  They, also, received in-service and continuing education training in good teaching techniques and strategies.

9

In fact, all of the teachers involved in this case were licensed teachers, with specialty certifications in appropriate areas. The evidence demonstrated that they used their scientifically-based training to instruct in their classes.  Again, this training met the requirements of IDEA regarding teaching strategies and methodologies.  There was no further requirement under IDEA that Respondent provide research or research data to a parent in order to utilize commonly-recognized teaching techniques and strategies for the schooling of a special education student in the Jackson County school system. Moreover, there was no evidence that it was practical or feasible for JCSB to conduct this type of research since JCSB was an educational institution and not a research institution. Again, such information, if any existed, was available to the parent through other agencies, publishers, and research organizations.

        6.    ████    (parent) is the biological parent of the Petitioner, ████.

        7.    ████  was born extremely premature on ████████████ At the time, Petitioner suffered serious complications due to extreme prematurity.  As a consequence, ████ underwent several surgeries.  Eventually, at eight months of age, a shunt was placed in ████  head in order to drain fluid from the brain.

8.   In November of 1999, at the age of ████, ████ underwent surgery for the removal of the shunt.  Unfortunately, the shunt's removal caused a large left-sided hematoma in ████ brain when a portion of ████ brain was also removed with the shunt.  The trauma caused a permanent traumatic brain injury to ████

9.   Due to this injury, ████ was and remains educationally delayed since ████ was slower at processing information, with occasional difficulty in formulating responses to verbal communication.  The parent testified that ████ had a hard time finding words to say and that, if ████ did not know how to do something, instructions might have to be repeated a few times before ████ caught on.  ████ also lost focus and at times seemed to tune out ████ surroundings.  Additionally, ████ had an IQ in the low average range of about 82-86.  IQ is not a measure that is significantly affected by a student's educational progress.

10.  ████ enjoyed basketball and volitionally read books at home on topics that interested ████  ████ often discussed the books ████ read with ████

11.  In general, the evidence showed that ████ was a normal and pleasant young person with some information processing difficulties that slowed learning for ████ and interfered with ████ ability to demonstrate the knowledge ████ had acquired.

The evidence further demonstrated that ███ had, and may
continue to have, difficulty with the abstract concepts involved
in higher forms of reading, writing, math, and science at the
high-school level.  This difficulty was and continues to be
partially related to Petitioner's age and low average
intelligence.  However, this difficulty was also partially
related to ████ impaired ability to process information and
the educational delay such impairment has caused.  The evidence
did not demonstrate that █████ educational delay was due to the
education ████ received from JCSB.  On the other hand, the
evidence showed that, with some limitations, █████ was generally
capable of learning anything an average student could learn.
However, ████ must work at a slower more repetitive pace in
order to master material and demonstrate such mastery.  Further,
the evidence showed that █████ impairments in learning were not
so extreme or unusual that ████ required different curriculum,
teaching techniques or teaching methodologies than are generally
available and provided in the Jackson County school system.

     12.  Additionally, the evidence demonstrated that █████ had,
and continues to have, some difficulty in interpreting the
behavior of others and sometimes misinterpreted group-oriented
behavior as directed at █████  Petitioner also sometimes
misinterpreted ordinary peer interactions as derogatory or
bullying towards █████  Added to this mix was the fact that ████

12

is overprotected by ████ which has at times reinforced ████
misperceptions.  Unfortunately, the combination of the parent's
overprotection and ████ misperception of the behavior of
others contributed and created many of the issues and parental
misperceptions in this case.

13.  On the other hand, the evidence did not show that,
compared to other teenagers, ████ had higher levels of anxiety
relative to fitting in at school.  Further, the evidence did not
show that, compared to other teenagers, Petitioner had higher
levels of anxiety relative to bullying, whether perceived or
actual, or higher levels of anxiety relative to insensitive peer
behavior, whether perceived or actual.  Finally, the evidence
did not show that Petitioner had lower abilities to cope with
such behavior.  In fact, the evidence showed that ████
emotional make-up and coping skills were quite normal when ████
was away from the parent.  At the time of the hearing, ████ was
around ████ old and in the ████ grade.

14.  Importantly, neither party disputed that ████ was a
"child with a disability" entitled to services in accordance
with IDEA.  As such, ████ was initially classified by the School
Board in the special education category of Other Health Impaired
(OHI).  ████ is currently classified in OHI, Traumatic Brain
Injury (TBI), Occupational Therapy (OT), Physical Therapy (PT),
and Language Impairment.

15.  At around age five, ███ enrolled in the Jackson
County public school system on April 25, 2001.  ███ parent
withdrew ███ from school on August 21, 2001.  Subsequently the
parent re-enrolled ███ on November 6, 2001.

16.  In late April 2003, at just over ███ years of age
and in first grade, ███ was neurodevelopmentally assessed by
the Morris Center in Gainesville, Florida.  The evaluation was
overseen by clinical psychologist, Tanya Mickler, Ph.D.  Kytja
K.S. Voeller, M.D. was the consulting physician.

17.  In general, the Morris Center evaluation confirmed an
average young person with deficits in the ability to retrieve
knowledge from the brain and/or find the words to
express/demonstrate that knowledge.  ███ ability to process
language and auditory stimuli was stronger than ███ ability
to process visual stimuli.  ███ also showed significant
impairment in attention, especially when such attention had to
be sustained over time.  In addition, ███ demonstrated some
difficulty with fine motor control involving the hands and
fingers, as well as, some difficulty with gross motor control
involving balance and posture.  Notably, by the time of the
hearing, these motor deficits were no longer significant to
███ education.  In short, ███ currently is mobile and walks
normally.  Additionally, ███ can write and use a keyboard,
albeit slowly.

18.   Based on the evaluation, Dr. Mickler recommended that ▆▆ be placed in a regular classroom setting with support to help ▆▆ stay focused, improve language skills, and improve motor development.

19.   In April 2004 at eight years, four months of age and in second grade, ▆▆ was neuropsychologically evaluated by the University of Florida.  At the time, ▆▆ still slept with ▆▆ ▆▆ also had not been told that Petitioner's parents were divorced even though the divorce had occurred about two years prior.  The evaluation generally confirmed what had been observed in the Morris Center evaluation.

20.   ▆▆ remained in elementary school until the parent again withdrew ▆▆ on September 21, 2004.  ▆▆ returned to the Jackson County school district around April 18, 2006.

21.   During the summer of 2006, ▆▆ was re-evaluated for Occupational Therapy (OT) and Physical Therapy (PT).

22.   The OT evaluation revealed that Petitioner was functional in ▆▆ ability to access ▆▆ environment and classroom, as well as, functional in ▆▆ fine motor and vision/perceptual skills.  ▆▆ continued to show some difficulty in the forming and spacing of letters, as well as, difficulty in the speed of ▆▆ writing.  However, ▆▆ handwriting was legible.  In order to address these issues,

15

Petitioner was provided an Alpha Smart to assist ▪▪▪▪ in typing ▪▪▪▪▪ work as needed.

23.   The Physical Therapy evaluation found that ▪▪▪▪ strength and mobility were normal, with some minor hip weakness that caused an inward rotation of the hip.  However, that weakness did not impact ▪▪▪▪ ability to access ▪▪▪▪ education or ▪▪▪▪ environment.  In fact, ▪▪▪ did not need any accommodations to participate normally in ▪▪▪▪ physical education class.  Based on this evaluation, PT was discontinued except on a monthly consultative basis.  The evidence did not demonstrate a continued need for physical therapy beyond a consultative basis was required for ▪▪▪▪  to receive FAPE or access ▪▪▪▪ educational environment.

24.   ▪▪▪ was also provided a sensory diet and objects that could be manipulated in order to stay focused in class.  However, based on staff observations, Petitioner's dependence on such a sensory diet was significantly decreased.

Fifth grade (2006/2007)

25.   During the 2006/2007 school year, ▪▪▪ was enrolled in a regular education class for fifth grade.  ▪▪▪ teacher was Ms. Comerford.  The class consisted of 30 or more regular education students who were at the same age and grade level as ▪▪▪  Petitioner was provided a full-time aide and additional supports to help with writing and attention deficits.

16

26.  Around August 31, 2006, at the beginning of school, the JCSB provided in-service training to all the staff and teachers who were assigned to ▮▮▮  The training included research information and materials on TBI.

27.  During the months of November and December 2006 through January 10, 2007, ▮▮▮ was evaluated by the Jackson County school psychologist, Nell Swails.  At the time, ▮▮▮ scored a full-scale IQ of 86.  The score placed ▮▮▮ in the low average range of intellectual functioning.

28.  The Wechsler Intelligence Scale for Children, 4th edition (WISC-IV) showed that ▮▮▮ cognitive abilities ranged from a Verbal Comprehension Score of 77 to a Perceptual Reasoning (nonverbal) score of 88.  ▮▮▮ Working Memory Composite score was 94 and Processing Speed Composite Score was 103.  In general, Petitioner's scores were average and showed strengths in speed, immediate auditory recall, and visual conceptualization.  The scores showed weaknesses in analyzing and synthesizing information, as well as, weaknesses in social judgment and reasoning.

29.  The Woodcock Johnson-III test of Achievement and Cognitive Abilities was also administered by the school psychologist.  The test assesses skills in the areas of reading, spelling, math, and writing.  Among other things, the test looks at a person's achievement in Broad Reading, Broad Written

17

Language, and Broad Math.  ██████  scores in each of these broad areas were in the average range.  The Total Achievement score was 93, and was, also, in the average range.  Additionally, ██████  cognitive ability scores were generally average, with a verbal ability score in the low average range (86).  The cognitive ability scores, also, showed significant weakness in processing speed.

30.  Likewise, the results from the Comprehensive Test of Nonverbal Intelligence (C-TONI), which de-emphasizes the impact of language and motor skills in measuring an individual's intelligence, and the Peabody Picture Vocabulary Test III were in the average range.  Additionally, the Children's Memory Scale, which assesses memory and learning abilities, was average overall.  All three tests reflected ██████  impairments in processing information, retrieving information, and attention. The tests were also in agreement with all of the evaluations of ██████  since 2003.

31.  In general, the evaluation indicated that ██████  was able to do fifth-grade instructional level work and learn a regular curriculum.  In fact, all of ██████  academic history demonstrated that ██████ was capable of and does do instructional-level work in a given grade, but at a slower pace due to the speed at which ██████ processes and retrieves information. However, ██████  ability to do instructional-level work does not

18

necessarily translate to scoring at or performing on grade
level.

32.   Grade level in the above assessments and in most of
the assessments that were performed in later years is a
statistical term generally defined as the raw score at which the
median or 50th percentile of all students that were tested
scored at a specific grade, plus or minus an amount (standard
deviation or standard error) to reflect the variability in the
assessment's data.  A corollary to grade level is grade
equivalent.  Grade equivalent is the grade at which the median
or 50th percentile of students that were tested received a
certain raw score on a particular assessment.  Importantly,
neither grade level nor grade equivalent is the same as the
instructional level used in a given grade to teach students the
Sunshine State Standards.  In fact, the instructional level of a
given class can vary from the actual grade at which a student
takes any given class.  Moreover, there was no competent
substantial evidence that grade level as defined in these
assessments is the same as or comparable to grade level in
standards-based assessments like the Florida Comprehensive
Assessment Test (FCAT), a state-mandated standardized test of
academic achievement.  Such standards-based tests generally are
measurements of proficiency, i.e., the ability to demonstrate
knowledge and understanding of a defined set of educational

standards.  In the case of the FCAT, those standards were the Sunshine State Standards or the Next Generation Sunshine State Standards.

33.  Importantly, the 2006 Swails' evaluation noted progress, as well as improvement, in ████ abilities when compared to the 2003 Morris Center evaluation.  It was this progress that was important for evaluating ████ education since ████ educationally progressed at a slower pace than other students at ████ age or grade.

34.  Further, the evaluation recommended that ████ dependence on an aide be decreased since ████ would be moving to sixth grade and middle school the next year.  ████ parent was in agreement with such a decrease.

35.  After the evaluation, the IEP team decided to try a variety of assistive technologies in order to help with organization and focus, as well as wean ████ from the aide.  In fact, ████ parent indicated in several emails and at team meetings that the parent wanted the aide removed and assistive technology substituted for that service.

36.  Towards that end, typing and keyboarding software was provided to help ████ learn and improve ████ typing and keyboarding skills.  Among other things, the goal was to reduce ████ dependence on the aide writing things down for ████  All

of the evidence demonstrated that these skills improved and that
████ currently knows how to use a computer and keyboard.

37.   Additionally, an FM-sound system and Time Timers were
tried in some of ████ classrooms at different times during the
year.  The FM device moved the teacher's voice closer to ████
and increased the volume of that voice.  The purpose was to
decrease the length and frequency of Petitioner's drifting off,
thereby increasing Petitioner's focus time.  However, the FM
device was not observed to have any efficacy in improving ████
focus or independence from the aide and was eventually
discontinued.

38.   The Time Timers were small desk-top timers that
counted down the amount of time during which a task was to be
performed.  Their purpose was to act as a reminder and/or focus
attention on a task.  ████ refused to use these devices and they
were eventually discontinued.

39.   At some point during the school year, the eighth-grade
middle school band performed at ████ elementary school.  The
eighth-grade band, as well as all the lower grade middle school
band classes, included many students with disabilities.

40.   At the time, many of the fifth-grade students,
including ████ , became interested in taking band in sixth
grade.  Like many young people, ████ wanted to be a drummer.

████ expressed ████ interest to ████ fifth-grade aide,
Cynthia Lagman.

41.  Later in the year, a letter to parents and students
from the middle school band director, Amy Allen, was sent to the
elementary school for distribution to all of the fifth-grade
students, including special education students.  The letter
informed the parents and students about the sixth-grade band.

42.  Towards the end of the school year, the band director
sent over a video band test to all of the fifth-grade teachers
for administration to all fifth-grade students.  The test was a
test of ear discrimination and rhythmic ability.  It did not
require musical training in order to score well on it.

43.  All students who wanted to take band class in sixth-
grade were required to take the band test.  However, selection
for band class was competitive because space was limited.
Therefore, selection for sixth-grade band was given first to the
student's with the highest scores on the band test.

44.  Eligibility letters were mailed by the band director
to the students selected for band.  The evidence did not
demonstrate that letters of rejection were mailed to students
who were not selected for band.  However, Ms. Allen encouraged
all fifth-grade students who did not receive an acceptance
letter to put their name on a waiting list or have their parent

put their name on a waiting list for sixth-grade band should a
band slot become available.

45.   At some point, ▓▓▓▓ was administered the band test in
fifth grade and provided accommodations in a separate room in
which to take the test.   ▓▓▓▓ memory of this event was distinct
and there was no competent or credible evidence that ▓▓▓▓ was
prevented from taking or not allowed to take the band test.   The
evidence was not clear as to ▓▓▓▓ results on the band test.
Indications were that ▓▓▓ did not do well since ▓▓▓ did not
receive an eligibility letter from the band director and did not
perform well on a later test in seventh grade.   However, ▓▓▓
did not communicate any testing information to ▓▓▓▓ and did not
communicate that ▓▓▓ could put ▓▓▓▓ name on a waiting list for
band.

46.   More to the point, there was no evidence that
demonstrated ▓▓▓ did not receive FAPE in regards to being given
the opportunity in fifth grade to qualify for the sixth-grade
band.   In fact, ▓▓▓▓ opportunity was the same as the
opportunity given other fifth-grade students.   Further, there
was no evidence that ▓▓▓ was discriminated against in regards
to the opportunity to participate in band or in not being
selected for band.

47.  Similarly, during ▓▓▓▓ fifth-grade year in elementary school, there was no competent evidence that ▓▓▓▓ was bullied by anyone at school.

48.  Finally, during ▓▓▓ fifth-grade year, ▓▓▓ generally had good grades.  However, ▓▓▓ scored a level I on the FCAT. The level I score was below grade level as defined by that test. On the other hand, the evidence demonstrated that ▓▓▓ made meaningful educational progress during ▓▓▓ fifth-grade year and was promoted to sixth grade.  No violation of FAPE that continued into the time period relevant to this matter was demonstrated by the evidence.

Sixth Grade (2007/2008)

49.  For ▓▓▓ sixth-grade year (2007/2008), ▓▓▓ was placed into regular classes with some supports to enable ▓▓ to participate in the regular classroom environment.

50.  ▓▓▓ parent continued to indicate in several emails and at team meetings that the parent wanted the aide removed and assistive technology substituted for that service.  In the past, the aide, among other things, recorded the assignments ▓▓▓ would have in various classes, helped with ▓▓▓ combination lock on the locker, organized ▓▓▓ desk and books, helped ▓▓▓ find the right page in a book, and took class notes for ▓▓▓ The aide also prompted ▓▓▓ to pay attention when needed.  There was no evidence that this aide did ▓▓▓ school work or failed

24

to encourage, prompt, or require ▮ to stay organized and
focused.

51.   The IEP team agreed that during ▮ sixth-grade
year, attempts to gradually remove the aide from ▮ would be
tried with staff observations of those attempts made in order to
gauge the efficacy of such efforts.  There was no need and FAPE
did not require that the methodology and or techniques used to
wean ▮ from the aide be put in the IEP, since these were
measures that were necessarily subject to adjustment in order to
determine what process worked and how fast the fading away
process should proceed, as well as to determine if ▮ was
sufficiently autonomous so that assistive technology could be
reliably substituted for the aide.

52.   Towards that end, sometime in August 2007, a
MotivAider was tried with ▮  A MotivAider is a pager-like
device that buzzes at programmed times to remind a person to pay
attention or prompt a person to perform a task.  It was hoped
that the device could substitute for some of the prompting
provided by the aide to ▮ and was part of the school's
attempt to wean ▮ from ▮ aide.  ▮ refused to use the
MotivAider.

53.   In addition, at some point in 2007 during the first
part of the school year and after consultation with a specialist
in the area of school inclusion, a plan was developed to wean

██████ from the aide by having the aide move away from ██████ in class and in the hall.  If there was positive behavioral response to this stepping away, the aide would be removed in classes where the aide's services were not utilized during that class.  There was no credible evidence that this plan was not appropriate.

54.  Notably, under this plan, ██████ progress towards independence was slow.  However, by December 2007, the plan for improving ██████ independence was working and ██████ dependence on the aide was decreasing to the point where ██████ exhibited consistent independence from the aide in certain classes.  Based on ██████ decreased reliance and to further improve independence, staff removed the aide from the classes in which ██████ showed the most independence.

55.  Around April 2008, the school had ██████ observed by outside professionals to obtain recommendations for other techniques that could be implemented to increase ██████ focus and organization and continue to wean ██████ away from the aide. At about the same time, instead of recognizing that ██████ was making progress in decreasing dependence on the aide, ██████ complained that the aide had been removed in certain classes before unspecified assistive technology had been put in place. The parent, also, complained that the parent was not informed about the aide's removal in December.  However, there was no

evidence that failure to immediately advise the parent of the progression of the aide-fading plan developed by the school denied FAPE to ███ or denied the parent a material opportunity to participate in development of ███ IEP. In fact, the plan and its implementation provided FAPE to ███.

56. Additionally, during spring break in 2008, Ms. Gardner, ███ reading teacher, attended a seminar on TBI in Orlando, Florida. The spring break period would normally be vacation time for Ms. Gardner, but she wanted to go to the seminar so that she could learn about TBI and help ███ as much as possible. Ms. Gardner brought back materials from that seminar and shared them with the faculty at the middle school during in-service training.

57. During sixth grade, ███ was enrolled in Science I, Math I, Intensive Reading, Body Management, Explorer Wheel I, Language Arts I, and World Cultures. ███ was not enrolled in band class during the sixth grade.

58. In Science, ███ achieved a grade of C for the first semester which was raised to a grade of A for the second semester. In Math, ███ made a grade of C for the first semester which was increased to a grade of B for the second semester. In Intensive Reading, ███ achieved an A in both semesters. In Body Management, ███ made a D the first semester which was increased to a B the second semester. In Explorer

Wheel, ▆▆ made a B in both semesters.  In Language Arts, ▆▆
achieved a C in both semesters.  In World Cultures, ▆▆ made a
B in both semesters.

59.  As can be seen, ▆▆ made meaningful educational
progress during the year.  As a consequence, ▆▆ was promoted
to seventh grade.  Again, the evidence did not demonstrate a
violation of FAPE that continued into the time period relevant
to this matter.

Seventh Grade (2008/2009)

60.  On August 15, 2008, near the beginning of the
2008/2009 school year, an IEP team meeting was held to address
▆▆  educational program for ▆▆  seventh-grade year.  ▆▆
parent attended and participated in the meeting.

61.  The evidence did not demonstrate any significant
issues with this IEP in relation to FAPE.

62.  One of the goals of ▆▆ education was to continue
to try to wean ▆▆ away from dependence on the aide through a
gradual process that included observation of ▆▆ behavior and
responses.

63.  Towards that end, an aide, who was experienced in
gathering data for behavior analysis, was provided for ▆▆
While the school did not think, and the evidence did not show,
that the formal collection of such data was necessary to further
develop a plan to gradually discontinue the services of an aide

28

for ██, data collection was provided at the request of ██ parent.

64.   The plan was to provide the aide and other professionals time to observe ██ at the beginning of school for about a month and then meet with the parent and the rest of the IEP team to discuss a plan to transition ██ away from the aide.  Potential assistive technology was also to be discussed at this later meeting after discussions with ██ teachers to determine what, how, or if any such technology could be effectively utilized in the classroom.  This process also provided the parent the opportunity the parent desired to provide further input into any potential aide-fading plan. Additionally, the process provided FAPE to ██ since ██ had a new aide, a new schedule, and other assistive technologies which had been tried and failed or rejected by ██

65.   During the school year, ██ was provided, among other things, access to a computer at school.  ██ was also provided an agenda book to keep ██ organized.  The IEP team also thought a technology device known as a watchminder should be tried.

66.   The watchminder is a wearable, watch-type device that, with certain limitations, can be programmed with an individual's schedule and alert that person to schedule changes through both buzzing and text messages.  Additionally, because it can be

29

scheduled, the watchminder, to a certain extent, can be
programmed to sound an alarm and display a text message to
remind a person to stay on task.

67.  Introduction of the watchminder was proposed once the
aide and staff observed ███ and developed an awareness of where
such a tool could be useful.  The approach by the team was
reasonable and provided FAPE to ███.

68.  Around September 8, 2008, staff and other assistive
technology specialists met with ███ to discuss further
technology, demonstrate the watchminder to ███, and gain ███
agreement to try the technology.  The watchminder was given to
███ around September 16, 2008.  It was programmed according to
a schedule provided by ███ aide that was based on
Petitioner's schedule.

69.  The aide assigned to ███ for seventh grade was Tamara
Ravenelle.  She was hired when the intended aide for ███ left
just before the start of school.  As indicated, Ms. Ravenelle
was selected because she was trained in data collection for
behavior analysis purposes.  The parent continued to believe
that assistive technology could be substituted for the aide.

70.  Unfortunately, Ms. Ravenelle's approach to ███ was
less gentle, sterner, and more authoritative than the previous
aide in sixth grade.  ███ perceived that Ms. Ravenelle did not
like ███ and complained that she was very critical of ███  No

professional testified that they saw Ms. Ravenelle behave
abusively or over-critically towards ███   Notably, the teachers
thought ███ was happy in class and that the aide was helpful to
███ when needed.

71.   Indeed, the various statements attributed by the
parent to the aide as being rude, abusive, or constituting
bullying had no context and just as easily could have been
attempts by the aide to motivate ███ to work faster or try
harder.  In fact, there was no competent or credible evidence
that the aide was rude, abused, or bullied ███

72.   On the other hand, the evidence was clear that ███
did not like this aide.  Additionally, at various points during
August and September 2008, during the early morning while
getting ready for school, ███ would say he did not want to go
to school that day and would become uncooperative and whiny,
with occasional shoe throwing.  ███ gave in to such behavior
and permitted ███ to miss some school.  The parent claimed that
███ behavior was because of the aide's treatment of ███
during late August and September.  However, as indicated and
even though the aide was with ███ during ███ classes, ███
appeared happy in ███ classes once ███ was at school and
away from home.

73.   On September 12, 2008, ███ parent met with the rest
of ███ IEP team and teachers to discuss the aide and

different supports the teachers might be able to incorporate in their classes.  The meeting covered a wide variety of topics. The evidence showed that ██████ provided a significant amount of input on those topics.

74.  At some point, ██████ attended school with ████  How long the parent shadowed ████ was unclear from the evidence. Unfortunately, ██████ engaged in a disruptive and loud argument with Ms. Ravenelle in front of students and teachers.  As a result, ██████'s privilege of shadowing ████ during school was terminated.  There was no evidence that the termination of ██████ privilege of shadowing ████ was a violation of IDEA or a failure to provide FAPE to ████

75.  At about the same time, around September 26, 2008, ██████ withdrew Petitioner from school, thereby preventing the district from resolving any issues ██████ had with the aide. ████ was home-schooled for the remainder of the semester.  The evidence did not demonstrate any violation of FAPE that continued into the time period relevant to this matter.

76.  ████ returned to Jackson County public schools in January 2009, for the second semester of the school year. Subsequently, the parties met on January 6, 2009, and developed an IEP for ████  The parent was provided adequate notice of the IEP meeting and participated in the meeting by telephone.  The parent was free to raise any concerns or issues about ██████

32

education.  There was no credible evidence that the parent was
prevented from fully participating in the meeting.

77.  The IEP team consisted of the minimal number of people
required by IDEA to form an IEP team.  The evidence did not show
that any other participants were necessary since the
participants were familiar with ███ educational issues based
on the earlier-developed IEP in August and prior involvement
with ███ education.

78.  At the conclusion of the meeting, the IEP team
extended the August 15, 2008, IEP with some adjusted dates to
reflect that the IEP was for the second semester of seventh
grade.  There was no credible evidence that this IEP did not
provide FAPE nor had any material defects in its requirements.

79.  The staff and teachers that were responsible for ███
education were all provided in-service training about TBI.  They
were all provided a copy of ███ IEP and special
accommodations.  There was no credible or competent evidence
that the middle school staff needed more education on TBI or
more familiarity with ███ accommodations.

80.  For ███ second semester of seventh grade and as
provided in ███ IEP, ███ was again placed into regular
classes with some supports to enable ███ to participate in the
regular classroom environment.  ███ was enrolled in Science II,

33

Math II, Intensive Reading, Throw/Catch (PE), Journalism II,

Language Arts II, and World Geography.

81.  In Science, ███ achieved a grade of C for the second

semester.  In Math, ███ made a grade of C for the semester and

mastered all of the math goals by May 28, 2009.  In Intensive

Reading, ███ achieved a C for the semester.  In Throw/Catch,

███ made a B for the second semester.  In Journalism II, ███

made a B for the semester.  In Language Arts II, ███ achieved

an A for the semester.  In World Geography, ███ made a C for

the second semester.

82.  Such grades show that ███ made meaningful educational

progress during the year.  ███ parent may have wanted more or

additional curriculum, but neither the facts of this case nor

the law supported the parent's attempt to demand certain

methodologies or curriculum be implemented by the Jackson County

schools.

83.  As support, ███ was assigned Krystal Moore as an

aide.  ███ shared her services with at least two other

students.

84.  Through the semester, she observed that Petitioner's

ability to stay focus increased.  In particular, ███ ability

to focus was more like a normal teenager.  In essence, ███

stayed focused the entire class period in subjects ███ was

interested in.  On the other hand, in classes Petitioner was not

34

interested in ███ could focus, but often lost focus and required prompts from ███ aide. However, even in these classes of lesser interest, ███ focus time increased during the year.

85. ███ was also provided an agenda book to keep organized. The book was a low-level assistive technology device and was used to write down assignments and scheduling information on a daily basis. The book, also, served as a means of communication between staff and the parent and accompanied ███ home after school.

86. During the second semester, ███ often deliberately refused to write down assignments when prompted by ███ aide, thereby manipulating the aide into writing the assignments down for ███ As indicated earlier, the parent believed that the aide could be weaned if higher-level assistive technology, such as a PDA, was substituted for the aide. However, like the lower-level agenda book, such higher-level assistive technology also required ███ to input schedules, class assignments, and other information into it. Both levels of technology required the self-discipline or self-motivation to input such data at the appropriate time. However, recording such information in a timely manner was something over which ███ continued to struggle. Therefore, it was not reasonable and there was no credible evidence that demonstrated, higher-level assistive

35

technology could or should be substituted for the lower-tech solution of the agenda book.

87.  Additionally, ███ received weekly occupational therapy sessions as listed in the IEP.  The evidence showed that by the end of the year, ███ achieved all of ███ OT goals. Further, ███ teachers and aide, also, received consultative PT and speech/language therapy services as required by the IEP.

88.  Ultimately, the evidence presented at hearing established that the Petitioner made educational progress during ████ seventh-grade year at the middle school.  Again, there was no credible or competent evidence that ████ seventh-grade FCAT scores of Level I in math and reading were indicative of a lack of progress in ████ education.  In fact, ████ FCAT score in math showed progress in math with a normal deceleration or plateau in reading.  Such scores were not an unusual pattern for students entering middle school.

89.  Ultimately, ███ was promoted to eighth grade at the end of the seventh-grade year.  The promotion was not a sham, but was based on ███ educational progress in ███ coursework.  The evidence did not demonstrate that ███ was denied FAPE during ███ seventh-grade year.

90.  On March 23, 2009, ███ was evaluated for speech/language, audiology, and auditory processing disorders at the University of Florida, Department of Communicative

36

Disorders.  The evaluation revealed that ███ phonemic

synthesis was slightly below the normal range, indicating ███

had difficulty forming (synthesizing) words from their separate

sounds (phonemes).  The evaluation also revealed ███ had

difficulty in the area of language synthesis (deriving meaning

from words or formulating words to impart meaning).  In order to

address these deficits, the evaluators recommended that ███ use

a computer-based program known as Earobics.

91.  The evaluation also revealed that ███ receptive

vocabulary score was within the normal range.  However, ███

expressive vocabulary score was slightly below normal.  In line

with earlier evaluations, ███ performance reflected strength

in auditory rote memory.  Additionally, ███ performance

reflected weakness in processing and executing auditory

directions.  The evaluator recommended a further speech and

language evaluation.  The parent discussed and was aware of the

results and recommendations of the University of Florida

evaluators.

92.  On April 9, 2009, the parent was provided telephone

notice of an IEP meeting scheduled for April 24, 2009.  The

purpose of the meeting was to develop Petitioner's IEP for the

upcoming eighth-grade year and discuss Extended School Year

(ESY) for the summer.  Written notice of the meeting was mailed

April 16, 2009.  The notice met the requirements of IDEA and

provided ample opportunity for the parent to prepare for the meeting.

93. Additionally, the parent indicated that the parent did not want to convene a formal team meeting to discuss ESY services for ███ ████ indicated that ████ would coordinate with Shawn Larkin, the ESE Director for Jackson County School District, in order to set up ESY services in time to discuss them at the April 24 IEP, meeting.

94. Sometime around April 20, 2009, ████ and Mr. Larkin discussed ████ summer 2009 ESY services. ESY was scheduled from 8:00 a.m. to 1:00 p.m., Monday through Thursday, during June 8 through 18 and July 6 through 16, 2009.

95. After discussion with ██████ Mr. Larkin recommended that ███ receive ESY services at an alternative school. The recommended ESY services included A+ reading, an on-line computer-reading program that was also available for use at home, Earobics, keyboarding, language therapy, and OT. Additionally, the recommendation included the provision of an aide while ███ was at school so that ███ could continue to work on independent functioning. ████ requested that Krystal Moore, ████ current aide, be assigned to work with ███ during the summer. At the time, it was not known whether Ms. Moore would be working during the summer.

96.   On April 24, 2009, the IEP team met to discuss and develop an IEP for Petitioner's upcoming eighth-grade year.  All required participants were in attendance.  Additionally, the parent attended the meeting and discussed the development of the IEP.

97.   During the meeting, ▮▮▮▮▮ for the first time, generally reported the results of the University of Florida evaluation to the school.  The specifics of the actual report were provided at a later time when a copy of the report was provided to the school.  However, at the time of the IEP meeting and based on the parent's representations about the University of Florida evaluation, the team agreed that one weekly 30-minute pull-out speech and language therapy session should be added to ▮▮▮▮ services listed in ▮▮▮▮ IEP.  Additionally, appropriate long-term and short-term goals were established by the team to increase ▮▮▮▮ comprehension, vocabulary, and use of correct grammar.

98.   ▮▮▮▮ also requested that assistive technology be skipped.  The rest of the team concurred since ▮▮▮▮ need for assistive technology was currently being met at school.  As a consequence, the assistive technology form that was part of the IEP only listed that an agenda book would be provided to ▮▮▮ There was no evidence that this form impacted the provision of FAPE to ▮▮▮

39

99.  Additionally, during the meeting, OT was addressed by the OT professional.  She reported that ▮▮▮▮ had mastered ▮▮▮▮ goals for the year.  Therefore, new and appropriate keyboarding goals were established by the IEP team.

100.  Further, as in the past, the IEP team continued PT consultation for eighth grade primarily at the parent's request. The parent's requests for strength building, weight training, and/or stamina building were not shown by the evidence to be remotely necessary for ▮▮▮ to access ▮▮▮▮ education and receive educational benefit from ▮▮▮▮ IEP.  In fact, the evidence showed that ▮▮▮ was able to ambulate normally and access all of the school's property.

101.  Finally, during the meeting, the IEP team also discussed ESY during the summer between seventh and eighth grade.  Again, based on the parent's representations about the University of Florida evaluation, the team arranged for the speech and language therapist to provide ▮▮▮ a copy of the Earobics program she possessed for ▮▮▮▮ use over the summer. The Earobics program, as well as, speech/language therapy would also be provided at the school.  Further, ▮▮▮ would work on a computerized reading program in order to maintain or improve ▮▮▮▮ reading skills.  Additionally, ▮▮▮ would be provided OT to work on ▮▮▮ keyboarding.

102.  The selection of these activities by the IEP team for summer was based on ▓▓▓▓ individualized needs. ▓▓▓▓ parent wanted research on these programs.  The parent also wanted different reading and math curriculum, as well as a higher-level Earobics program than the program supplied by the school.  The parent's concern was that ▓▓▓ had not achieved a passing level on the FCAT in reading or math.  The parent's desire was to close what the parent perceived as a performance gap faster than ▓▓▓▓ current progress.  In fact, the parent did not recognize any progress that ▓▓▓ made in ▓▓▓▓ education that was attributable to the school.  However, the evidence did not support the parent's contention about ▓▓▓▓ progress.

103.  On the other hand, the evidence showed that ▓▓▓ made genuine progress in ▓▓▓▓ education.  The evidence did not demonstrate a need in either ESY or eighth grade for a faster pace given ▓▓▓▓ slow pace in acquiring and demonstrating knowledge.  Additionally, the evidence did not demonstrate a need for different curriculum materials since the materials used by the School Board met ▓▓▓▓ educational needs and provided the opportunity for ▓▓▓ to progress in ▓▓▓▓ education.

104.  Lastly, at the April 24, 2009, IEP meeting, the parent granted permission for the three-year re-evaluation of ▓▓▓ to occur in January 2010.  Selection of the appropriate

41

evaluation and testing instruments was to be determined by the professional performing the evaluation.

105. In this case, the evidence was clear that, at the IEP meeting on April 24, 2009, the rest of the IEP team considered the input of the parent, who was also a member of the IEP team. None of the items on the IEP were predetermined.

106. Further, the evidence demonstrated that the IEP was well-developed and contained all required substantive components, including appropriate annual goals, appropriate statements of services, and appropriate individualization for ███ It also specifically stated the Initiation Date, Duration Date, Frequency, and Location for Consultative Services, Language Therapy, Occupational Therapy, Assistive Technology, Physical Therapy Consultation, school health services, and access to a paraprofessional. The evidence showed that the IEP was reasonably calculated to provide educational benefit to ███ Moreover, there was no competent or credible evidence that any material procedural or substantive violations of IDEA occurred in developing this IEP. However, ███ refused to sign the IEP.

107. Towards the end of seventh grade, the evidence demonstrated that on May 13, 2009, ███ was playing with some friends on the playground during the lunch break. Mr. Ellis was supervising the playground.

42

108.   Both ████ and ████  friends enjoyed professional wrestling.  The group, including  ████  , decided to imitate wrestlers in a wrestling match and began wrestling with each other.  During the course of this play, and before Mr. Ellis could intervene, a member of ████ playgroup and ████ either fell or wrestled each other to the ground.  Petitioner was not body slammed by Petitioner's friend and, given the size of this friend, it was highly unlikely that ████  friend could have body slammed Petitioner.

109.  Mr. Ellis witnessed the incident and immediately intervened to stop the play.  Neither student appeared to be injured.  ████ pants were slightly torn.  Both students resumed playing in a more appropriate manner.

110.  At the conclusion of lunch, ████ attended the class following lunch where ████ met Ms. Moore.  After Ms. Moore observed  ████  , she took Petitioner to the nurse's clinic for minor scrapes that ████ incurred while wrestling.  At the nurse's clinic, ████ reported ████ back hurt.  ████ was examined by the nurse, but did not appear to have any serious injuries.  While at the clinic, Ms. Moore called ████ parent and reported the incident.

111.  The next day, the parent complained to the school that ████ had been "bullied" and "body slammed" to the ground by three "ESE" students.  ████ demanded information from the

43

school, including the names of the other students' parents so that the parent could send █████ medical bills to them.  The parent claimed to base the parent's accusations on what █████ told the parent after school.  The evidence was unclear as to whether ███ misrepresented the facts to the parent or whether the parent misperceived and overreacted to █████ story. Irrespective of why the parent claimed ████ was bullied, █████ view of the facts involved in this incident was grossly inaccurate.

112.  Ultimately, there was no credible evidence that this wrestling incident was part of an ongoing pattern or practice of bullying and/or harassment at the school, but instead was, at most, an isolated instance of rough play between peers. Likewise, there was no credible or competent evidence that this incident or its investigation denied FAPE to ████.

113.  The evidence was clear that the teachers and administrators at the middle school took █████ allegations of bullying seriously and investigated the allegation of bullying by the parent.  The investigation was appropriate and included speaking to the students, as well as the teachers who witnessed the wrestling incident.  The parent's claim that statements of the witnesses to the wrestling incident should have been recorded was not supported by the evidence.

44

114.  Additionally and contrary to Petitioner's allegations, the evidence did not establish any additional incidents of bullying during ████ seventh-grade year.

115.  Further, the evidence showed that throughout █████ time at the middle school, the school took precautions to prevent bullying at the middle school.  Among other things, school personnel maintained a program of hall, lunch room, and playground supervision.  The school also posted anti-bullying signs around the campus to remind students of appropriate behavior.

116.  Moreover, the School Board took a proactive approach to prevent bullying at all of the schools in the district, including the middle school, and developed a "Bullying Plan" and an anti-bullying policy that focused on preventing the behavior. The policies of the School Board were contained in the middle school's student code of conduct and student handbook.  This information was given to all students enrolled in the middle school.  Further, students who engaged in misconduct, including misconduct that constituted bullying, were subject to discipline for that conduct.  The evidence was clear that the students were very aware of the School Board's policies.  Clearly, such action by the School Board provided FAPE to ████  Again, the parent may have desired more programs or different discipline; however, IDEA does not provide a parent with a vehicle to micromanage the

45

enactment of policies by the School Board or the imposition of discipline at schools.

117.  About a month before the end of ████ seventh-grade year, ████ again expressed interest in playing in the band during ████ eighth-grade year.  Again, the band included many students with disabilities.

118.  On May 15, 2009, about two weeks before the end of the school year, the parent inquired about ███ joining the band for ████ eighth-grade year.  At this point in time, ███ had no significant training in music or training on any musical instrument.

119.  ████ was informed that ███ needed to demonstrate some proficiency in music since the eighth-grade band class available to ███ contained students who were trained in music and more advanced than ███  Further, the sixth- and seventh-grade band classes were not available to ███ because the scheduling of the middle school grades did not permit a student in the eighth grade to participate in the sixth- or seventh-grade band classes due to conflicts between the inter-class schedules.  Indeed, there was no credible or competent evidence that a mixed-grade band class could be reasonably created in order to facilitate ████ desire to play in the band.  Moreover, IDEA does not require the creation of such a class.

46

120.   ████ requested that ████ be tested for band.  In an effort to work with the parent, the band director asked ████ to have ████ come by her office to take the band test.  ████ never appeared to take the test.

121.  Around May 31, 2009, the parent brought ████ to the band director's office.  During the meeting, ████ expressed an interest in playing the drums; however, there were no openings in the band on drums.  At the time, the middle school band had a long waiting list of more advanced students who wished to play drums.  Such a waiting list was a normal circumstance for the band.

122.  The band director offered ████ the opportunity to play another instrument and showed ████ what options were available.  One of those instruments was bells.  Additionally, the director attempted to teach ████ to create sound on a wind instrument.  ████ could not blow the reed with sufficient force to create a sound.  ████ was also administered a band test, and again did not perform well.  Petitioner did not know musical notation and could not maintain a rhythm.

123.  In light of ████ poor performance on the music test and the fact that ████ could not produce sound on the wind instrument, the band director informed the parent that ████ needed to take music lessons over the summer if ████ wanted to play in the band during ████ eighth-grade year.  The director

47

suggested a local instructor in Marianna who could provide the lessons.  Alternatively, Ms. Allen offered to personally provide lessons to ████.

124.  The evidence was clear that ████ did not have the required knowledge of music to qualify for or participate in the middle school band.  Further, ████ failed to take advantage of the opportunity provided by the band director and the school to acquire the necessary skills to join the band.  Petitioner failed to produce any competent substantial evidence to support the claim that ████ was denied the opportunity to participate in the band due to disabilities.  Indeed, there was no evidence that ████ was discriminated against or denied FAPE in regards to band.  Moreover, there was no credible evidence that participation in band was educationally relevant to the provision of FAPE under ████ IEP.

125.  The parent would later accuse the band director of discrimination and threaten her with personal liability for such discrimination.  Similarly, the parent would make the same accusations of discrimination against the Respondent.  These accusations were unfounded and appear to be geared toward forcing the school and the band director to enroll ████ in band and/or remake the middle school schedule to accommodate ████ enrolling in the sixth-grade band.  Such actions were not reasonable advocacy on behalf of ████ Unfortunately, such

48

action and misperception by ▮▮▮ would become more frequent and commonplace in the future.

126. Finally, on May 26 and 27, 2009, ▮▮▮▮ again objected to the ESY program and claimed that the program denied FAPE to ▮▮▮ The parent's objections were mostly based on the parent's misperception that the school was required to provide research data on the curriculum and strategies being used during ESY. This demand would also become a perennial demand by the parent. As discussed earlier, this demand was without merit.

127. Additionally, the parent objected that, in the past, progress monitoring regarding these programs had not been provided. The parent also objected to the duration of ESY and the vacation breaks during the ESY period. However, the parent's objections were not supported by the evidence and were appropriately responded to by the School Board. Additionally, as indicated earlier, there was no credible or competent evidence that the ESY 2009 program agreed upon by the IEP team failed to provide FAPE to ▮▮▮

128. Ultimately, the evidence did not demonstrate any material violations of IDEA occurred that continued into the time period relevant in this proceeding.

IEE

129. During the same time period, beginning around April 24, 2009, the parent sent an email to Mr. Larkin, the ESE

49

Director, requesting an Independent Education Evaluation (IEE) at public expense.  That same day, the ESE Director mailed the parent the School Board's policy regarding IEE evaluations and the form to request such an evaluation.  The paperwork also included a list of evaluators in Florida that met the qualifications for evaluators and were pre-approved vendors for JCSB.

130.  The Board's policy on IEE evaluations established geographic and monetary limitations for parental selection of evaluators.  The policy limited the cost of the evaluation to $500.00.  It limited the geographic region to Florida within an area ranging from Tallahassee to the western border of Florida. The purpose of the limitations were to control the expense of the independent evaluation since the school board was responsible for paying travel, lodging, and other expenses associated with the evaluation.  These limitations could be waived by JCSB if a qualified evaluator could not be found within the limits of the School Board's policy.  These waivable limitations were reasonable and complied with IDEA.

131.  The parent picked up an additional copy of the policy, IEE request form, and evaluator list on May 6, 2009. Thereafter, the parent contacted several of the evaluators on the JCSB list.

132.  On May 23, 2009, the parent returned the IEE form to the School Board.  The form did not identify the evaluator the parent chose to complete the IEE.  The lack of the information prevented JCSB from determining if the parent's chosen evaluator met JCSB policy.

133.  Communication between the parent and the ESE director continued about the difficulty the parent was experiencing in finding an evaluator within the limits of the JCSB policy.  At some point, one of the evaluator's the parent contacted recommended Dr. Michael Passler, a neuropsychologist located in Dothan, Alabama, as an appropriate person to do the type of evaluation the parent desired.

134.  Dothan, Alabama is about 40 miles from Marianna with about a 45-minute to an hour drive between the two towns.  While the location was outside Florida, the distance from Marianna was similar to or less than the distance of other evaluators located in the geographic limitations of JCSB's policy.

135.  Around June 4, 2009, the parent forwarded this correspondence to the ESE Director.  The parent sent the letter in order to show that the $500.00 fee limitation was not reasonable.  However, the letter contained the information regarding Dr. Passler.  ████  also advised the Director that the parent wanted the Morris Center in Gainesville, Florida to

do the independent evaluation.  As noted earlier, the Morris
Center performed an evaluation of ▪▪▪ in 2003.

136.  However, Gainesville is over 200 miles from Marianna
with about a three-and-a-half hour drive between the two
communities.  Unlike Dothan, Gainesville was well outside the
distance of other evaluators within the JCSB policy limits.

137.  At some point, the ESE Director contacted Dr. Passler
and verified his qualifications to perform an independent
evaluation.  Indeed, Dr. Passler was qualified to perform an
intensive IEE evaluation.  Later, Dr. Passler was added to the
list of approved vendors for JCSB.  The Director suggested ▪▪▪▪
contact Dr. Passler.

138.  The parent contacted Dr. Passler and was advised that
the cost of the evaluation would likely be as high as $2,000.00.

139.  On June 15, 2009, the parent advised the School Board
of the cost and asked JCSB to waive the $500.00 fee limitation.
The fee limitation was waived by JCSB.

140.  Ultimately, the parent indicated the parent's consent
for Dr. Passler to perform an independent evaluation of ▪▪▪
However, the parent was concerned about Dr. Passler's fee.  The
Director advised the parent that he had agreed to pay for the
IEE by Dr. Passler at the School Board's expense.  As a
consequence, the fee for the IEE was no longer an issue that the

parent should have been concerned about since the parent could obtain the IEE that the parent wanted.

141. Oddly, on June 25, 2009, the parent rescinded the parent's earlier selection of Dr. Passler and demanded that the Morris Center perform the IEE. The parent did not believe that there was anyone in the panhandle region of Florida who was qualified to administer the intense evaluation desired by the parent.

142. On June 30, 2009, the ESE Director was confused and/or baffled by the parent's action. He again mailed the parent the IEE request form so that the parent could complete the form and request the Morris Center or one of the other vendors on the JCSB list. Along with other names, the list contained the name of Dr. Passler. In the meantime, the ESE Director contacted the Morris Center to determine their fee for an independent evaluation. The fee the Morris Center quoted was significantly higher than quotes from other evaluators, including Dr. Passler. The parent presented no evidence regarding the fee for the Morris Center evaluation.

143. On July 7, 2009, the ESE director asked to meet with the parent to resolve the parent's selection of the evaluator for the IEE. The parent complained about the meeting and indicated the parent's unwillingness to discuss the topic further. Therefore, on July 9, 2009, the Director formally

denied the parent's selection of the Morris Center as the
independent evaluator since the Morris Center did not meet the
geographic limitations under the School Board's IEE policy.
Further, the evidence did not support the parent's contention
that the Morris Center was the only location where a
comprehensive evaluation could be done.  On the other hand, the
evidence showed that the ESE director's denial was appropriate
and did not violate IDEA.

144.  On July 13, 2009, the parent sent a letter to the ESE
director restating the parent's position as to why the parent
felt the Morris Center was the only evaluator who could perform
the comprehensive evaluation the parent desired.  The parent
attached a special education evaluation protocol to the letter.

145.  The ESE Director forwarded the protocol to
Dr. Passler for his review.  Dr Passler confirmed he had the
capabilities to perform the evaluation according to the special
education protocol the parent desired.  Dr. Passler's response
was communicated to the parent.

146.  Thereafter, on July 13, 2009, the parent consented to
an evaluation by Dr. Passler, but indicated that the parent did
not consider the evaluation to be independent.  The reason the
parent gave for the parent's position was that the evaluator
should not be "so connected to the way school districts do
business that they have the same low expectations and lack of

54

knowledge/courage to discuss and implement replicable research that will result in . . . learning and closing the achievement gap." However, Dr. Passler had not done business with JCSB in the past. On the other hand, the parent believed a neuropsychology evaluation was appropriate for ███ and should have been performed previously by the School Board. Because of the parent's belief, the parent indicated that the parent would cooperate in accomplishing a neuropsychology evaluation by Dr. Passler.

147. On July 28, 2009, the ESE Director advised the parent to make an appointment with Dr. Passler for the evaluation.

148. Instead of making an appointment, the parent, on October, 16, 2009, after the beginning of ███ eighth-grade year, filed a complaint with the Florida Department of Education regarding the IEE the parent had sought with the Morris Center. The Department found no procedural violations by JCSB regarding the parent's request for an IEE.

149. On December 3, 2009, the parent voiced the parent's objection to the independence of the IEE, but acknowledged that Dr. Passler's evaluation would serve as the IEE the parent had requested. Additionally, in a separate email that was part of a series of emails exchanged with the parent to clarify the parent's April 7, 2009, consent for the required three-year reevaluation of ███ , the parent, on January 12, 2010, in

referring to the Passler evaluation stated, "That is an IEE, not a three year re-eval . . . ."  The parent scheduled an appointment with Dr. Passler for January 18, 2010.

150.  During the same time period, the parent decided that Dr. Passler should only give his report to the parent and not the School Board.  For inexplicable reasons, the parent believed that the School Board should receive the neuropsychology report that the parent insisted was necessary to evaluate ▆▆▆▆ only from the parent.  ▆▆▆▆ engaged in an argument through email with the ESE Director over this issue and discovered that neither the IDEA nor the Florida Department of Education supported the parent's claim to such a right.  However, the School Board, in an effort to meet the parent's concerns over whether the School Board should receive a copy of the report directly from Dr. Passler and in an effort to facilitate the evaluation, agreed that Dr. Passler should only give the report to the parent and advised Dr. Passler of its position.

151.  On January 13 and 14, 2010, a package of information from the School Board that Dr. Passler requested was prepared. The parent picked up the package for delivery to Dr. Passler during the appointment on January 18, 2010.

152.  On January 18th, and before the evaluation could begin, the parent raised an issue regarding the Health Insurance Portability and Accountability Act (HIPPA), a federal health

information privacy law unrelated to IDEA or FAPE.  The issue
arose when Dr. Passler asked the parent to sign an un-amended
release of information so that he could interview or receive
information from JCSB staff who had worked with ███ in the
classroom.  Notably, the evaluation criteria the parent supplied
as part of the parent's demand for an IEE included input from
such personnel.  The parent threatened to file a professional
practice complaint against Dr. Passler if he did not change his
consent and release forms for independent evaluations.
Dr. Passler advised the parent that he would conduct the IEE in
accordance with established procedures.  Indeed, the parent's
position and testimony on this issue was, at best bizarre, given
the fact that the parent felt a neuropsychology evaluation was
necessary in order to develop an IEP for ███  Further, the
totality of the facts regarding the Passler IEE are more
indicative of an attempt to sabotage the IEE which was approved
by Respondent in order to try to force an IEE by the Morris
Center through manipulating the situation to achieve that end or
claim a denial of FAPE.

153.  Ultimately, the parent never followed through with
the IEE allegedly due to the parent's concerns that Dr. Passler
intended to share the results of the IEE with the School Board
and/or interview school staff.  In this case, the evidence was
clear that the School Board did not refuse to provide ███ with

an IEE and did in fact provide the opportunity for an IEE to Petitioner.  However, █████ through the parent's own actions and for the parent's own reasons, sabotaged that effort.  As a consequence the IEE was not completed.  There was no credible or competent evidence to support Petitioner's claim that failing to provide the IEE procedurally or substantively violated the IDEA or denied FAPE to ████

ESY 2009

154.  During ESY 2009, ████ was scheduled to receive five hours of instruction a day over four weeks during the months of June and July 2009, at the Alternative School.  The ESY time period when added to the time period ████ spent in school during the regular school term provided ████ ten and a half months of school a year.  Notably, this amount of school per year met one of the recommendations that would later be proposed in 2011 by Petitioner's expert, Kytja K.S. Voeller, M.D.  Further, the evidence demonstrated that the amount of school offered by JCSB per year provided FAPE to ████

155.  ████ was enrolled in A+ reading, a state-approved reading curriculum.  Additionally, ████ worked on keyboarding skills, handwriting skills, phoneme synthesis, and language synthesis during ESY 2009.

156.  While at the Alternative School, ████ was enrolled in a class of seven and provided both individualized and one-on-one

instruction.  Further, ███ was provided the elementary-level Earobics program so that ███ could work on phoneme synthesis skills.  The evidence demonstrated that the elementary-level Earobics program was the appropriate level for ███ to start on. The Respondent obtained the next level of the Earobics program so that ███ would have it available once ███ progressed to that level.

157.  The staff responsible for █████ education during ESY was provided a copy of █████ IEP and special accommodations. Instruction was individualized based on the ESY teachers' review of the IEP and █████ demonstrated needs.  There was no credible or competent evidence that ESY staff needed more familiarity with █████ accommodations or education on TBI.

158.  As indicated above, ███ was assigned to the Alternative School for ESY 2009.  There was no evidence that middle school ESY services were available at any other school location in Jackson County.

159.  Upon entering the school, Petitioner was subject to daily searches.  These searches were routine and were administered to every person entering the Alternative School, including other students.  There was no competent or credible evidence that these searches violated IDEA or compromised the provision of FAPE to ███.

59

160.  Petitioner also alleged that the Alternative School
was not the least restrictive environment for ESY 2009 due to
the appearance of the facility.  The parent described the
facility as looking like a prison.

161.  However, during the due process hearing, the
undersigned and the parties conducted a view of the Alternative
School.  Notably, the route to the Alternative School passed by
the middle school.

162.  The view revealed that the Alternative School did not
remotely resemble a prison, but looked like an ordinary
elementary or middle school.  In fact, from the outside, it
looked like a smaller version of the middle school.  Other than
████████, no witness familiar with the school thought the school
looked like a prison and most seemed truly baffled by questions
on this point that were asked at the hearing.

163.  On the other hand, the parent's claim regarding the
appearance of the school seemed to be a deliberate attempt to
misstate the facts in order to force the Respondent to provide
ESY at a location preferred by the parent.  However, as
indicated earlier, there was no competent evidence that middle
school ESY was offered at another location in Jackson County.
Again, IDEA does not serve as a mechanism under which the parent
could micromanage the school system's decisions regarding use of
its buildings and facilities.  Further, Petitioner failed to

60

produce any competent substantial evidence to support the parent's claims that providing ESY services at the Alternative School was inappropriate or that it was not the least restrictive environment for ESY during 2009.

164.  Unfortunately, ███ attended only three days of ESY during 2009.  Thereafter, the parent withdrew ███ from the program.

165.  To the parent's credit, the parent provided ███ with the adolescent version of Earobics, as well as a variety of on-line courses during the summer of 2009.  Those on-line courses included Failure Free Reading, FASTT Math and Brain Builder. However, there was no competent evidence regarding these courses relative to ███ ongoing educational program under IDEA.

166.  In addition, at the parent's request, ███ was privately tested during the summer of 2009 by the Sylvan Learning Center.  Again, there was no competent evidence regarding the validity of the Sylvan testing or the interpretation of the data obtained during such testing.

Eighth Grade (2009/2010)

167.  ███ was enrolled in the eighth grade at the middle school during the 2009/2010 school year.  Petitioner was placed in regular classrooms and enrolled in Science III, Math III, Intensive Reading, Physical Fitness, Reading III, Language Arts III, and U.S. History and Career Planning.

168.  As in previous school years, the staff responsible
for ████ education was provided in-service training about TBI.
All staff was provided a copy of ████ IEP and special
accommodations.  There was no credible or competent evidence
that middle school staff needed more education on TBI or more
familiarity with ████ accommodations.

169.  In Science, ████ achieved a grade of C for the first
semester and a grade of C for the second semester.  In Math,
████ made a grade of C for the first semester and a grade of D
for the second semester.  In Intensive Reading, ████ achieved a
C in both semesters.  In Physical Fitness, ████ made an A for
the first semester and an A for the second semester.  In Reading
III, ████ made a C in both semesters.  In Language Arts, ████
achieved a B the first semester and a C the second semester.  In
U.S. History and Career Planning, ████ made a C for the first
semester which increased to a B for the second semester.

170.  While enrolled at the middle school, ████ used
Jamestown Reading Navigator, FCAT explorer, and Accelerated
Reading programs.  These programs, among other things, were
designed to increase ████ reading comprehension and were
individualized for ████ current level of performance.

171.  Importantly, the evidence showed that ███ was vocal
and participated in ████ eighth-grade classes and participated
in a class play during ████ eighth-grade year.  Moreover,

███ reading level was about the same as the average student

in ███ eighth-grade accelerated reading class.  Notably,

███ reading level increased from a sixth-grade level to a

seventh-grade level during ███ eighth-grade school year.  In

fact, ███ was proud of ███ achievement.

172.  The increase in ███ reading level was documented

by a variety of testing and progress-monitoring tools provided

for use with the state-approved reading materials used in ███

reading classes.

173.  Further, ███ reading lexile level increased from

530 to 1205 during ███ eighth-grade year according to the

Florida Assessment in Reading, a state-approved assessment tool.

A lexile reading measure is a numeric measure of an individual's

reading comprehension.  It is not a grade equivalency measure.

Notably, ███ blossomed in Intensive Reading and similarly,

increased ███ reading level in that class.

174.  ███ also made adequate yearly progress (AYP) in both

Reading III and Intensive Reading.  AYP is a measure of a

student's progress based on the difference between an individual

student's beginning level of performance and ending level of

performance over the course of a school year.  In its simplest

terms, progress is adequate if the student achieves a year's

worth of educational growth during the year.  AYP is not based

on the grade the student is enrolled in, but on the student's

increase in their individual level of performance over time.
Importantly, the student's individual level of performance may
be higher or lower than the grade the student is enrolled in.

175. At hearing, Tamara Johnson, ▆▆▆▆ Intensive Reading
teacher, testified that she falsified ▆▆▆▆ first semester
Intensive Reading grades because she was instructed by Amber
Tucker, the ESE coordinator for the middle school, that it was
JCSB policy to not give an ESE student less than a grade of C.
Ms. Tucker denied Ms. Johnson's claim.

176. However, Ms. Johnson's testimony about the first-
semester grade she gave ▆▆▆▆ was not credible. At the time of
the hearing, Ms. Johnson was embroiled in a claim of retaliation
against JCSB over her termination for sexually harassing two
male teachers. She was also under licensure investigation by
the Educational Practices Committee of the Florida Department of
Education. More importantly, the clear and uncontroverted
evidence demonstrated that, contrary to her testimony,
Ms. Johnson gave several ESE students grades lower than a C,
including some grades of F, during the time period relevant to
this case.

177. On the other hand, ▆▆▆▆ grade of C in both classes
reflected ▆▆▆▆ progress in reading. Further, there was no
competent or credible evidence that demonstrated ▆▆▆▆ progress
in reading was not valid.

178.  Additionally, ████ made adequate yearly progress in ████ math class. ████ FCAT score in math also showed a year's growth while enrolled at the middle school.

179.  Ultimately, because of ████ grades and the progress ████ demonstrated, ████ was promoted to ninth grade.  The fact that ████ did not achieve a passing level on the FCAT assessment in either reading or math was not relevant since AYP does not depend on passing that assessment.  Moreover, there was no credible or competent evidence that ████ eighth-grade FCAT scores of Level I in math and reading were indicative of a lack of progress in ████ education.  In fact, ████ FCAT scores in math and reading showed adequate progress in both areas.

180.  Further, the fact that ████ did not achieve a passing level on the FCAT or perform on grade level in reading does not lead to the conclusion that JCSB failed to provide FAPE to ████ As demonstrated by the evidence, ████ made meaningful educational progress during the year based on Petitioner's beginning and ending levels of performance during ████ eighth-grade school year.  Given the fact that TBI slows ████ ability to learn and process information, it is not surprising that achievement gaps have developed in ████ levels of performance in reading and math.  The IEP and the pace of ████ education, among other things, were designed to work on closing those gaps at ████ pace.  While the parent may wish to see faster

65

progress towards closing those gaps, the evidence did not demonstrate that attempts to close those gaps can or should occur at a faster or more intense pace in order for ██████ to receive FAPE.

181. Indeed, the evidence showed that the services and accommodations established by ██████ eighth-grade IEP were provided and that the methodologies, techniques, and curriculum used by staff were reasonably calculated to achieve the goals established in the IEP. Again, there was no competent or credible evidence that material violations of FAPE occurred in the execution of ██████ eighth-grade IEP.

182. On September 17, 2009, Tessa Schirm, Petitioner's eighth-grade Language Arts teacher, divided her class into groups of three to work on an assignment. Coach Windsor was present in the class since he was the substitute aide for ██████ and two other students.

183. One group formed by Ms. Schirm consisted of ██████ ████, and ████ ████ was one of ██████ friends. ██████ was placed in another group of three. During the activity, ██████ engaged in a bout of name-calling with the members of the ████ group. The name-calling was meant to be funny and was a juvenile attempt at play among schoolmates. ██████ became angry when ██████ called ██████ a "retard" or "retarded." Thereafter, the game ceased.

184.  Ms. Schirm did not hear the four students calling each other names during the class.  More importantly, the evidence did not show that the name-calling incident was bullying.  On the other hand, the evidence showed that the incident was play between students.

185.  As noted earlier in this order, ███ was sensitive about being labeled as less than intelligent.  However, the evidence demonstrated that ███ went about the rest of the school day and was not significantly affected by the name-calling incident.

186.  Further, ███ did not report the incident to either the teacher or the aide.  However, at some point during the evening after school, ███ complained to ███ about being called names in Ms. Schirm's class.  Apparently, ███ did not tell the parent that ███ also engaged in the activity with the other group or that the activity started off as play.

187.  The next day, ███ complained to the school about bullying in Ms. Schirm's class.  The incident was investigated.  The teacher and the students, including ███ , were interviewed.

188.  On September 21, 2009, the parent demanded that Respondent pay the fees of ███ existing counselor.  However, the evidence did not demonstrate that such a demand was

justified.  Further, the evidence does not demonstrate that ████
was discriminated against or denied FAPE.

189.  At about the same time during the eighth-grade school
year, applications to participate on the committee to create the
school's yearbook were sought by Ms. Schirm.  The evidence was
not clear whether Ms. Schirm was the teacher or the advisor to
the yearbook committee.  In addition, the evidence showed that
Greta Charles was not a teacher or advisor to the yearbook
committee.  In fact, Ms. Charles only helped input information
into a computer for the yearbook committee, but was not
otherwise materially involved with that committee during ████
eighth-grade year.

190.  The application for the yearbook committee required
all students to obtain the recommendation of two teachers.  This
requirement was reasonable.  There was no other competent
evidence regarding the criteria for selection of the students
for the yearbook committee.  However, the evidence showed that
Ms. Schirm received many more applications than available slots
on the yearbook committee.

191.  ████ wanted to be on the yearbook committee.  Towards
that end, ████ obtained an application and asked Ms. Gardner,
████ sixth-grade reading teacher, to recommend Petitioner for
the committee.  Ms. Gardner happily complied with the request.
However, for unknown reasons, ████ did not obtain a second

68

teacher recommendation as required by the application.  ▇▇▇▇ turned in the application with only one recommendation.  As a consequence, ▇▇▇▇ was not selected for the yearbook staff and was upset by that non-selection.  In fact, there were many students who were not selected for the yearbook committee and were upset to the point of tears by their non-selection.

192.  In this case, the evidence demonstrated that ▇▇▇▇ was given the same opportunity to apply for the yearbook as every other student.  ▇▇▇▇ was provided the opportunity to complete the same form as other students who applied for the yearbook committee.  There was no competent or credible evidence that, unlike other students, ▇▇▇▇ should not be required to meet the same requirement to provide two teacher recommendations on that form.  Moreover, the parent's assertion that ▇▇▇▇ education required participation on the yearbook committee in order to foster ▇▇▇▇ self-esteem and acceptance at school was speculation.  Indeed, there was no competent or credible evidence to support such an assertion.

193.  Unfortunately, ▇▇▇▇ parent eventually accused the School Board and staff of discrimination against ▇▇▇▇ because ▇▇▇▇ was not selected for the yearbook committee.  However, there was no competent or credible evidence that ▇▇▇▇ was discriminated against or denied the opportunity to participate on the yearbook committee at the middle school due to ▇▇▇▇

69

disability.  Further, the IEP team did not determine that such participation was necessary in order for ▇▇▇ to receive FAPE.  Additionally, there was no competent or credible evidence that participation on the yearbook committee was necessary in order for ▇▇▇ to receive FAPE.  Again, the parent's actions in regards to the yearbook committee were not reasonable advocacy on behalf of ▇▇▇.

194.  At about the same time as applying for the yearbook committee, ▇▇▇ became interested in trying out for the middle school basketball team.

195.  The evidence showed that ▇▇ enjoyed and played basketball during ▇▇▇ physical education classes in middle school.  Additionally, the evidence showed that ▇▇▇ also played basketball for one of the Marianna-sponsored city league teams.  The evidence was not clear when ▇▇▇ played on the city league team or whether such play occurred during ▇▇▇ seventh, eighth, or ninth-grade years.  The evidence also was not clear as to the extent of ▇▇▇ play on the city league team.  Additionally, the evidence did not demonstrate that because of ▇▇▇▇ participation on a city league basketball team, Petitioner possessed the necessary skills or stamina to make or play on the middle school basketball team.  On the other hand, such play on the city league team demonstrated that, contrary to the parent's

assertion, ▮▮▮ possessed sufficient arm strength and stamina to write for 45 minutes to an hour without becoming too fatigued.

196.  Around October 15, 2009, Petitioner tried out for the basketball team at the middle school.  Brad Cross was the coach of the middle school basketball team when ▮▮▮ tried out.

197.  At the time, about 30 or 40 other students also tried out for the team.  Selection for the team was on a competitive basis and was based on the skills and stamina needed to play a game of basketball under competitive conditions.  There was no credible or competent evidence that the selection criteria for the eighth-grade basketball team were inappropriate or discriminatory.

198.  In fact, the evidence was clear that ▮▮▮ was given the same opportunity to try out for the team as every other student.  ▮▮▮ participated in the same sprints, suicide drills, basketball skirmishes, and skills assessments as the other students who were trying out.  However, ▮▮▮ generally dribbled the basketball while looking down instead of looking up, impeding ▮▮▮ ability to observe activity on the court.  ▮▮▮ also dribbled the basketball with more of the palm instead of the fingertips, thereby lessening the quickness of maneuvering the ball.  Additionally, ▮▮▮ did not have the stamina the coach wanted to see in his middle school basketball players.  During the tryouts, ▮▮▮ failed to demonstrate the ability to sustain

71

increased physical activity for at least half an hour.  Such
stamina was necessary in order to have the ability to sustain an
acceptable level of play during a school basketball game without
fatigue impeding the quality of play.

    199.  Like many other students who tried out that year,
████ did not make the team because ████ was not as skilled at
basketball as other students who made the team.  The students
who made the team had more advanced or developed skills than
████ , as well as greater stamina than ████.

    200.  ████ was upset when ████ did not make the basketball
team.  ████ encouraged ████ to send an email to Coach Cross
inquiring as to the reasons Petitioner was not selected for the
team.  Coach Cross responded with an email outlining the areas
in which ████ needed to improve in order to potentially make the
team the following year.  In particular, Coach Cross advised
Petitioner to begin to run a little bit every day, increasing
the distance as ████ got into better shape.  The goal was to be
able to easily run for about half an hour.  Such stamina
building could easily be implemented at home.  However, from the
evidence, ████ was not self-motivated enough to work on ████
stamina and did not begin a program of running or walking at
home.  Moreover, the parent did not appear to encourage ████ to
begin running or walking at home.

201.  As in the past, the parent accused Coach Cross and
the Respondent of discrimination against ████ for not permitting
████ to be on the basketball team.  Again, these accusations
appear to be made in order to force the School Board to let ████
play on the eighth-grade basketball team and/or obtain services,
such as weight training or stamina building, that were not
educationally relevant for ████ to access ████ educational
environment.  Further, the parent's actions were not reasonable
advocacy on behalf of ████.

202.  Additionally, the parent's speculative assertion that
████ education required playing on the basketball team in
order to foster ████ self-esteem and acceptance at school was
misplaced.  Neither self-esteem nor acceptance by peers can be
achieved by permitting a student to play on a team upon which
that student has not meritoriously earned the right to play.
Moreover, the parent's assertion ignored the fact that self-
esteem is also developed by a student in learning to
appropriately deal with that student's failures.  Further, the
parent's speculative assertion that ████ education required
playing on the basketball team in order to achieve ████
"career" goal of playing college-level basketball at the
University of Florida was similarly misplaced.  Playing
basketball in college is not an appropriate career goal under
IDEA and was not an appropriate goal for ████  Moreover, the IEP

team did not conclude and there was no competent or credible evidence that participation on the eighth-grade basketball team was required in order for ▪▪▪▪ to receive FAPE under IDEA. Finally, there was no credible or competent evidence that demonstrated Respondent discriminated against ▪▪▪▪ based on ▪▪▪▪ disability.

203.  In addition to trying out for basketball, ▪▪▪▪ also played some basketball during ▪▪▪▪ PE class.  During that class period, ▪▪▪▪ and ▪▪▪▪ shared PE time with ▪▪▪▪ The evidence was not clear how often these two students actually interacted with ▪▪▪▪ during PE.

204.  At some point between January 28, 2009, and February 1, 2010, ▪▪▪▪ told ▪▪▪▪ that on January 28, 2010, ▪▪▪▪ and ▪▪▪▪ were laughing and making fun of the way ▪▪▪▪ played basketball and said that ▪▪▪▪ was always missing the basket because ▪▪▪▪ did not know how to shoot.  Allegedly, the PE coach was not present at the time and Krystal Moore, ▪▪▪▪ aide, was occupied with one of her other charges.

205.  However, on January 28, 2009, ▪▪▪▪ was not at school. Additionally, on January 28, 2009, ▪▪▪▪ was not in PE class because ▪▪▪▪ was in OT with Amy Nobles, ▪▪▪▪ OT specialist. The evidence was not clear why this story was fabricated.

206.  On February 1, 2010, the parent emailed Coach Cross to complain about the alleged ▪▪▪/▪▪▪ incident and advise him

that, because the school received federal funds, he could be
personally liable for discrimination for failing to stop
bullying by these students.  The language regarding federal
funds, discrimination, and personal liability would eventually
become boilerplate in most of ██████ emails where the parent
voiced any complaint about █████  treatment at school, █████
non-selection for extracurricular activities, or █████
education.

207.  That same day, Krystal Moore tried to talk to █████
about the alleged incident.  There was no evidence that
Ms. Moore was mean or treated █████ in any manner that would
intimidate █████  After school, █████ complained to ██████  about
Ms. Moore asking █████ questions regarding the alleged incident.
Instead of reassuring █████ that there was no need to be afraid
or intimidated when someone in authority was doing their job and
only trying to find out what happened, the parent asked that
█████ not be interrogated unless the parent was present.  The
school also interviewed ██████, █████ and Amy Nobles wherein, it
was discovered that neither █████ nor █████ was present in PE that
day.

208.  Understandably, █████ was upset by ██████ accusations
and confronted █████ about them on February 2, 2010.  Allegedly,
█████ had some of the accusations wrong.  During that
confrontation, it was reported that █████ threatened to beat up

████ if ███ reported ████ again.  The episode was not bullying by ████ but a dispute between two students.  On this occasion, ████ was disciplined by school staff for ████ remarks to ████

209.  ████ complained to the school about its interview of ███ during its investigation.  The parent accused the school of feeding false information to ████

210.  However, there was no evidence that the school's investigation was inappropriately conducted or that the school fed false information to ████  Indeed, it was appropriate for the school to investigate █████ complaint.

211.  In the meantime, ████ emailed or wrote a note to ████ about the confrontation and stated that ████ should have told ████ to quit bullying ████ if ████ did not want to get in further trouble.

212.  ████ also complained to the principal of the middle school about alleged bullying that occurred on February 26, 2010, during a lunchtime football game among several students, including ███  The alleged bullying occurred when one of the players became angry for reasons that were not clear and allegedly shoved ███ and another student.  However, the evidence showed that this incident was not bullying, but another instance of rough play that got out of hand.

213.  █████ again, reminded the principal about federal funds, discrimination, and personal liability.  However, there

was no credible or competent evidence to demonstrate that any
bullying occurred.  Moreover, there was no competent or credible
evidence that the process used by the School Board to
investigate the parent's allegations denied FAPE to ▮▮▮▮
Likewise, there was no competent or credible evidence that ▮▮▮▮
was discriminated against because of this incident.

214.  Notably, in regards to the football incident, ▮▮▮▮
also complained about ▮▮▮▮ aide not being with ▮▮▮▮ during the
lunch period.  The evidence showed that the parent's position
regarding whether an aide should accompany or not accompany ▮▮▮▮
vacillated depending on whether ▮▮▮▮ complained about ▮▮▮▮
lack of independence or complained about ▮▮▮▮ being bullied.

215.  Lastly, in regard to Petitioner's allegations of
bullying, ▮▮▮▮ , on April 20, 2010, reported to Ms. Hinson
that ▮▮▮▮ stabbed ▮▮▮▮ hand with a pencil during class that
day.  Such an accident was not uncommon in the eighth grade.
Notably, ▮▮▮▮ did not report that ▮▮▮▮ stabbed ▮▮▮▮ in the hand
and there was no evidence that ▮▮▮▮ stabbed ▮▮▮▮ in the hand
since ▮▮▮▮ initial and only report to Ms. Hinson was accurate.

216.  Ms. Hinson looked at ▮▮▮▮ hand.  She did not see
any blood, but could see where the pencil had entered ▮▮▮▮
hand.  She sent ▮▮▮▮ to the school nurse.

217.  At the nurse's clinic, ▮▮▮▮ reported that ▮▮▮▮
stabbed ▮▮▮▮ in the hand.  ▮▮▮▮ was laughing about the incident

and did not want to call the parent.  Again, ▓▓▓▓ did not report
that ▓▓▓▓ stabbed ▓▓▓ in the hand.  The nurse cleaned the area
and sent ▓▓▓ back to class.  At the time, ▓▓▓▓ did not tell
▓▓▓▓  parent about the stab wound on ▓▓▓▓  hand.

218.  In addition to the parent's complaints regarding
bullying, the evidence demonstrated that around the middle of
August 2009, close to the beginning of the eighth-grade school
year, the School Board received a complaint from ▓▓▓▓  that
there was a potential mold problem at the middle school.  The
parent, again, reminded personnel about federal funds,
discrimination, and personal liability.

219.  During that year, the evidence demonstrated that ▓▓▓▓
did not attend classes in the classroom where the mold problem
was alleged to have occurred.  Indeed, the evidence showed that
▓▓▓▓ was able to and did attend school that year.

220.  Around November 20, 2009, the parent forwarded the
parent's complaint regarding mold to the Inspector General at
the U.S. Department of Education.  The Inspector General
forwarded the complaint to the Environmental Protection Agency.

221.  Eventually, around June 10, 2010, and after the
school year ended, the School Board hired Southern Earth
Sciences, a mold testing and remediation specialist, to test the
building for mold.  Even though some of the furniture and part

of the ceiling appeared to be stained, the tests revealed that
there was not a mold problem at the middle school.

222.  More importantly to this case, there was no competent
or credible evidence that any mold at the school impacted the
provision of FAPE to ████  Likewise, there was no competent or
credible evidence that any mold at the school impeded █████
equal access to FAPE or impeded █████ equal access to school
facilities.  Again, the parent's claims regarding discrimination
and/or violations of IDEA because of the impact of mold at the
middle school were unrelated to █████ education and were
without merit.

223.  Around February 20, 2010, during the second semester
of eighth grade and in relation to █████ education, the school
psychologist, Nell Swails, reevaluated ████  As indicated
earlier, ████ parent consented to the reevaluation.  There
were no material procedural violations shown by the evidence in
regards to this reevaluation.

224.  During the reevaluation, the Woodcock Johnson-III
Test of Achievement was administered by the school psychologist.
As indicated earlier, this test looks at a person's achievement
in three areas:  Broad Reading, Broad Written Language, and
Broad Math.  ████ scores in each of these areas were 107, 91,
and 76, respectively.  The grade equivalency for Broad Reading
was 10.5, for Broad Written Language, 6.7, and for Broad Math,

4.7.  The Total Achievement score was 91, with a grade equivalent of 7.0.  The Total Achievement score was in the average range.

225.  ███████ scores on the subtests in the Woodcock Johnson III were scattered with high average scores on subtests involving reading fluency, spelling, and reading recognition.  ██████ scored lowest on subtests involving the application of mathematics and written expression.  However, the weakness shown in the area of math was due, in part, to the fact that █████ could not use a calculator on the math portions of the assessment and was not motivated to perform on the math portions of the assessment.  Additionally, the weakness shown in the area of math was due, in part, to the increasingly abstract math involved in the assessment.  However, both the weakness in math and written expression also reflected the fact that █████ continues to have difficulty spontaneously retrieving learned information.

226.  Likewise, the results from the Comprehensive Test of Nonverbal Intelligence (C-TONI) were in the average range.  The scores were similar to the scores █████ received on the C-TONI assessment █████ took in 2006.

227.  However, the Peabody Picture Vocabulary Test III scores were in the high average range (111) with a grade equivalency score of 11.3.  The test scores showed improvement

80

over the test scores on the Peabody Picture Vocabulary Test ████
took in 2006.

228.  Additionally, the Children's Memory Scale, which
assesses memory and learning abilities, was average overall.
The scores ranged from above average on the Visual Immediate
Index score and the Attention/Concentration score to borderline
on the Delayed Recognition score.  This scattering of scores on
the Children's Memory Scale indicated that ████ was learning
information well, but continuing to have difficulty in
retrieving the information Petitioner learned.

229.  More importantly, the 2010 Swails' evaluation
reflected that ████ had progressed in ████ cognitive abilities
and educational goals.  Additionally, the 2010 Swails'
evaluation was consistent with earlier evaluations of ████
educationally-relevant strengths and weaknesses.  Ms. Swails
recommended continued fading of ████ aide and some strategies
to help ████ maintain focus.  The recommendations that could be
accommodated in a regular education classroom were already
incorporated in ████ IEP.

230.  Around March 19, 2010, the school sent a copy of the
Swails' evaluation to ████ and emailed the parent with several
suggested dates for a meeting to discuss the evaluation.  The
parent did not respond.  On March 25, 2010, another email was
sent to the parent along with a notification for a meeting to

discuss the evaluation.  The notice scheduled the meeting for April 7, 2010.

231.  On April 5, 2010, ████ responded that ████ was not available to meet on April 7, 2010.  The parent also voiced the belief that the Swails' evaluation was not thorough and the data was incomplete.  ████ also mentioned that ████ was attempting to obtain independent evaluations on ███  However, at this point, the IEE evaluation by Dr. Passler had already been sabotaged by ████  The parent additionally suggested some dates in the middle of May 2010, for the IEP meeting.

232.  Thereafter, the School Board contacted the parent to discuss extending ████ April 24, 2009, IEP which was required to be annually reviewed by April 24, 2010, prior to the end of the current school year.  The School Board properly noticed a meeting to discuss extension of the IEP for April 20, 2010, by sending multiple Meeting Participation Forms dated April 7, 2010 and April 8, 2010, to the parent.  The notice provided sufficient time for the parent to prepare for the IEP meeting and met the requirements of the IDEA.

233.  On April 20, 2010, the IEP team met to discuss the extension of the April 24th IEP and to discuss a plan to meet in the future to develop an IEP for Petitioner's upcoming ninth-grade year.  The parent attended this meeting and fully discussed the extension of the IEP.

234.  At the meeting, the IEP team extended the April 24, 2009, IEP to June 4, 2010.  However, the parent refused to sign the extension without an annotation that the parent felt the parent was not allowed "to be an equal participant & fully participate" in the IEP meeting.  The notation was placed in the record of the IEP meeting.  The evidence demonstrated that the parent was provided the opportunity and did fully participate in the April 20th IEP meeting.

235.  Ultimately, Petitioner alleged that the School Board failed to have a valid IEP in place for the period of time between April 23, 2010, and June 7, 2010.  However, clearly this allegation was not supported by the evidence in this case since the IEP was extended.  Moreover, the few days remaining between the end of the extended IEP and the creation of a new IEP on June 7 and 21, 2010, was not shown by the evidence to be materially relevant to the provision of FAPE in this case.

ESY 2010

236.  After the meeting to extend the April 24th IEP, the School Board, around May 7, 2010, and prior to the end of ████ eighth-grade year, attempted to set up a meeting with the parent to discuss ESY for the summer of 2010 and draft a new IEP for ████ ninth-grade year.  The meeting was delayed because the ESE Director wanted to obtain ████ FCAT scores on the subtests for math and reading.  The subtest scores provided information

83

in the areas of math and reading on which ███ needed to work over the summer. However, for reasons not involving JCSB, the FCAT scores for all rising high school students in Florida were delayed and not available for use in planning for ESY. The evidence demonstrated that, while FCAT information would have been useful in planning ESY for ███ , such information was not necessary in order to develop an appropriate ESY program that provided FAPE to ███

237. Eventually, through a series of emails between the School Board and the parent, a meeting was set for June 1, 2010, to finalize an educational program for ESY 2010. The date for this meeting was coordinated with the parent and allowed sufficient time for the parties to prepare for the meeting. Later, the parent was provided a formal written notice of the meeting. There were no material procedural violations regarding the scheduling of the June 1, 2010, meeting. Moreover, the delay in holding the meeting did not materially affect the provision of FAPE to ███ or, otherwise, violate IDEA.

238. Additionally, through a series of emails and conversations, the School Board and the parent each outlined draft proposals for ESY 2010. The School Board's proposal was provided to the parent on May 20, 2010. The draft proposed that ESY should be provided at the high school so that ███ could become familiar with ███ assigned school for the fall. The

School Board also proposed that ESY instruction occur during a three-hour period from 8:00 a.m. to 11:00 a.m. over the regularly established four-week period in June and July for ESY in Jackson County.  Additionally, the Board proposed that ███ receive instruction in BrainBuilders, an online cognitive therapy program with which ███ had worked, as well as, math and reading curriculum with certified math and reading instructors.

239.  On May 27, 2010, the parent proposed ESY for a longer period of time during the summer with the use of specific curriculum, methodologies, and/or strategies.  Essentially, the parent wanted five-and-a-half hours of instruction per day for nine weeks during the summer.  The parent's goal was to try to close ████ "achievement gap" using a variety of curriculum, methodologies, and strategies that the parent specified.

240.  The "gap" the parent referred to was generally related to the difference between the level I scores ███ achieved on the FCAT assessment and the level III scores needed to demonstrate proficiency or "pass" that assessment.  The "gap" also referred to the less than eighth-grade level in reading and math that ███ achieved on some of the assessments of ███ that were completed in the past.

241.  The parent proposed OT on handwriting to enable ███ to plan and write a 45-minute essay and PT to enable ███ to join band and basketball.  The curriculum the parent proposed

included Earobics, intensive reading with the Failure Free
Reading program, intensive math with a variety of math programs,
and reading/writing with the SIMS Sentence Writing and Paragraph
Writing program.  With the exception of Earobics, there was no
competent or credible evidence that any of the parent's proposed
curriculum, methodologies, or strategies were approved for use
in Florida or provided instruction in a manner that was not
already adequately provided by JCSB through the use of other
curriculum, methodologies, or strategies on which its teachers
were trained.  In particular, there was no evidence that JCSB
teachers were trained in the SIMS curriculum and methodology.
In fact, the scheduling of this case interfered with and
prevented staff that was to be trained in the SIMS curriculum
and methodology from attending that training because Petitioner
required the staff member to be a witness in this case; thereby
defeating the parent's future requests that the SIMS curriculum
and methodology be provided to ███  Further, there was no
evidence that the parent's proposed curriculum provided any
instruction, methodologies, or strategies that ███ was not
receiving or was, otherwise, required in order for ███ to
progress in ███  education.

242.  The parent attended the June 1, 2010, meeting and
participated in the discussions regarding an educational program
for ███ over the summer.  The evidence was clear that ESY

services were not predetermined by the School Board.  Further,
the evidence was clear that the parent had meaningful input into
these ESY services.

243.  The IEP team decided that the purpose of the 2010 ESY
program was to help ███ transition into the high school
environment and become familiar with the high school campus
prior to the start of school in the fall.  Additionally, the
purpose of the 2010 ESY program was to enable Petitioner to
maintain skills achieved during eighth grade and to work on
skills that were emerging at the end of eighth grade.

244.  Towards that end, the IEP team decided that the ESY
program was to be provided for three-and-a-half hours, Monday
through Thursday, from 8:00 a.m. to 11:30 a.m. for four weeks
during June and July 2010.

245.  The IEP team also agreed that, while at school, ███
was to receive reading with a certified instructor, math with a
certified instructor, Brainbuilders, Earobics, language arts
with a concentration on writing, OT on handwriting, and
consultative PT.  The specific curricula for math and reading
was to be chosen by the certified instructors based on their
review of the data the school had on ███ in those areas and on
the training the instructors had in the use of specific
curriculum relative to those areas.  ███ was also to be
provided help to familiarize ███ with the high school campus,

87

as well as, practice with opening a locker at the high school.
Additionally, ███ was to be provided a watchminder to help with
█████ focus and attention, as well as, continue to wean ████
from the necessity for an aide.

246.  Prior to the start of ESY, the SIMS Reading/Writing
program was reviewed to see if it met the state educational
requirements of the school, the training of JCSB teaching
personnel, and █████ need to practice essay writing skills.  As
indicated earlier, there was no evidence regarding the SIMS
program.  Ultimately, another reading/writing strategy program
was used by the School Board during ESY 2010.

247.  During the summer of 2010, ████ in fact attended ESY
at the high school.

248.  Rico Williams was one of ████ ESY teachers.
Mr. Williams worked on Brainbuilders and Earobics with ████  ,
as well as, pre-algebra skills in order to prepare ████ for
Algebra I-A in high school.

249.  Progress monitoring was a component of both the
BrainBuilders and Earobics programs.  Mr. Williams completed
such monitoring for both programs during the summer.
Unfortunately, the computer-based progress monitoring for
Brainbuilders and Earobics was lost when some problems with the
school's computers occurred.  There was no evidence that the
loss of this data denied FAPE to  ████

250.   More importantly, Mr. Williams also completed assessments and tests of ████ math skills.   These assessments and tests were sent home with ███ to give to █████   The parent wanted more progress monitoring on ███  However, there was no competent or credible evidence that more monitoring was necessary in order to keep the parent apprised of ████ progress during ESY.   Additionally, there was no competent or credible evidence that any further monitoring was needed to provide FAPE to ███

251.  Rico Williams also walked with ███ around the high school campus in order to familiarize ███ with the school's environment.   He also helped ███ practice opening a locker at the high school.   Notably, by the end of ESY, ███ could open a locker and get around the high school campus without help.

252.  Ms. Tulani Honablew was █████ reading and writing teacher during ESY 2010.  She used the Six + Trait strategy for writing and the UNRAVEL strategy for reading.  Both strategies were peer-reviewed strategies and were strategies on which Ms. Honablew was trained.  Both strategies were appropriate for ███ and provided ███ an opportunity to progress.  On the other hand, there was no competent or credible evidence that the SIMS strategies were required for ███ to receive FAPE.  Similarly, there was no competent or credible evidence that Ms. Honablew,

or any other certified teacher, was trained in the SIMS strategies.

253.  Progress monitoring for reading and writing was accomplished through the DAR, an approved diagnostic reading assessment, as well as through teacher observations.  ████ was able to implement the strategies used in ████  reading and writing program.  More importantly, by the end of ESY, ████ progressed in ████  writing and reading comprehension skills. Again, while the parent may have wanted more progress monitoring, there was no competent or credible evidence that more progress monitoring was required in order to keep the parent apprised of ████  progress.  Additionally, there was no competent or credible evidence that more progress monitoring was required in order to provide FAPE to ████

254.  Finally, during ESY 2010, ████ was provided with a watchminder.  As indicated earlier, one of the purposes of the watchminder was to aid ████ in remaining on task by reminding ████ to pay attention in order to minimize the effect of distractions.

255.  Towards that end, the watchminder was set to alert ████ at 15-minute intervals throughout the day.  However, even with this level of intervention, ████ occasionally became distracted by or over-focused on the watchminder.  On those occasions, ████ would remain off task because of the

90

watchminder.  Thus, the watchminder had mixed efficacy towards
████  goals during ESY 2010 and was itself a source of
distraction for ████

256.  On the other hand, the parent wanted the watchminder
programmed with reminders every five minutes for staying on
task, plus additional alarms one minute before each class change
and one minute before the beginning of each class, as well as,
alarms for the bus, to get books, take books home, bring
assignments to school, etc.  Unfortunately, the watchminder
could not be programmed in the intensive manner desired by the
parent.  Moreover, there was no competent or credible evidence
that the programming desired by the parent was possible with any
assistive technology device, feasible in an education setting,
or required by IDEA in order to provide FAPE to  ████

257.  Ultimately, the evidence showed that ████ progressed
in the 2010 ESY program and that the program provided FAPE to
████  Additionally, there was no competent or credible evidence
that a longer or more intense program was required by IDEA in
order for ████ to continue to progress in ████  education.

June 7, 2010 IEP Meeting

258.  At about the same time that the meeting to develop
████  ESY program was being set, the parties, again through a
series of emails, established a date of June 7, 2010, for an IEP
meeting to develop an IEP for ████  upcoming ninth-grade year.

The written notice for the meeting was provided to the parent around May 26, 2010.  The notice met the requirements of IDEA and allowed adequate time for the parent to prepare for the meeting.

259.  In fact, the parent had time to and did develop a parent proposed IEP (PPIEP) for ███ that was submitted in summary form to the School Board around June 5, 2010.  Later, on June 6, 2010, the parent submitted a complete and very detailed, 17-page parent-proposed IEP to the School Board.  The parent's proposals were distributed to all the relevant IEP team members who reviewed it in preparation for the IEP meeting.

260.  Among other things, the parent proposed IEP recommended annual academic goals for ███ , such as, ███ was to achieve an "A" or "B" on every assignment or test with a "C" or better on end of course exams; ███ was to earn a minimum of six credits per semester; and ███ was to maintain a grade point average of "no less than" 3.0.  Further, every grade of less than a "B" was to be reviewed to determine if the grade was related to ███ disability with reports and assignment adjustments provided to the parent within seven days of ███ receipt of the "low grade."  The PPIEP also recommended annual academic goals that ███ was to achieve a reading lexile level of 1250 and "master all math facts to automaticity."

261.   Automaticity is a concept in learning theory.  It is generally defined as the ability to do a task without occupying the mind with the low-level details required in accomplishing that task.  In short, the performance of a given task over time becomes an automatic response pattern or habit that is performed with little to no thinking.  Importantly, automaticity generally is acquired through learning, repetition, and practice, which opportunities were already provided to ▮▮▮▮ , as well as all other students through their education in Jackson County public schools.

262.   However, more to the issues involved in this case and based on the evidence, these annual academic goals were not appropriate or reasonable goals for ▮▮▮▮ and were not required in order for ▮▮▮ to receive FAPE.  Moreover, the PPIEP goals involving intense progress monitoring were not required for ▮▮▮▮ to access ▮▮▮▮ education or have the opportunity to progress in that education.

263.   The PPIEP also recommended social and physical goals for ▮▮▮▮ , such as, ▮▮▮▮ was to participate with peers in extracurricular activities for at least eight hours a month through band and basketball; and ▮▮▮▮ was to improve stamina and gait so that ▮▮▮▮ could walk a minimum of five miles and/or participate in basketball.  Again, the evidence did not demonstrate that either of these goals was necessary for ▮▮▮▮ to

access ███ education or have the opportunity to progress in
that education.

264.  Additionally, the PPIEP recommended that ███ was to
be provided approximately two-and-a-half hours of extended
school day services with 1:1 tutoring in math and reading, as
well as, training in a variety of strategies for learning and
test taking.  The learning strategies instruction was to be
limited to a student group of eleven or less.  Further, the
PPIEP required that the SIMS curriculum and methodology be used
to instruct ███ in math, reading, and writing.

265.  The goal of the parent in recommending these services
was to speed up ███ progress in ███ education and to
reduce the amount of time the parent spent at home helping ███
with ███ education.

266.  The parent estimated that ███ homework time was
generally between two to three hours during the school week,
with some study time over the weekend.  The amount of time spent
on studying over the weekend was not clear from the evidence.
Additionally, there was no competent or credible evidence that
the amount of time ███ spent studying at home was
extraordinary.  Moreover, as with all students, homework and
studying at home were, and will continue to be, part of a
student's education.  The amount of time any student spends on
such homework or studying was, and will continue to be,

94

particular to that student.  Similarly, the amount of time a
parent needs to spend in helping their child with homework and
studying was, and will continue to be, particular to that
parent's child.  Further, completion of assignments at home was
part of the extended time ███ was permitted to finish
assignments that ███ was unable to complete in class.  As such,
homework and studying at home were, and remain, integral parts
of ███   education.

267.  Finally, the evidence did not demonstrate that the
services requested by the parent were necessary for ███ to
access ███   education or have the opportunity to progress in
that education.  Moreover, while the parent's desire to speed up
███   education was understandable, the evidence did not
demonstrate that the parent's desire was reasonable or
appropriate for ███ given the educational delay caused by ███
impairment.

268.  On June 7, 2010, the IEP team met to discuss and
develop an IEP for Petitioner's upcoming ninth-grade year.  The
parent was in attendance, along with all other required IEP
participants.  The meeting lasted several hours.

269.  During the meeting, the IEP team discussed the 2010
reevaluation of ███ completed by Nell Swails, the School Board
psychologist.  The team also discussed the PPIEP at length.  The
evidence was clear that, contrary to the parent's claim, the

parent fully participated in this meeting and had the opportunity to voice the parent's position regarding ▮▮▮▮ education.  Further, the evidence demonstrated that this meeting complied with the requirements of IDEA.

270.  Because of the length of the IEP meeting, the IEP team adjourned the meeting with the intent of continuing the meeting at a later date to provide the parent further opportunity to discuss the PPIEP, as well as, ▮▮▮▮ education and eventual IEP.

271.  As a result, the IEP team reconvened on June 21, 2010, to complete the IEP for the upcoming year.  The parent was again present during the June 21, 2010, meeting.  Other IEP team members were present, as well.  However, Petitioner alleged that there was no "basic" education teacher present during the meeting on June 21, 2010.  The evidence demonstrated that Ms. Charlene Wiggins, who is a certified teacher, as well as a guidance counselor, attended the meeting as a basic education teacher.  In fact, all of the required participants were present at the June 21, 2010, meeting.  Additionally, there were no material procedural violations shown by the evidence in regards to this meeting.

272.  At the June 21 meeting, the parent was again given the opportunity to discuss the parent's recommendations contained in the PPIEP.  In fact, the parent read the PPIEP to

96

the other team members and discussed the PPIEP with the rest of
the IEP team.  Some items on the PPIEP were raised for a second
time during the June 21st meeting.  Clearly, the parent was
provided an opportunity and did fully participate in this second
meeting.  The parent's claim to the contrary was without merit.

273.  During the two meetings in June 2010, the School
Board proposed the placement of ▮▮▮▮ into regular education
classes, with the addition of a Learning Strategies class to
aide ▮▮▮▮ in ▮▮▮▮ transition to high school with its
accompanying increased workload.

274.  The Learning Strategies class was developed
consistent with the Florida Department of Education Course
Description.  The class was designed to and would have afforded
▮▮▮▮ additional time at school to complete ▮▮▮▮ assignments
with a teacher who could help ▮▮▮▮ with those assignments.  The
class was also designed to and would have provided additional
1:1 instruction if ▮▮▮▮ needed such help.  Additionally, the
Learning Strategies class was designed to and would have helped
▮▮▮▮ with test-taking skills, study skills, and peer-interaction
skills.  Undoubtedly, the class would have been beneficial to
▮▮▮▮

275.  Notably, in the past, the parent requested such
learning strategy type instruction in one form or another.
However, the parent wanted these services provided either before

97

or after school in 1:1 environments which were the most
restrictive environments in school.  Oddly, the parent did not
want ███ in a class that would have benefitted ███ and
provided services the parent requested for the parent's ESE
child because the parent perceived the class was primarily for
ESE students.  The parent's explanation for the parent's
position was, at best, puzzling.

276.  The parent was advised by school personnel familiar
with the Learning Strategies class that, in their experience,
students benefitted greatly from the class.  Again, the parent
demanded scientific research or data about the Learning
Strategies class and curriculum.  Again, the parent's demand was
misdirected.

277.  As indicated, the parent refused the school's offer
of services the parent desired unless ███ received those
services in the manner the parent dictated.  However, IDEA does
not support such micromanagement by the parent in the use of
school resources or personnel.  Moreover, there was no competent
or credible evidence that demonstrated ███ required an extended
school day in order to progress in ███ education or receive
FAPE.

278.  Instead, the parent insisted that ███ be placed into
all regular classes without the Learning Strategies class.  As a
result of the parent's objection, the IEP team decided to not

include the Learning Strategies in ████ June 7 and 21, 2010,
IEP. Further, the evidence did not demonstrate that, at the
time of the June IEP meetings, Learning Strategies was necessary
in order for ███ to receive FAPE, even though that class would
have been beneficial to ███ and provided services the parent
desired.

279. Additionally, during the two meetings in June 2010,
the IEP team discussed the continued use of a paraprofessional
to aide ███ with ████ coursework. The School Board proposed
that ███ continue to have a paraprofessional in █████ classes
to aid ███ in staying on task and organize ████ assignments.
The parent proposed the removal of the paraprofessional in order
to prevent potential social isolation in the high school
environment. However, given ████ continued need for prompting
in certain classes, complete removal of the aide was not
appropriate at this time in ████ education. Ultimately, the
IEP team decided on a compromise where ███ would have "access
to a paraprofessional" as needed. This was a change from ████
previous IEP which provided a classroom paraprofessional at all
times. The change was reflected in ████ IEP and was a
reasonable decision by the IEP team.

280. The parent also requested that the School Board
provide ███ with textbooks on tape/cd for each class on ████
schedule during the ninth grade. The IEP team agreed that

99

textbooks on tape/cd might help ▪▪▪ to learn the subject matter
taught in some of ▪▪▪▪ courses and agreed to provide such
electronic books "as available."

281.  In Florida, textbooks in sound-recorded electronic
form were required to be provided by textbook publishers since
about 2008.  See § 1006.38, Fla. Stat.  However, the statute did
not mandate the format of these electronic books or the level of
functionality of such books.  Further, the high school used some
textbooks that were previously purchased by the School Board and
pre-dated the statute requiring electronic versions of textbooks
be provided by the publishers.  These textbooks were not covered
by the statute and may or may not have had electronic versions
available.  For these reasons, electronic textbooks could only
be provided if they were available.  As such, there was no
violation of FAPE or IDEA in limiting the provision of
electronic textbooks based on their availability.

282.  Additionally, the intent of the IEP team was that
▪▪▪ would use the textbooks on tape/cd at home for pre-teaching
and post-teaching, i.e. studying, rather than at school during
class time.  Indeed, the evidence demonstrated that it was
unlikely that ▪▪▪ would receive any benefit from listening to
audio books during actual class time.

283.  Finally, the IEP team determined with input from
appropriate individuals including the parent that ▪▪▪ would be

100

provided ESE consultative services on at least a monthly basis, language therapy for 30 minutes per week, OT therapy for 30 minutes per week, PT therapy consultative services on a monthly basis, and school health services as needed.  ESY was left undetermined with a plan for the IEP team to meet by June 2, 2011, to develop an ESY program for ███ based on ████ performance over the school year.  The evidence demonstrated that these services were appropriate for ███ and provided FAPE to ███

284.  As a result of the two meetings, an IEP was developed for ███  The evidence demonstrated that the IEP provided ███ the opportunity to progress in ████ education and otherwise complied with IDEA.  However, Petitioner alleged that the IEP developed by the IEP team during the June 7 and June 21, 2010, meetings was predetermined, failed to specifically identify the duration and number of services, and was not reasonably calculated to lead to some educational benefit, thereby denying ███ a free and appropriate public education.  There was no competent or credible evidence to support the Petitioner's allegations.

285.  Rather, the June 7 and 21, 2010, IEP was well developed and contained all required substantive components, including appropriate annual goals and appropriate statements of services for ███  The June 7 and 21, 2010, IEP specifically

101

stated the Initiation Date, Duration Date, Frequency, and

Location for Consultative Services, Language Therapy,

Occupational Therapy, Assistive Technology, Physical Therapy

Consultation, school health services, and access to a

paraprofessional.  Additionally, ████  June 7 and 21, 2010, IEP

and the services contained within that IEP were appropriately

individualized for ███ and ████  educational needs, and

provided FAPE to ███

     286.  Further, the evidence was clear that the parent was

provided more than ample opportunity to participate in the

June 7, 2010 and June 21, 2010, IEP meetings and more than ample

opportunity to provide meaningful input into the development of

the June 7 and 21, 2010 IEP.  The team not only considered all

of the parent's input but actually accepted and implemented some

of the parent's suggestions.  Further, the IEP did not contain

any substantive or procedural inadequacies which denied ████

FAPE.

     287.  At the conclusion of the meeting on June 21, 2010,

the IEP team agreed to meet again before the start of school in

August of 2010.  This plan allowed the IEP team to consider any

changes to ████  services or class schedule that might be

necessary as a result of the extended school year services ████

was to receive during the summer of 2010, as well as any changes

that might be warranted in light of ████  FCAT scores which had

not been received by the school in time for the June IEP
meetings.

288.   Later that summer, ████ participated in a summer
basketball camp.   The camp was provided at the high school
gymnasium.   Rico Williams was one of the coaches for the camp.
There were many allegations regarding ████ participation in
this camp.   However, there was no competent or credible evidence
regarding ████ participation while attending the camp.   More
importantly, there was no competent or credible evidence that
this camp was provided by the School Board or had anything to do
with ████ education or FAPE.

289.   Additionally, during the summer, the guidance
counselors at the high school worked on developing a master
schedule for the school and eventual assignment of classes to
all the students who would be attending the high school in the
fall.

290.   In general, the scheduling process occurred every
year during the summer months and took approximately two-and-a-
half months to complete.   The end of the process resulted in
students receiving proposed class assignments a week or two
prior to the start of school.

291.   The first step in the scheduling process was to
develop the master schedule for the school.   In order to create
the master schedule, the school used a computer program that was

103

developed for such purpose.  The program determined the number
of classes needed for the upcoming school year based on the
class requests of all the students that were submitted during
April of the previous school year.  Once the number of classes
was determined, teachers were preliminarily assigned to those
classes.

292.  Thereafter, a rough draft of a master schedule was
created based on how many times a day a class was taught and the
number of students requesting various classes.  The goal was to
create a draft master schedule with the fewest scheduling
conflicts through the day that fulfilled the greatest number of
class selections by students and also fulfilled the graduation
requirements that remained for each student.

293.  At some point, some of the regular curriculum classes
were categorized as skills classes.  Skills classes were regular
education classes and met the same Sunshine State Standards as
other classes that were not so designated.  They were not
"dumbed down" classes as the parent claimed.  However, skills
classes were taught using a variety of teaching strategies
geared towards students that required more support in mastering
a particular course's state standards.  In general, skills
classes proceeded at a slower pace, used more multisensory
techniques in curriculum presentation, presented material in
smaller segments, and used less complex instructional materials.

Notably, all of these strategies and accommodations were the strategies and accommodations that were either listed on ████ IEP or were recognized as appropriate by the IEP team.

294.  The evidence was not clear whether all regular curriculum classes were subdivided in this manner.  However, relevant to this case, the Algebra I-A and Biology I classes were further divided into skills and non-skills classes and included in the draft master schedule for the 2010/2011 school year.

295.  Once the draft master schedule was generated, all individual student class schedules were put into the computer to again determine if the schedule could be adjusted to fulfill more students' class requests.  Thereafter, the final master schedule was created and proposed student schedules were generated.

296.  Through this process, 90 to 93 percent of students received their primary requests for classes for all seven periods of school.  Seven to ten percent of students did not receive their primary requests for classes due to a conflict in the schedule that could not be resolved.  Where these conflicts existed, individual student schedules were adjusted based on alternate class choices made by the individual student.  However, in order to meet the needs of the most students, there was no guarantee that an individual student would receive all

the classes that the individual student desired.  Additionally,
for the same reason, there was no guarantee that an individual
student would be placed in classes at a certain time during the
day.  In fact, there was no evidence that demonstrated
scheduling more difficult classes in the morning could be
reasonably accomplished without impairing the School Board's
ability to meet the graduation needs of the most students at the
high school.  Further, there was no evidence that demonstrated
that JCSB's system or method of creating a master schedule for
the high school was discriminatory.  Indeed, the evidence
demonstrated that the JCSB's system of scheduling students was
based on neutral criteria with neutral implementation and was
fair to all.

297.  As indicated earlier, once all the proposed students'
schedules were created, they were mailed to the students and
their parents.  This mailing generally occurred in the first
part of August, one to two weeks before the start of school.

298.  In this case, ████ and the parent received the
school's proposed schedule around August 8 or 9, 2010, at least
two weeks prior to the beginning of school on August 23, 2010.
Contrary to the parent's assertions that ███ was denied FAPE
because ███ did not have time to practice the schedule prior to
the start of school, the evidence demonstrated that ███ had
more than adequate time to practice the schedule prior to the

106

start of school.  More importantly and again contrary to the

parent's assertions that ▮▮▮ required such practice in order to

function at the high school, the evidence demonstrated that ▮▮▮

was very familiar with the high school environment since ▮▮▮

attended ESY at the high school and was provided a program to

familiarize ▮▮▮  with the high school grounds and the lockers

during ESY.  In fact, ▮▮▮  , during ▮▮▮ ninth-grade year,

was able to and did independently locate ▮▮▮ classes and work

the lock on ▮▮▮ locker.

299.  The preliminary schedule for ▮▮▮ ninth-grade year

placed ▮▮▮ in English I for first period, Personal Fitness for

second period, Intensive Reading for third period, Algebra I-A

for fourth period, Algebra I-A for fifth period,

Recreation/Outdoor Education (P.E.) for sixth period, and

Biology I for seventh period.  ▮▮▮ received the six core

classes and one elective ▮▮▮ requested.  The elective was P.E.

300.  Moreover, given ▮▮▮ difficulty with comprehension,

the six core classes were all challenging for ▮▮▮ Clearly, as

a practical matter, it was impossible to schedule six

challenging core classes in the morning as proposed by the

parent in the PPIEP.  Moreover, the evidence did not demonstrate

that it was possible or reasonable to schedule the skills

biology or algebra classes in the morning as desired by the

parent.  Neither IDEA nor the concept of FAPE enable a parent to

107

micromanage the school system's resources and demand a particular schedule for their child in a public school.

301.  In this case, the parent's request for morning scheduling and ████ request for classes was provided to the school and given consideration by the school guidance counselors who prepared the master schedule based on all the students' requests at the high school, as well as, the limits of available school personnel.  There was no violation of IDEA demonstrated by the evidence in scheduling ████ for the classes ████ requested or in scheduling ███ at the times those classes occurred.

302.  Further, the evidence did not demonstrate that scheduling specific classes like biology or algebra in the morning was necessary for ███ to have the opportunity to progress in school as required by FAPE.  The fact that an expert recommended that more difficult classes generally be scheduled in the morning for ███ does not demonstrate that FAPE required such class scheduling.  Such expert recommendations only suggest that the recommended strategy might be beneficial to a student.  Such recommendations do not demonstrate that a recommended strategy was required in order for a student to have the opportunity to progress in that student's education, especially in light of the fact that there are many strategies and methods that can be used to provide the opportunity for educational

progress and achieve FAPE.  Additionally, there are many independent life skills that are learned by regular high school students through traditional high school schedules and days. In fact, it is important for all regular education students to have the opportunity to acclimate themselves so that they can work and focus throughout the school day and, eventually, the work day.

303.  Indeed, the evidence showed that, throughout Petitioner's time in school, ████ was able to work the entire school day.  There was no evidence that suggested █████ impairment significantly limited █████  ability to function throughout the day to the point that █████  regular education day should be specially scheduled.  Moreover, there was no credible or competent evidence that the School Board violated IDEA in establishing a schedule for █████ ninth-grade year. Similarly, there was no competent or credible evidence that ████ was discriminated against in regards to that schedule or its development.

304.  On August 11, 2010, and prior to the beginning of school, one of the high school guidance counselors emailed the parent attempting to set a date and time for a meeting to discuss █████ schedule and transition to high school.  Although reluctant to do so, the parent eventually consented to such a meeting and agreed to meet on August 18, 2010, at 9:00 a.m.

305.  Unfortunately, the parent did not arrive on time and
did not attend the meeting.  Because the parent was not present,
the School Board did not hold an IEP meeting, but instead
utilized the time to discuss implementation of ███ current IEP
and accommodations with the teachers and staff assigned to
instruct ███ during ████ ninth-grade year.  Additionally, the
School Board utilized the meeting time to provide the same staff
and teachers' in-service training about TBI.  There was no
credible or competent evidence that the high school staff needed
more education on TBI or more familiarity with ████
accommodations.  Further, the meeting complied with IDEA and
provided FAPE to ███ since information was given to school
personnel in order to familiarize them with ███ and ████ IEP.

306.  The parent arrived at the school around 12:30 p.m.
At that time, the parent met with two guidance counselors, █████
exceptional student education consultative teacher, and the
principal of the high school.  At the meeting, Chorus, Speech,
and Personal Fitness were discussed.  Personal Fitness was a
course required for graduation.  Again, band and basketball were
discussed.  Ultimately, the parent removed ███ from Personal
Fitness and placed ███ in Speech I.  However, the parent
remained very unhappy and quite angry with regards to █████ IEP
and schedule.

307.  Additionally, on the same date, the parent was provided the locker number and numeric combination for ▮▮▮▮ locker.  The evidence demonstrated that provision of this information provided ▮▮▮ with sufficient time to practice opening ▮▮▮▮ locker prior to the beginning of school. However, neither the parent nor ▮▮▮ took advantage of this time to practice opening ▮▮▮▮ locker at the high school.

308.  Also during the summer of 2010, and just prior to the beginning of school in August 2010, ▮▮▮▮ was evaluated by Dr. Susan Crum at Central Florida Neuropsychology.  Again, the Crum evaluation, while more psychologically oriented, reflected results similar to other evaluations of ▮▮▮ and confirmed ▮▮▮▮▮ continued difficulty with attention, focus, memory and abstraction, as well as, ▮▮▮▮ slower pace in acquiring and demonstrating knowledge.  Among other things, the report recommended a resource class similar to the Learning Strategies class offered at the high school and continued instruction in reading.  The report also recommended ESY during the summer. Dr. Crum did not testify at the hearing regarding her evaluations or recommendations.  Moreover, the parent did not provide the report to the School Board until September 16, 2010.

Ninth Grade (2010/2011)

309.  As early as the first day of school on August 23,
2010, Ms. Neves, the high school principal, received a
notification from the parent alleging that ▮▮▮ was being denied
FAPE and that the parent was obtaining unspecified private
services.  The evidence did not establish the nature of the
services to which the parent referred.

310.  As indicated, ▮▮▮▮ was enrolled in the ninth grade at
the high school during the 2010/2011 school year.

311.  That year, school began at 7:30 a.m. and was
dismissed at 2:35 p.m.  ▮▮▮▮  school day consisted of seven 50-
to 60-minute classes and a half-hour lunch period.  The first
class began at 7:35 a.m.  Three or four class periods were held
in the morning, followed by lunch.  Additionally, depending on
where lunch was scheduled, lunch was followed by all afternoon
classes or one more morning class and three afternoon classes.

312.  ▮▮▮▮ was placed in regular education classrooms and
was enrolled in English I, Speech I, Intensive Reading, two
periods of Algebra I-A, Recreation (first semester), Outdoor
Education (second semester), and Biology I.

313.  In Intensive Reading, ▮▮▮▮ achieved a B in both
semesters.  In Recreation, ▮▮▮ made an A for the first
semester.  In Outdoor Recreation, ▮▮▮▮ made an A for the second
semester.  In Speech I, ▮▮▮ achieved a C in the first semester

112

which was increased to a B in the second semester.  In biology, ███ achieved a grade of C for the first semester and a grade of D for the second semester.  In algebra, ███ made a grade of F for the first semester.  However, ███ was withdrawn from Algebra I-A by the parent for the second semester.  After ███ withdrawal, ███ was enrolled in Personal Fitness and Intensive Math.  ███ received a B in both Personal Fitness and Intensive Math for the second semester.

314.  As indicated above, the parent withdrew ███ from Algebra I-A prior to the second semester of ███ 's ninth-grade year because ███ was failing the class.  The evidence demonstrated that ███ difficulty in Algebra I-A was in part due to the increasing abstraction of that course.  More importantly however, the evidence also demonstrated that ███ was missing a substantial portion of instruction time in algebra due to ███ partial and full period absences from that class.  Further, the evidence demonstrated that these absences substantially contributed to and were the primary cause of ███ difficulty in Algebra I-A.

315.  Prior to the withdrawal, the school attempted to intervene in ███ education in order to prevent ███ from failing algebra for the year and enable ███ to acquire a full credit for the course.  Indeed, the school attempted in September, October, and November to meet with the parent to

113

discuss, among other things, ████ teachers' concerns over
████ performance in algebra, as well as, ████ other classes.
The evidence demonstrated that, contrary to the parent's
assertions of cooperation, the parent was not cooperative in
that endeavor even though ████ was failing in algebra.

316.   The school proposed for the second semester of the
year that ████ repeat the second half of Algebra I and enroll in
Intensive Math.   The school's proposal, in which the IEP team
concurred, was the next step in the school systems strategy to
intervene in a struggling student's education in order to
prevent that student from failing core classes in school.   This
strategy was known as "response to intervention" and was an
appropriate strategy for the school to utilize in responding to
████ struggles in algebra.   The intervention would have
permitted ███ to earn a full credit in Algebra I-A, if the
parent had followed the school's proposed intervention.

317.   However, the parent elected to enroll ███ in Florida
Virtual School (FLVS) for the purpose of taking the course
online and obtaining a full credit in Algebra I-A that could be
transferred to the high school.

318.   FLVS is a public school in Florida, separate from
Jackson County school system.   FLVS provides high school courses
online and is free to all students residing in Florida.   FLVS
provides teachers to assist students online, through email,

regular mail, or by telephone, depending on the student's needs. Generally, in FLVS, the parent is the learning coach for their child directly responsible for ensuring the student move through the curriculum at a reasonable pace.

319.  Unfortunately, ████ logged on and completed only one day of ████ online Algebra I-A class through FLVS.  The record is devoid of any explanation by the parent for ████ failure to even attempt to complete Algebra I-A through FLVS.  As a consequence of the parents actions, ████ did not earn any credit for Algebra I-A even though the parent's stated desire was for **** to complete the course and earn a full credit for the same.

320.  However, even with ████ difficulty in algebra, the evidence demonstrated that ████ made meaningful educational progress during the year.  Again, there was no credible or competent evidence that ████ ninth-grade FCAT rank of Level I in math and reading were indicative of a lack of progress in ████ education.  In fact, ████ raw scores on the FCAT test in math and reading showed progress.  Further, the evidence demonstrated that ████ failed to use ████ accommodation of extended time to take the FCAT and rushed through the test in less time than non-accommodated students were provided to take the test.  Moreover, even though ████ did not earn a full credit in algebra, ████ remained on track to graduate since ████ still

had time to earn credit for that course.  In fact, ▮▮▮▮ was
appropriately promoted to tenth grade.

    321.  As indicated earlier, all the staff and teachers
responsible for ▮▮▮▮ education were provided in-service
training about TBI.  They were all provided a copy of ▮▮▮▮ IEP
and special accommodations.  Further, throughout the school
year, staff routinely consulted with ▮▮▮▮ ESE teacher to
review ▮▮▮▮ performance at school and attempt to continue to
provide or improve strategies to implement ▮▮▮▮ IEP.
Additionally, the principal of the school was monitoring ▮▮▮▮
progress.

    322.  Further, the evidence showed that the services and
accommodations provided for in ▮▮▮▮ IEP were implemented by
the School Board.  In particular, ▮▮▮▮ was seated in each
classroom close to the teacher's desk and was reminded to stay
on task by those teachers.

    323.  ▮▮▮▮ ninth-grade teachers also used multi-sensory
instruction to aid ▮▮▮▮ in learning the concepts that were
taught.  Additionally, although reading textbooks in class did
not occur often, the teachers provided multisensory input to
▮▮▮▮ during these times by either reading the text aloud or
having students read the text aloud.  As a consequence, the
evidence did not demonstrate a need for books on tape/cd while
▮▮▮▮ was at school.

324.  Further, ████ ninth-grade teachers provided ████ individualized one-on-one instruction as needed.  They also provided instruction in small groups as was appropriate within the curriculum.

325.  In addition, ████ was given extended time to complete class assignments.  This additional time was often provided by permitting ████ to complete assignments at home.  At other times, extended time for assignments was provided by allowing the entire class extra time to complete the assignment, thereby not singling out ████ with special treatment.

326.  The goal of this accommodation for ████ was to permit ████ a reasonable amount of time to complete assignments while also teaching ████ that deadlines existed for such assignments and that consequences resulted if such deadlines were not met.  Such consequences are not punishment; but, are an important part of educating and preparing students for life outside school.  Importantly, extended time for assignments did not mean that ████ could take as much time as ████ wanted in order to complete such assignments.

327.  The parent complained that ████ was not provided extended time to complete assignments in "bell work" for algebra and a cell project for biology.

328.  Bell work in algebra consisted of very short math problems that students were to work while the teacher was

117

administratively occupied during the first part of class before
the tardy bell rang for that class.  In ████ algebra class,
bell work extended beyond the sounding of the tardy bell to
afford the entire class the opportunity to complete the
assignment.  The teacher used the student's bell work to begin
instruction for class in order to address areas where her
students were having difficulty with the math concept the bell
work was addressing.  In algebra or any math class, it was, and
continues to be, of great importance that students attempt to
perform the math problems given to them because such instruction
was, and continues to be, very hands on.

    329.  In this case, the evidence demonstrated that ████
would sometimes complete ████ bell work assignments, sometimes
attempt such assignments, and sometimes refuse to attempt such
assignments.  The times that ███ refused to complete bell work
assignments occurred after a reasonable amount of time for the
assignment was extended and after multiple prompts from the
teacher to the whole class, and individually to ████ , to
complete the assignment.  There was no credible or competent
evidence that ███ was not provided extended time to complete
████ bell work assignments.  The parent's complaint to the
contrary was simply a misapplication of the accommodation for
extended time provided in ████ IEP.

330.  The parent also complained that ▆▆▆ was not provided
extended time on a cell project for biology.  In that regard,
the project consisted of drawing and labeling a plant or animal
cell.  The class was provided time to complete the project at
home.  As part of the project, the students were required to
turn in a rubric or instructions when they turned in their
completed drawing.

331.  Two printed versions of the instructions or rubric
were provided to ▆▆▆ because ▆▆▆ lost the first version of
this paper.  Further, ▆▆▆ was cautioned by Ms. Harvey not to
lose the second set that ▆▆▆ was provided because the paper was
required to be turned in with ▆▆▆▆ cell project.

332.  In this case, ▆▆▆ "worked hard" on the project at
home and, in fact, completed the cell project for submission the
next day within the time allowed for the project.  ▆▆▆ turned
in the project on time, but forgot to turn in the rubric or
instructions with the project.  As a consequence, 30 points were
deducted from ▆▆▆ grade.

333.  Once the parent learned about the lowered grade, the
parent complained that ▆▆▆ did not receive extended time for
the assignment.  However, the evidence clearly demonstrated that
▆▆▆ completed the project.  Again, the parent's complaint was a
misapplication of the accommodation for extended time provided
in ▆▆▆ IEP.

119

334.  Unfortunately, even though the parent was advised of these accommodations, helped ▮▮▮ daily with ▮▮▮▮ homework, and could access ▮▮▮▮ grades online, the parent remained mistrustful of the staff that worked with ▮▮▮ and made increasing and repetitive demands for proof of the IEP's implementation, as well as, increasing and repetitive demands for scientific research and data regarding the implementation of ▮▮▮▮ IEP.  However, there was no credible or competent evidence that the parent's demands were reasonably necessary for the parent to participate in ▮▮▮▮ education.  Further, there was no credible or competent evidence that such information was necessary to comply with IDEA or provide FAPE to  ****

335.  Additionally, as provided in ▮▮▮▮ IEP, ▮▮▮ met with Amy Nobles, the School Board's Occupational Therapist on a regular basis.  Among other things, Ms. Nobles worked with ▮▮▮ on ▮▮▮▮ writing and typing skills.  Ultimately, ▮▮▮ was able to take notes and complete ▮▮▮▮ assignments on a daily basis. ▮▮▮▮ teachers were also able to read ▮▮▮▮ handwriting. Further, ▮▮▮ could functionally type on a keyboard, albeit slowly, and in a hunt-and-peck style.

336.  ▮▮▮ also received physical therapy consultation from Edwin Carroll, the School Board Physical Therapist.  In fact, ▮▮▮▮ met with Mr. Carroll once every month as provided in ▮▮▮▮ IEP.  The evidence demonstrated that ▮▮▮ was able to access

120

██████ education.  Further, the evidence demonstrated that ████ was capable of transitioning to and from class successfully and independently moving around the high school campus.

337.  Additionally, as provided in ████ IEP, Angela Cross provided speech and language services to ████ at the high school.  Importantly, ████ was able to hear and understand ████ teachers, and read and write assignments in a legible manner.

338.  ████ also received ESE consultative services under ██████ IEP.  The evidence showed that the ESE consultative teacher reviewed ████ work and consulted with ████ teachers to determine if other supports, strategies, or accommodations needed to be put in place to help ████ achieve ████ academic goals.

339.  The evidence demonstrated that all of these IEP services provided FAPE to ████ and met the requirements of IDEA.  These services also provided ████ the opportunity to progress in ██████ education.

340.  Additionally, as part of the services provided under ██████ IEP, ████ was provided access to an aide.  The aide assigned to ████ was Todd Davis.  He did not accompany ████ to all of ████ classes.  However, by the second week of school, ████ was also provided a watchminder to substitute for the aide and continue to wean ████ away from the aide.  The delay in

providing the watchminder was immaterial to the provision of FAPE to ▓▓▓

341.  As indicated earlier, the watchminder functioned during ESY and was a source of distraction for ▓▓▓  However, the watchminder malfunctioned almost constantly during the first nine weeks of school.  Each time the watchminder malfunctioned ▓▓▓  teachers informed the ESE Director and/or Ms. Bradford, the Assistive Technology specialist.

342.  The School Board sent the watchminder back to the manufacturer for repair on three occasions.  It was replaced on one of those occasions.  Unfortunately, the repaired or replaced watchminder continued to malfunction.  In addition, Ms. Bradford purchased batteries for the repaired or replaced watchminder on several occasions.  Despite these attempts by the School Board, none of the watchminders worked properly and therefore were not beneficial to ▓▓▓  Further, the evidence did not demonstrate that the watchminder was necessary for ▓▓▓ to receive FAPE.

343.  As in earlier years, ▓▓▓ was also provided an agenda book/planner which ▓▓▓ was encouraged to use and to which **** teachers and aide had access.  Petitioner failed to produce any competent substantial evidence to support Petitioner's claims that ▓▓▓ education required the School Board to supply higher technology devices like a laptop, IPad, IPod, or IPhone as a substitute for the low technology solutions of the agenda book

or other classroom interventions to keep ▓▓▓▓ focused and
organized.  However, should such devices and/or applications be
supplied by the parent, the IEP team should explore the
potential efficacy of such devices relative to the potential
distraction or disruption such devices can also provide.

344.  ▓▓▓ also had access to a computer in **** 
classrooms.  Additionally, at the beginning of the ninth-grade
year, the School Board provided ▓▓▓ with a "Victor Reader,"
also known as a "Daisy Reader" for use at school and at home.

345.  The Victor Reader was an assistive technology device
that allowed ▓▓▓ to listen to the text of certain textbooks
while reading along in that book.  Importantly, the Victor
Reader, unlike other electronic textbook solutions, had several
unique functions that allowed ▓▓▓ to navigate directly to a
certain page in the textbook without having to scroll through
the whole text to get to that page.  Such functionality was
needed in order for electronic textbooks to be useful in the
classroom setting.  Additionally, such functionality made
electronic textbooks less time-consuming and easier for ▓▓▓ to
use at home.

346.  The evidence demonstrated that ▓▓▓ was trained by
the School Board in the proper use of the Victor Reader.  ▓▓▓
and the parent were also provided the instruction manual for its
use.  Further use training was arranged for the parent.

123

However, the evidence did not establish whether the parent took advantage of this training.

347.   Neither ▆▆▆ nor the parent liked the Victor Reader and both refused to use the device.   The parent demanded that someone be assigned to ▆▆▆ to carry the Victor Reader for ▆▆▆ because ▆▆▆ would become fatigued if ▆▆▆ carried it from class to class.   Within one week of its being given to  ****   , the parent returned the Victor Reader to JCSB.   The parent stated in a handwritten note to the School Board that the Victor Reader was being returned, "since [ ****   ] will fatigue carrying it from class to class."

348.   In fact, the Victor Reader weighed approximately one pound and would not have been overly taxing for ▆▆▆ to carry. Instead, the parent demanded that the School Board provide ▆▆▆ with audio versions of ▆▆▆  textbooks in a format that could be accessed on a personal computer.   From the evidence, the parent's demand and claim of fatigue were without merit and were an attempt by the parent to obtain newer technology like an IPhone or IPad for ▆▆▆  However, despite the fact that neither ▆▆▆ nor the parent liked the device, the Victor Reader provided ▆▆▆ access to books on tape/cd to the extent such books were available for use at home and during ▆▆▆  ninth-grade classes.

349.   In this case, Petitioner alleged that the School Board failed to provide ▆▆▆ with the appropriate technology to

124

allow ▮▮▮ the ability to review books on tape/cd, and therefore, denied ▮▮▮ FAPE.  However, the Petitioner's allegation was without merit.

350.  In fact, the School Board, prior to the beginning of school, provided the parent with information on how to receive a free membership to Recordings for the Blind and Dyslexic.  This membership offered ▮▮▮ another means of accessing textbooks that were available in electronic format.  Moreover, Recordings for the Blind and Dyslexic was the same organization from whom the School Board obtained cd versions of its textbooks. However, at the time, the School Board's information was that the electronic format of the recordings was not searchable and did not provide a method to move from section to section in a given textbook.  Additionally, the School Board also ordered and provided ▮▮▮▮ textbooks in cd form if they were available.

351.  In this case, the evidence demonstrated that electronically-recorded books might aid Petitioner in ▮▮▮▮ education because they provide an aural sensory input of information, in addition to the visual (reading) input of information.  However, as indicated earlier, the evidence did not show that it was necessary for ▮▮▮ to have classroom access to books on tape/cd in order to receive FAPE and enable ▮▮▮ to continue to progress in ▮▮▮▮ education as ▮▮▮ had in the past.  Moreover, the evidence was clear that ▮▮▮ and the parent

were provided access to electronically-recorded textbooks, if

they were available.  Additionally, the evidence demonstrated

that, if there was any lag time in the provision of such books,

that time was immaterial to the implementation of the IEP and

the provision of FAPE to ███  Again, Petitioner failed to

produce any competent substantial evidence to support the claim

that ████  ninth-grade IEP was not implemented in regards to

the provision of electronically-recorded books.

352.  About one month after the beginning of school, on

Friday, September 24, 2010, ███ was playing basketball during

P.E.  At some point, ███ obtained possession of a paper

belonging to ███ on which ███ had written the lines to a song.

███ observed ███ with the paper and walked towards ███ with

████  hand held out asking for the return of ████  paper.

███ began laughing and moving the paper back and forth to keep

it away from ███  When ███ grabbed the paper, ███ snatched it

away and handed the paper to ███  ███ again grabbed the paper.

However, ███ held onto the paper.  At that point, ███ very

maturely walked away and resumed playing basketball with some

other students.  The totality of the keep-away incident occurred

in less than 5 minutes.

353.  Todd Davis and one other adult were in the gym during

the time the keep-away incident occurred.  Neither witnessed the

incident.  However, ███ did not seek help from either of these

126

two adults.  More to the point, the evidence did not demonstrate that this incident constituted bullying, but was, instead, an isolated incident of inappropriate behavior among students.

354.  On Saturday, September 26, 2010, the parent demanded that the school resource officer who was a Sheriff's Deputy assigned to the school from the Jackson County Sheriff's Department, file a police report for theft based on the keep-away incident.  The parent emailed copies of the parent's demand to the high school's administration, including the principal and assistant principal.  The parent further alleged that ███ and ███ had bullied ███ in the past.

355.  As addressed earlier in this order, the parent, almost a year prior during ███ eighth-grade year, alleged ███, ███ and ███ had bullied ███ during a name-calling incident in Ms. Schirm's class.  However, there was no competent or credible evidence to support the parent's claim of bullying.  The parent also claimed that, over three and half years prior during ███ fifth-grade year, ███ was bullied by ███  Again, there was no competent or credible evidence to support the parent's claim.  Moreover, as to both of these past incidents, their occurrence was too remote in time to reasonably conclude that these students engaged in an ongoing pattern or practice of abuse towards ███

356.  However, as with all of the parent's claims of
bullying, the high school administration did not summarily
dismiss the parent's complaints of bullying, but, on Monday,
September 27, 2010, took proactive steps to investigate and
speak with the students involved, as well as, the parents of
those students.   ███ was not interviewed because the parent
would not permit ███ to be interviewed without the parent's
presence.  Moreover, on these facts, an interview of ███ was
not necessary since the school had █████ version of the
incident as related by the parent.  Further, the two other boys
involved in the incident admitted to keeping █████ paper away
from ███

357.  However, more to the issues involved in this case,
appropriate discipline was administered.  It was made clear to
the students that such behavior was unacceptable and should not
continue.  It was also made clear to the students that any
future infractions would result in more serious discipline being
imposed.  Further, the P.E. coach passed out an anti-bullying
handout to █████ P.E. class and gave a short speech about the
inappropriateness of such behavior.  There was no competent or
credible evidence that the School Board violated IDEA in the
process it used to investigate this incident or impose
appropriate discipline on the students involved in this
incident.  Moreover, there was no competent or credible evidence

that the process used by the School Board to investigate the parent's allegations denied FAPE to ████  Likewise, there was no competent or credible evidence that ████ was discriminated against because of this incident or the school's handling of the matter.

358.  The same day, while the students were dressing out for P.E. class, ████ overheard some of the students gossiping about the "charges" filed by ████ parent.  The conversation was not directed at ████ , but was among a group of friends. Additionally, there was no evidence that any threats were made against ████ during this conversation or at any time after this conversation.  Later that day, a couple of other students, on separate occasions, asked ████ , in a colloquial manner, why charges were being filed against ████.  None of these inquiries were threatening towards ████ and only demonstrated the natural curiosity of students about the parent's desire to file criminal charges over a minor keep-away incident.  Moreover, neither the earlier conversation in P.E. nor the later student inquiries lead to the conclusion that ████ was in danger at the school or in danger of retaliation at school.  In fact, contrary the parent's many claims of discrimination and retaliation, no such retaliation or discrimination was demonstrated by the evidence.

359.  The assistant principal communicated to ████ that the situation had been handled "at the school level."  The

parent asked what discipline was imposed on the two students. However, discipline of other students by the school was confidential by law and the parent was so informed by the assistant principal.

360.  Unfortunately, the parent was not satisfied by the discipline the school meted out to the students and demanded a "public apology" "in front of their peers" by the two students to ███ as a form of "restorative justice" for ███  The parent further demanded non-specific disability awareness training and education to develop "appropriate social attitudes" for the two students.  The school declined the parent's demands.  Again, there was no competent or credible evidence that the School Board violated IDEA in declining the parent's demands for further action.  Moreover, there was no competent or credible evidence that declining the parent's demand for further action denied FAPE to ███  In fact, ███ continued to have the opportunity to access the education offered by the School Board. Finally, there was no competent or credible evidence that ███ was discriminated against because the school declined the parent's demands.  IDEA is not a vehicle by which a parent can impose their notion of justice or appropriate discipline on a school system.  Further, IDEA does not give a parent the ability to micromanage the disciplinary or anti-bullying policies of a school system.

361.  Sometime around October 3, 2010, and shortly after
the keep-away incident, ▆▆▆ complained about ▆▆▆▆ hand
hurting during a visit to ▆▆▆▆ physician.  When asked about
the hand, ▆▆▆ informed ▆▆▆▆ that ▆▆▆ had taken ▆▆▆▆ pencil
away from ▆▆▆ during Ms. Hinson's class in eighth grade and
stabbed ▆▆▆▆ hand with the pencil.  The evidence showed that
the incident to which ▆▆▆ referred was the incident that
occurred on April 20, 2010, described earlier in this Final
Order.  However, as noted earlier, ▆▆▆▆ did not stab ▆▆▆ in the
hand during eighth grade, but ▆▆▆▆ self-inflicted the pencil
wound on ▆▆▆▆ hand.  The evidence was not clear why ▆▆▆▆
fabricated this episode while in the doctor's office.  However,
▆▆▆▆▆ claimed the incident was bullying by ▆▆▆ against ▆▆▆
Again, the parent's claim was without merit.

362.  Sometime in October 2010, Petitioner again tried out
for the basketball team at the high school during ▆▆▆▆ ninth-
grade year.  Rico Williams was the coach of the junior varsity
basketball team.

363.  As with middle school, selection for the team was on
a competitive basis and was based on the skills and stamina
needed to play a competitive game of high school basketball.
There was no credible or competent evidence that the selection
criteria for the ninth-grade basketball team were inappropriate
or discriminatory.  In fact, the evidence was clear that ▆▆▆

131

was given the same opportunity to try out for the team as every other student. ████ did miss a large portion of the try-outs due to illness and an elective surgical operation on ████ hand. Neither of these reasons was related to ████ disability. However, to the extent ████ attended the tryouts, ████ participated in the same drills, basketball skirmishes, and skills assessments as the other students who were trying out. ████ did not have the stamina or skills the coach wanted to see in his junior varsity basketball players.

364. Again, like many other students who tried out that year, ████ did not make the junior varsity basketball team because ████ was not as skilled at basketball as other students who made the team. The students who made the team had more advanced or developed skills than ████ , as well as greater stamina than ████.

365. Such stamina building could easily have been implemented at home. However, from the evidence, it again appears that ████ was not self-motivated enough to work on ████ strength and stamina and did not begin a program of building such strength or stamina at home. Moreover, the parent did not appear to encourage ████ to begin walking, running, or working with weights at home. In fact, the parent's concerns regarding helping ████ with weight training at home were not credible.

366.  As in the past, the parent accused Coach Williams and the Respondent of discrimination against ▪▪▪▪ for not permitting ▪▪▪▪ to be on the basketball team.  Again, these accusations appear to be made in order to force the School Board to let ▪▪▪▪ play on the ninth-grade basketball team and/or obtain services, such as weight training or stamina building, that were not educationally relevant for ▪▪▪▪ to access ▪▪▪▪ educational environment.  Additionally, the parent's actions were not reasonable advocacy on behalf of ▪▪▪▪.

367.  Again, the parent's speculative assertion that ▪▪▪▪ education required playing on the basketball team in order to foster ▪▪▪▪ self-esteem and acceptance at school was misplaced for the reasons discussed earlier in this Final Order.  Likewise, the parent's speculative assertion that ▪▪▪▪ education required playing on the basketball team in order to achieve ▪▪▪▪ "career" goal of playing college-level basketball at the University of Florida was similarly misplaced.  The IEP team did not conclude, and there was no competent or credible evidence, that participation on the ninth-grade basketball team was required in order for ▪▪▪▪ to receive FAPE under IDEA.  Further, there was no credible or competent evidence that demonstrated Respondent discriminated against ▪▪▪▪ based on ▪▪▪▪ disability.

368.   Petitioner also alleged that, around October 26, 2010, during basketball tryouts, Coach Williams made derogatory comments about ███ when ███ could not lift sufficient weights during a voluntary conditioning session in the high school weight room.   At the time, many of the female athletes at The high school were also lifting weights in the weight room.   ███ alleged that Coach Williams said that his little girl could lift the weights that ███ could not.

369.   Ms. Neves, the high school principal, spoke to Coach Williams about the incident and investigated the conduct in the weight room.   Coach Williams admitted that he commented to the entire room that the girls could lift the weights in the weight room and that the boys should be able to lift the same weights and/or lift as much as the girls.   He denied the comment was made to ███   However, irrespective of the exact wording of Coach Williams' comment and irrespective of who he made it to, or how many times he may have made such a comment, the statement does not constitute bullying or abuse by Coach Williams towards ███   In fact, the statement(s) was intended to motivate the listener to greater effort towards lifting weights.   It was not intended to bully or abuse the listener.   The parent's failure to understand this distinction was illustrative of the misperceptions and persecutory ideation the parent had developed regarding school personnel.

370. █████  again reminded the principal about federal
funds, discrimination, and personal liability.  The parent also
reminded the School Board of the same.  However, there was no
credible or competent evidence to demonstrate that any bullying
or abuse occurred.  Moreover, there was no competent or credible
evidence that FAPE was denied to ████  Likewise, there was no
competent or credible evidence that ████ was discriminated
against because of this incident.  Again, the parent's actions
were not reasonable advocacy on behalf of  ███

371.  On November 8, 2010, a disruption occurred in █████
biology class after several students in the class noticed a bad
odor.  Many students in the class were talking amongst
themselves about the odor.  Further, many of the students in the
biology class were coming from physical education class where
they had participated in physical exercise.  The origin of the
odor was not known or discovered by any of the students in █████
biology class.  One student believed that it was her feet that
were causing the odor and put her shoes back on.  However, there
was no competent or credible evidence that concern over the odor
was directed at  ███

372.  Ms. Harvey, who taught the biology class, handled the
disruption appropriately by asking the students to calm down and
opening the door to allow fresh air into the classroom.  The
teacher used words to the effect that the students' would have

135

"to deal with" the odor, indicating the class should come to order so that instruction could begin.  None of the teacher's comments about the odor were directed at ███, but were addressed to the class as a whole.  None of the comments by the teacher were inappropriate or derogatory to anyone.  There was no competent or credible evidence that either Ms. Harvey or the students in her classroom targeted ███ during this incident. Moreover, each of the students in the class was interviewed by the assistant principal, Rex Suggs, and not a single student identified ███ as having been bullied during this biology class.

373.  On the evening of November 8, 2010, the parent emailed the teacher and the principal to inquire about the incident.  Ms. Neves asked Ms. Harvey about the incident who reported that ███ was not bullied in her class.  Additionally, Ms. Harvey spoke to her students the day following the odor incident about being more sensitive with each other when they encounter novel situations.   ███ was not singled out during Ms. Harvey's talk.

374.  On November 10, 2010, the parent scheduled a meeting before the start of school to meet with the principal and the teacher regarding the odor incident.  The meeting did not occur because the parent wanted to record the meeting and the teacher objected to the parent's recordation of the meeting.

136

375.   The issue of a parent's right to record a parent teacher/administrator type meeting will be more thoroughly addressed in the Final Order in <u>Jackson County School Board v. A.L.    and P.L.B.</u>, DOAH Case Number 12-2562, involving these same parties.  However, for purposes of this case, there was no competent or credible evidence that IDEA was violated or that ▄▄▄ was denied FAPE because the parent was unable to record a non-IEP meeting between the parent and school personnel.  In fact, the evidence clearly demonstrated that the parent's communication and involvement over the odor incident or any other issue raised by the parent was not impacted by the parent's inability to record such meetings.

376.   Even without the meeting, the principal appropriately assigned Carla Elliot, one of the high school's guidance counselors, to sit in on Ms. Harvey's biology class on November 10, 2010, in order to make ▄▄▄ feel comfortable in that class.  ▄▄▄ attended the biology class with Ms. Elliot present.

377.   Significantly, ▄▄▄ was only able to identify this single incident involving a bad odor as allegedly constituting bullying in Ms. Harvey's ninth-grade biology class.  ▄▄▄ did not testify about two girls who allegedly made a comment on November 10th regarding Ms. Elliot observing the class because

of ▮▮▮   Only the parent, on November 11, 2010, claimed these
two girls bullied or harassed ▮▮▮

378.  Again, the evidence showed that this conversation was
between these two girls and not directed at ▮▮▮   The next day
the two girls' assigned seats were moved away from ▮▮▮ so that
▮▮▮ would feel more comfortable in the class.   There was no
competent or credible evidence that this conversation
constituted bullying, harassment, or discrimination towards ▮▮▮
The parent's claim to the contrary was without merit.

379.  At about the same time, Rex Suggs, the Assistant
Principal of the high school was tasked with investigating the
odor incident.   Towards that end, Mr. Suggs interviewed the
students involved and completed a written report regarding his
findings.   The evidence showed that the investigation was
appropriate.   Ultimately, Mr. Suggs found that no bullying had
occurred.   For that reason, no one was disciplined because there
was no discipline to impose.   For the same reason, and contrary
to the parent's demands, no students or personnel were made to
apologize to ▮▮▮ because no apologies were warranted.

380.  The parent received a copy of the report and was not
happy with the investigation.   However, the parent's complaints
about the investigation of this incident were without merit.

381.  In addition to investigating the allegations, on
November 11, 2010, the School Board offered to place, and did

place, a paraprofessional in ▪▪▪▪ physical education and biology classes so that ▪▪▪ would feel comfortable in these two classes, where the parent's allegations of bullying were directed.  Todd Davis was the assigned paraprofessional.  As such, he was tasked with looking for inappropriate student conduct and preventing bullying/conflict between students.

382.  However, the evidence demonstrated that the parent both asked for, and complained about, a paraprofessional being placed in the classes with ▪▪▪  In essence, the parent wanted to dictate the choice of the person who could be in these classes with ▪▪▪ and attempted to limit the school's choice of personnel to Ms. Elliot or one of ▪▪▪▪ parents.  The basis for the parent's concern was somewhat convoluted and not supported by the evidence.

383.  Notably, the parent's concern for the safety and emotional well-being of ▪▪▪ was not so great that the parent would consent to any staff other than who the parent wanted.  In fact, the parent was willing to permit ▪▪▪ to remain in Ms. Harvey's biology class without the protection of a paraprofessional unless the parent's demands were met.  However, IDEA does not support such micromanagement by the parent in the use of school resources or assignment of its personnel.

384.  Ultimately, by November 16, 2010, the parent wanted ▪▪▪ moved to Ms. McCrary's biology class which occurred during

139

the same period as ▪▪▪▪ biology class.  At first, the
principal of the high school thought the move was a good idea.
However, she changed her mind after she consulted with the
guidance counselors and ESE Director on the matter since an IEP
meeting on the transfer was necessary to determine if
Ms. McCrary's biology class met ▪▪▪▪ educational
accommodations.

385.  Unfortunately, the evidence demonstrated that
Ms. McCrary's class was not a skills class and generally moved
at a much faster pace than Ms. Harvey's class.  The class was
not set up to implement the accommodations that ▪▪▪ needed in
biology.  Additionally, Ms. McCrary's class used a different
textbook that was written at a higher instructional level than
the textbook used in Ms. Harvey's class.  More than likely,
Ms. McCrary's class was at a different place in the curriculum
than Ms. Harvey's class.  Clearly, a change in classes this far
into the semester was not feasible and would not have provided
FAPE to ▪▪▪

386.  The school offered another skills biology class that
was probably at the same point in the curriculum and used the
same textbook as the one used in Ms. Harvey's class.  The class
was also designed to incorporate the accommodations ▪▪▪ needed
for biology and provided FAPE to ▪▪▪  However, that skills
biology class entailed ▪▪▪ foregoing P.E.  The parent rejected

the substitute skills biology class because ▇▇▇ would have to give up P.E.  The school also suggested that ▇▇▇ could take online through the FLVS.  That program permitted ▇▇▇ to work at ▇▇▇▇ individualized pace.  This option was also rejected by the parent.  For reasons that were not comprehensible in the evidence, the parent elected to leave ▇▇▇ in a biology class the parent claimed ▇▇▇ was fearful of being in and one which the parent claimed was affecting ▇▇▇▇ well-being.

387.  Petitioners allege that the School Board violated IDEA and denied ▇▇▇ FAPE by refusing to allow ▇▇▇ to transfer to another biology class in November 2010.  However, the evidence did not support Petitioner's claim on this issue.  In fact, as outlined above, ▇▇▇ was given the opportunity to transfer into another biology class that met the needs of ▇▇▇ IEP.  It was the parent who did not take advantage of this opportunity.

388.  Further, the parent claimed that ▇▇▇ was denied FAPE because ▇▇▇ began missing biology as a result of the alleged "bullying" incident that occurred in November 2010.  However, the evidence did not support the parent's claim.  In fact, ▇▇▇ missed all or some portion of 20 biology classes before the incident occurred on November 8, 2010.

389.  In fact, the parent claimed multiple times that ▇▇▇ was fearful of the alleged bullies at the high school.  However,

141

the evidence demonstrated that, while at school, ▆▆▆ was not fearful of the students the parent accused of bullying ▆▆▆  On two separate occasions around December 7, 2010, ▆▆▆ tried to sit next to ▆▆▆ during lunch in the cafeteria.  Both times, ▆▆▆ blocked the seat with ▆▆ leg and ▆▆▆ sat elsewhere in the cafeteria.  On another occasion ▆▆▆ stood up to ▆▆▆, who was described as the best friend of ▆▆▆ when ▆▆▆ told ▆▆▆    , while playing in the gymnasium at school, that ▆▆▆ "sucked at basketball".

390.  The Assistant Principal of the high school again was tasked with investigating these incidents.  As indicated, Mr. Suggs interviewed the students involved and called their parents.  He completed a written report regarding his findings with regard to these allegations.  The evidence showed that the investigation was appropriate.  Ultimately, both boys apologized to ▆▆▆ in front of school staff.  The discipline was appropriate for the situation.  The parent received a copy of the report.  However, the parent was not happy since the apologies were not before the student body.

391.  After December 2010, the parent made multiple complaints or demands for investigations to the school regarding alleged bullying by a changing panoply of students.  One of the reports involved an incident of rough play during a basketball game in P.E.  The parent reported it as a possible battery.  All

142

of these incidents were appropriately investigated by the school
and the parent was provided the reports of those investigations.

392.  Throughout, the parent demanded the security camera
footage that may have covered the area of these alleged
incidents.  These tapes were not routinely kept by the school.
Their purpose was to aid in maintaining the security of the
school grounds.  The tapes were not, and are not, educational
records of ████ to which the parent was entitled.  Moreover,
there was no credible or competent evidence that ████ was denied
FAPE because the parent was not provided the security footage,
if any, regarding these multiple allegations.

393.  Again, ███████ repeatedly reminded the principal and
others in the administration about federal funds,
discrimination, and personal liability.  However, there was no
credible or competent evidence to demonstrate that any bullying
occurred during these post-December incidents.  Moreover, there
was no competent or credible evidence that the process used by
the School Board to investigate the parent's allegations or the
disciplinary action it took denied FAPE to ████  Likewise, there
was no competent or credible evidence that ████ was
discriminated against because of these incidents.  Again, the
parent's continuous accusations of such were not reasonable
advocacy on behalf of ████

394.  In addition, the high school, like the middle school, posted anti-bullying signs around the high school that were visible and obvious to students.  Additionally, students who engaged in misconduct, including misconduct that constituted bullying, were subject to discipline for that conduct.  School personnel also maintained a program of hall, lunch room, and free-time supervision.  The evidence demonstrated that this monitoring was adequate.

395.  Further, as indicated earlier, the School Board took a proactive approach to prevent bullying at all of the schools in the district, including the high school, and developed a "Bullying Plan" and anti-bullying policy to focus on preventing the behavior.  These policies were consistent with state law.

396.  The policy of the School Board was contained in the high school's student code of conduct and student handbook. This information was given to all students enrolled in the school.  The testimony at the hearing demonstrated that students were very aware that the School Board, through the school, did not tolerate bullying and that such conduct would subject a student to disciplinary action.  There was no competent or credible evidence that these policies were not followed or not enforced.  Moreover, there was no competent or credible evidence that the school or the School Board should have done more or complied with the "restorative justice" demands of the parent.

144

Similarly, there was no credible or competent evidence that these policies denied FAPE to ████  Likewise, there was no competent or credible evidence that ████ was discriminated against because of these policies.

November 17, 2010 IEP

397.  As outlined earlier in this Final Order, the School Board's efforts to schedule a meeting with the parent to review ████  IEP and discuss the classes ████ would take during ████ ninth-grade school year began in early August 2010, prior to the beginning of school.  In fact, an IEP team meeting was scheduled for August 18, 2010, which the parent missed.  Additionally, as discussed earlier in this Final Order, the School Board, beginning with the first day of school, began receiving complaints from the parent about the services being provided to ████ These complaints occurred throughout the time period relative to this case.  In addition, as outlined above, the parent made multiple and unsubstantiated allegations that ████ was being bullied by staff and other students at school.  At the same time, the parent asked that the paraprofessional be pulled back and spend less time with ████

398.  On September 2, 2010, the principal of the high school, Ms. Neves, met with ████ teachers to again go over the accommodations on ████ IEP, and to address concerns the teachers might have.

399.   On September 9, 2010, the principal sent the parent a letter stating that "after consulting with ▌▌▌▌ teachers and carefully reviewing [ ▌▌▌ 's] academic progress during the first three weeks of school, I feel that it would be in [ ▌▌▌ 's] best interest for the IEP team to reconvene to review and update [ ▌▌▌ 's] IEP to ensure that [ ▌▌▌ 's] needs are being met with a FAPE."  The Principal identified the issues the School Board wanted to discuss at the meeting, as follows: access to paraprofessional, learning strategies, use of watchminder, agenda book homework assignments, recording device, books on tape, and parent/teacher communication.  Importantly, the September 30th meeting, as with all the rescheduled meetings, was for the purpose of discussing the topics listed in the principal's letter and not to necessarily change ▌▌▌ IEP, although such changes might result from the IEP team's discussion of the above topics.

400.   Later, the parent would accuse the principal and School Board of "unlawfully" holding a meeting in the parent's "absence" on September 9, 2010.  The parent's allegation was wholly unsubstantiated by the evidence in this case.

401.   Following the principal's letter, meeting notification forms were sent to the parent, on September 16, 2010, and September 21, 2010, notifying the parent of an IEP meeting on September 30, 2010.  Through a series of emails, the

146

parent refused to consent to the IEP meeting on September 30,
2010, claiming that the parent was not prepared to participate
in such a meeting since the parent had not yet met with all of
██████ teachers, did not have all the progress monitoring data
the parent needed to participate in the IEP meeting, and did not
have the "specific" changes the school proposed to make to ██████
IEP.  As a consequence, the School Board cancelled the September
30th IEP meeting in order to allow time for the parent to
consult with ██████ teachers.  Additionally, as requested by the
parent, the school provided the parent with the progress
monitoring and testing information that ██████ teachers
completed during the first month of school.  The school also
explained the meeting was for the purpose of "discussing" the
topics outlined in the principal's letter of September 9, 2010.

    402.  In addition to the school's previous concerns, by the
end of September, ██████ teachers also expressed concern about
██████ attendance.  As noted earlier, during ██████ ninth-grade
year, ██████ began missing a significant number of classes at an
alarming rate for various reasons.  The absences included
partially-missed classes, partially-missed days, and all day
absences.  Attendance was important because missing class
reduced instructional time.  Moreover, 10 or 15 minutes out of a
50-55 minute class was a significant amount of instructional

time to miss in a class, especially if the absences were
multiple in a particular class.

403.  By the end of ▐▐▐▐  ninth-grade school year, ▐▐▐
missed all or some portion of at least one class in 83 out of
180 days of school.  Many of these absences occurred as a result
of ▐▐▐  visits to the nurse's clinic, others occurred when the
parent removed ▐▐▐ from school early.  Moreover, the parent was
aware of these absences.

404.  Interestingly, these absences began prior to any
allegations of bullying in biology or P.E.  Further, ▐▐▐▐
absences occurred least in P.E., a class in which ▐▐▐ claimed
to have been bullied.  On the other hand, ▐▐▐  absences
occurred most in algebra, a class in which ▐▐▐ made no
allegations of bullying, but was a class in which ▐▐▐ had the
most academic difficulty.  Such facts, again, demonstrated that
▐▐▐ was not fearful of being at school, as well as,
demonstrated that such perceived bullying was not related to
▐▐▐  absences during the school day.

405.  The parent claimed that ▐▐▐ attendance record was
falsified or inaccurate.  However, there was no competent or
credible evidence that ▐▐▐  attendance record was falsified or
inaccurate.

406.  The clear evidence was that ▐▐▐ frequently missed 10
to 15 minutes out of a 50 to 55-minute class in classes that

were academically challenging.  The amount of missed classroom
time was significant and contributed to ▆▆▆▆ decline in
academic success during the beginning of ▆▆▆▆  ninth-grade
school year.

407.  Because these absences continued and because of the
parent's repeated complaints, the IEP meeting was rescheduled
for October 14, 2010.  Meeting notification forms were sent home
to the parent on September 30, 2010, and October 7, 2010.  These
notices complied with the requirements of IDEA and provided the
parent adequate time to prepare for the IEP meeting.

408.  Again, the parent refused to consent to or attend the
IEP meeting scheduled for October 14, 2010.  Prior to any
meeting, the parent demanded to be provided:

> "telephone messages and emails about ▆▆▆ or
> [ ▆▆▆ 's] parents, the recordings of the
> recent bullying incident, all reports or
> statements or records of the investigation
> of the bullying incident, notes that all the
> teachers are apparently keeping about ▆▆▆▆
> and notes taken at meetings about ▆▆▆▆
> including but not limited to the Sept 9th
> meeting and the meetings I have had with Ms.
> Neves, and the records of your having
> requested the audio books, your response to
> FLDOE on complaints and everything else that
> exists."

Additionally, the parent thought the IEP meeting was unnecessary
"unless the school is willing to provide the additional services
. . . as identified in the private evaluations we have provided
. . . ."  However, the parent's position for refusing to consent

to or attend the October 14, 2010, meeting was without merit especially in light of the parent's ongoing complaints about ████ education and the difficulty ████ was having in algebra and biology.  Moreover, the clear evidence was that the parent was more than adequately prepared to intelligently discuss ████ education and perceived educational needs and routinely did so in the multitude of emails the parent sent to various School Board staff and the PPIEPs that the parent had prepared earlier.

409.  However, because of the parent's ongoing objections, desire to complete the parent's observations of ████ classes, and finish meeting with all of ████ teachers, the School Board again cancelled the IEP meeting and rescheduled it for November 17, 2010.  Meeting notification forms were sent home to the parent on November 3, 2010, and November 10, 2010.  These notices complied with the requirements of IDEA and provided the parent adequate time to prepare for the meeting.

410.  In addition, the School Board arranged for the parent to finish observing ████ classes in the days and weeks leading up to the November 17, 2010, IEP meeting.  Following the observations, the parent met with each teacher to discuss ████ and ████ needs in each of their classes.  Further, the School Board reminded the parent that the parent could schedule an appointment to obtain and/or review the cumulative educational record maintained on ████ by the School Board.  There was no

competent or credible evidence of any material violations of
IDEA or FAPE by the School Board relative to the parents demand
for records or demand to obtain such records.

411.  In late October or early November, and even though by
this time ████ was significantly struggling in algebra, the
parent refused to meet on November 17, 2010.  Later, the parent
sent an email to Ms. Neves on November 15, 2010, agreeing to
attend the IEP meeting on November 17, 2010.

412.  Additionally, on November 15, 2010, the parent
provided the School Board with a PPIEP.  The proposal was
similar to the PPIEP the parent provided for the June 7 and 21,
2010 IEP.  It was given to each of the IEP team members prior to
the meeting on November 17, and was reviewed by the appropriate
team members.

413.  Unfortunately, on the morning of November 17, 2010,
the parent sent an email to Ms. Neves stating that the parent
was sick and, therefore, unable to attend the IEP meeting which
was scheduled that day.  Later, the School Board called the
parent before the meeting to determine if the parent was going
to attend or could attend by telephone.

414.  By this time in the school year with the first
semester almost over, the evidence was clear that the
November 17th, IEP meeting should not be continued again even if
the parent could not attend due to the necessity to address the

151

fact that ▮▮▮▮ continued to struggle in algebra and biology and continued to have excessive absences in those classes.  The School Board, therefore, refused to cancel the meeting a fourth time.  The School Board's rationale for not continuing the meeting was clearly reasonable and warranted by ▮▮▮▮ educational needs.  Additionally, the parent was provided more than adequate time and multiple opportunities to participate in IEP meetings to address the school's legitimate concerns over ▮▮▮▮

415.  The parent was informed that the IEP team would continue with the meeting as planned.  The School Board offered to arrange for the parent to attend the IEP meeting by telephone due to the parent's illness.  However, the parent refused, despite the fact that the parent had participated in previous IEP meetings by telephone.

416.  The evidence was clear that the School Board made numerous attempts to meet with the parent throughout the fall of 2010.  However, the parent consistently refused to meet with the IEP team and/or took actions that were tantamount to refusing to meet with the IEP team.  The evidence was also clear that the School Board properly held the November 17, 2010, IEP meeting despite the parent's failure to attend.  Additionally the evidence demonstrated that the School Board complied with the requirements of IDEA.

417.  As indicated, the School Board held the IEP meeting on November 17, 2010, to discuss ▪▪▪▪ academic progress and address the fact that ▪▪▪ was struggling in several of ▪▪▪▪▪ classes.  All other required participants were in attendance.

418.  At the November 17, 2010, IEP meeting, the School Board added a Learning Strategies class to ▪▪▪▪ schedule to provide ▪▪▪ with additional support.  As indicated, the Learning Strategies class provided students with an opportunity to get extra help in their regular classes, as well as, the opportunity to learn new strategies for approaching their coursework.  During the meeting, the School Board considered the PPIEP and the Crum evaluation.  As noted earlier in this Final Order, the Crum evaluation recommended the addition of a Learning Strategies class for ▪▪▪▪ , similar to the class the School Board added to ▪▪▪▪ IEP at the meeting.  In fact, all of the experts who testified at the hearing were of the opinion that a Learning Strategies or "resource" class would benefit ▪▪▪ Moreover, the evidence demonstrated that such a class would benefit ▪▪▪ Thus, the addition of the class to ▪▪▪▪ November 17, 2010, IEP was appropriate, provided FAPE to ▪▪▪ , and complied with the requirements of IDEA.

419.  Further, during the November 17, 2010, IEP meeting, the IEP team discussed transferring ▪▪▪ to a different biology class.  However, the IEP team did not move ▪▪▪ to a different

biology class since, as previously discussed in this Final Order, it was not prudent to change ████ biology class at this late point in the school year.  Moreover, the IEP team reasonably concluded that ████ social issues in Ms. Harvey's class could be addressed through the addition of an aide in the class.  Again, the team's decisions provided FAPE to ███ and complied with IDEA.

420.  During the meeting on November 17, 2010, the IEP team also clarified the purpose and role of books on tape/cd that were listed on ████ June 2010 IEP.  The IEP team clarified that books on tape/cd were to be used by ███ at home, as needed, rather than in class while the teacher was lecturing or reading aloud from the textbook.  Again, the teachers provided other non-technological methods for aural multisensory input when the textbook was read in class.  The team's decision provided FAPE to ███ and complied with IDEA.

421.  The IEP team also reaffirmed during the meeting that ███ needed access to a classroom paraprofessional to help ███ stay on task.  The evidence demonstrated that the team's decision provided FAPE to ███ and complied with the requirements of IDEA.

422.  The other accommodations and services in ███ June 2010, IEP remained the same.  Again, the team's decisions regarding the remainder of the IEP provided FAPE to ███ and

154

complied with IDEA.  Further, the IEP was set to take effect on
November 27, 2010, in order to allow the parent time to review
the IEP and voice any objections or provide further input to
that IEP.  The delay in implementing the IEP complied with IDEA
and provided FAPE to ████

423.  In this case, Petitioner complained that the
November 17, 2010, IEP was predetermined, failed to specifically
identify the duration and amount of services, and was not
reasonably calculated to lead to some educational benefit,
thereby denying ████ FAPE.  Petitioner also complained that the
School Board failed to deliver the accommodations and services
contained in the November 17, 2010, IEP.

424.  However, the evidence demonstrated that the
November 17, 2010, IEP was well developed and contained all
required substantive components, including appropriate annual
goals, appropriate statements of services, and appropriate
individualization for ███  The November 17, 2010, IEP
specifically stated the Initiation Date, Duration Date,
Frequency, and Location for Consultative Services, Language
Therapy, Occupational Therapy, Assistive Technology, Physical
Therapy Consultation, school health services, and access to a
paraprofessional.  Moreover, it was reasonably calculated to
enable ███ to receive some educational benefit.  The

155

November 17, 2010, IEP did not contain any substantive or procedural inadequacies which denied ▮▮▮ FAPE.

425.  Unfortunately, the November 2010, IEP was never implemented due the parent's request for a due process hearing in this case and the automatic stay that resulted from that request under IDEA.

426.  However, the evidence was clear that, throughout the time period relevant to this case, ▮▮▮ was enrolled in all general education classes with non-disabled peers. Additionally, ▮▮▮ advanced from grade to grade while enrolled with the Jackson County School District and is currently on track to graduate and receive a standard diploma following the 2013/2014 school year.

427.  Moreover, ▮▮▮ evaluations have been consistent in their findings regarding ▮▮▮ disability and its impact on ▮▮▮ education. Educationally, ▮▮▮ continued to evidence difficulty in memory, attention, focus, and responsiveness. The impacts of these difficulties on ▮▮▮ education caused ▮▮▮ to be educationally delayed because ▮▮▮ was slower at processing information, moving that information into long-term memory, and retrieving such knowledge.

428.  In fact, the latest evaluation of ▮▮▮ in July 2011, by Dr. Kytja Voeller of the Western Institute for Neurodevelopmental Studies and Interventions in Boulder,

Colorado, did not reveal materially-relevant new information
regarding ████ disability.  Indeed, Dr. Voeller who first
evaluated ████ in April of 2003, while at the Morris Center in
Gainesville, Florida, found that, "[d]espite the impediments to
[ ███ 's] ability to learn, [ ███ 's] progress in many
areas has been remarkable."  Dr. Voeller also testified that she
saw an impressive shift in certain areas of ████ development.
Further, Dr. Voeller testified that even she was amazed by ████
development in certain areas and stated that "[ ███ ] has
demonstrated clear improvement in several language related
areas."

      429.  Indeed, the 2011 evaluation conducted by Dr. Voeller
reflected considerable development in the areas of reading
accuracy and reading fluency, as well as, progress in the area
of verbal fluency.  On the other hand, math and subjects
involving abstract reasoning and higher levels of comprehension
remained difficult for ███ because both those skills involve
interpretive and evaluative understanding for implicit
significance and analytical meaning.  Such higher levels of
thought necessarily involve the input, storage, and retrieval of
information.  Additionally, such higher levels of abstract
reasoning and comprehension are normally being developed
throughout a student's high school years.  Given ████
demonstrated strength and weaknesses at school, none of the test

results or information from the Voeller evaluation was
surprising or new.  More importantly, Dr. Voeller's evaluation
and testimony demonstrated that ▮▮▮▮ educational plan provided
▮▮▮▮ with a basic floor of opportunity to progress in ▮▮▮▮
education.  Further, according to Dr. Oakland, an expert in
psychology and special education, ▮▮▮▮ had progressed at a
normal rate relative to that of ▮▮▮▮ age peers, in the area of
reading fluency.  Indeed, the clear evidence in this case from
all the experts were that ▮▮▮▮ progressed in ▮▮▮▮ education at
▮▮▮▮ individualized pace and has received meaningful benefit
from A.L's IEPs.

430.  Undeniably, ▮▮▮▮ ninth-grade year was difficult as
is the case with many ninth graders.  However, ▮▮▮ made
progress and received meaningful educational benefit under the
June 7 and 21, 2010, IEP.  The various tests and evaluations
performed on ▮▮▮ evidence that ▮▮▮ had learned throughout
▮▮▮▮ years in the Jackson County School District.  ▮▮▮ tests
within the average range in the areas of overall executive
function, general language development, receptive language,
written language, broad reading, word recognition, reading
fluency, reading comprehension, spelling, and broad math.

431.  In this case, Petitioner alleged many violations of
FAPE and IDEA over the years.  However, none of those alleged
violations were supported by the evidence.  Petitioner also

alleged many violations of FAPE and IDEA based on discrimination.  Again, none of those alleged violations were demonstrated by the evidence.  In fact, no violations of IDEA or FAPE alleged by the parent in this case were shown by the evidence.  Based on these facts, the Petitioner's request for due process is, therefore, dismissed.

CONCLUSIONS OF LAW

432.  The Division of Administrative Hearings has jurisdiction over the parties to and the subject matter of this proceeding.  § 1003.57(5), Fla. Stat. (2012), and Fla. Admin. Code R. 6A-6.03311(5)(e).

433.  The Individuals with Disabilities Act (IDEA) requires state and local educational agencies to provide disabled children with a "free appropriate public education" (FAPE). 20 U.S.C. § 1400(c).  Further, IDEA entitles disabled students to receipt of FAPE in the least restrictive environment (LRE). In general, FAPE must be available to all children residing in a state between the ages of 3 and 21, inclusive.  34 C.F.R. § 300.101(a).  To accomplish these things, Congress established an elaborate procedural framework under IDEA, the cornerstone of which is the individual education plan (IEP).

434.  The IEP is a document that serves as the blueprint for a particular child's education for a given school year.  See Honig v. Doe, 484 U.S. 305, 308-312 (1988) (history and purpose

159

of and procedural framework created by IDEA).  It is developed
based on relevant information by an IEP team consisting of local
school personnel, relevant experts, if needed, and the parents,
at a formal meeting for which the parents are given adequate
notice and an opportunity to attend and participate.  20 U.S.C.
§ 1414(d); 34 C.F.R. § 300.501.  Importantly, IDEA does not give
any one member of the IEP team the right to veto a decision made
by the IEP team or to micromanage the details of a decision made
by the IEP team.  A.W. ex rel. Wilson v. Fairfax Cnty. Sch. Bd.,
372 F.3d 674, 683 n.10 (4th Cir. 2004)("[T]he right conferred by
the IDEA on parents to participate in the formulation of their
child's IEP does not constitute a veto power over the IEP team's
decisions."); J. C. v. New Fairfield Bd. of Educ., Case No.
3:08-cv-1591, 2011 U.S. Dist. LEXIS 34591 *48 (D. Conn. Mar. 31,
2011) ("[T]he Parents may attend and participate
collaboratively, but they do not have the power to veto or
dictate the terms of an IEP."); and B. B. v. Haw. Dep't of
Educ., 483 F. Supp. 2d 1042, 1050-1051 (D. Haw. 2006).

435.  A "free appropriate public education" is defined in
20 U.S.C. section 1401(9).  That section states as follows:

> . . .  The term 'free appropriate public
> education' means special education and
> related services that-
>
> (A)  have been provided at public expense,
> under public supervision and direction, and
> without charge;

160

(B)  meet the standards of the State
educational agency;

(C)  include an appropriate preschool,
elementary school, or secondary school
education in the State involved; and

(D)  are provided in conformity with the
individualized education program.  ...

436.  "Special education" is defined in U.S.C. section

1401(29).  That section states, in pertinent part:

(A)  . . .  The term "special education"
means specially designed instruction, at no
cost to parents, to meet the unique needs of
a child with a disability, including (A)
instruction conducted in the classroom, in
the home, in hospitals and institutions, and
in other settings; and

(B)  instruction in physical education.

437.  "Related services" are defined in U.S.C. section

1401(26).  That section states:

(A)  The term "related services" means
transportation, and such developmental,
corrective, and other supportive services
(including speech/language pathology and
audiology services, interpreting services,
psychological services, physical and
occupational therapy, recreation, including
therapeutic recreation, social work
services, school nurse services designed to
enable a child with a disability to receive
a free appropriate public education as
described in the individualized education
program of the child, counseling services,
including rehabilitation counseling,
orientation and mobility services, and
medical services, except that such medical
services shall be for diagnostic and
evaluation purposes only) as may be required

to assist a child with a disability to
benefit from special education, and includes
the early identification and assessment of
disabling conditions in children.

(B)  EXCEPTION - The term does not include a
medical device that is surgically implanted,
or the replacement of such device.

438.  "Individualized education program" is defined in

U.S.C. section 1401(14).  That section states, in pertinent

part, as follows:

. . .  The term "individualized education
program" or "IEP" means a written statement
for each child with a disability that is
developed, reviewed, and revised . . . .

439.  The Code of Federal Regulations (C.F.R.) implements

the federal statutes.  Section 300 is the regulation applicable

to IDEA.

440.  The regulation related to FAPE is 34 C.F.R. section

300.17.  That section states as follows:

Free appropriate public education or FAPE
means special education and related services
that-

(a)  Are provided at public expense, under
public supervision and direction, and
without charge;

(b)  Meet the standards of the SEA [State
educational agency], including the
requirements of this part;

(c)  Include an appropriate preschool,
elementary school, or secondary school
education in the State involved; and

162

(d)  Are provided in conformity with an
individualized education program (IEP) that
meets the requirements of §§ 300.320 through
300.324.

441.  The regulation related to the individualized

education plan is 34 C.F.R. section 300.22.  It states as

follows:

Individualized education program or IEP
means a written statement for a child with a
disability that is developed, reviewed and
revised in accordance with §§ 300.320
through 300.324.

442.  The regulation related to special education is 34

C.F.R. section 300.39.  That section states, in pertinent part,

as follows:

(a)  General.

(1)  Special education means specially
designed instruction, at no cost to the
parents, to meet the unique needs of a child
with a disability, including-

(i)  Instruction conducted in the classroom,
in the home, in hospitals and institutions,
and in other settings; and

(ii)  Instruction in physical education.
(2)  Special education includes each of the
following, if the services otherwise meet
the requirements of paragraph (a)(l) of this
section-
(i)  Speech-language pathology services, or
any other related service, if the service is
considered special education rather than a
related service under State standards;

(ii)  Travel training; and

(iii)  Vocational education.

163

443.  Specially-designed instruction is defined in 34
C.F.R. § 300.26.  That section states, in relevant part:

> (b)(3)  Specially-designed instruction means
> adapting, as appropriate to the needs of an
> eligible child under this part, the content,
> methodology, or delivery of instruction –
>
> (i)  To address the unique needs of the
> child that result from the child's
> disability; and
>
> (ii)  To ensure access of the child to the
> general curriculum, so that he or she can
> meet the educational standards within the
> jurisdiction of the public agency that apply
> to all children.

444.  Under IDEA, Petitioner bears the burden of proof to
establish by a preponderance of the evidence that IDEA was
violated, thereby denying FAPE to the student.  See Schaffer v.
Weast, 546 U.S. 49, 62 (2005); Loren F. v. Atlanta Indep. Sch.
Sys., 349 F.3d 1309, 1313 (11th Cir. 2003).  See also Ross v.
Bd. of Educ. Township High Sch. Dist., 486 F.3d 279, at 270-271
(7th Cir. 2007)("[T]he burden of proof in a hearing challenging
an educational placement decision is on the party seeking
relief."); Brown v. Bartholomew Consol. Sch. Corp., 442 F.3d
588, 594 (7th Cir. 2006) ("The Supreme Court recently has
clarified that, under the IDEA, the student and the student's
parents bear the burden of proof in an administrative hearing
challenging a school district's IEP,"); Devine v. Indian River

Cnty. Sch. Bd., 249 F.3d 1289 (7th Cir. 2001); M.M. v. Sch. Bd. of Miami-Dade Cnty., 437 F.3d 1085, 1096, n.8 (11th Cir. 2006); and Sebastian M. v. King Philip Reg'l Sch. Dist., Case No. 09-10565-JLT, 2011 U.S. Dist. LEXIS 35501 (D. Mass. Mar. 31, 2011).

445.  The legal standard for determining whether a disabled student has received FAPE is a two-pronged test described by the United States Supreme Court in Board of Education of the Hendrick Hudson Central School District v. Rowley, 458 U.S. 176, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982).

446.  Under Rowley, the first prong of the test is whether the State complied with the procedures set forth in IDEA.  The second prong of the test is whether the IEP developed through IDEA's procedures was reasonably calculated to enable the disabled child to receive educational benefits.  458 U.S. at 206.

447.  The Rowley standard requires administrative law judges to strictly review an IEP for procedural compliance even though technical procedural safe guard violations will not automatically invalidate an IEP.  Dong v. Bd. of Educ., 197 F.3d 793, 800 (Fla. 6th Cir. 1999).  Additionally, in evaluating whether a procedural defect has deprived a student of FAPE, the defect must be more than a mere technical defect.  Weiss v. Sch. Bd. of Hillsborough Cnty., 141 F.3d 990 (11th Cir. 1998).  In essence, the Petitioner must prove that there was a procedural

165

defect in the development of a student's IEP and that such defect materially affected that student's education.  Id.

448.  In this case, Petitioner raised several procedural issues, related to the development of the April IEP, June 7 and 21, 2010 IEP, and the November 17, 2010 IEP.  These allegations centered on notification of the parent of IEP meetings, the parent's right to participate in IEP meetings and the technical details of the April, June, and November IEPs.

449.  The evidence demonstrated that the technical details of the April, June, and November IEPs were well developed and contained all required components, including appropriate annual goals, appropriate statements of services, and appropriate individualization for ████  They also specifically stated the Initiation Date, Duration Date, Frequency, and Location for Consultative Services, Language Therapy, Occupational Therapy, Assistive Technology, Physical Therapy Consultation, school health services, and access to a paraprofessional.  No technical procedural violations were established by the evidence with regards to these three IEPs.

450.  Further, IDEA and 34 C.F.R., section 300.322(a)(1) and (b)(1), require that the School Board take steps to notify one or both parents of the IEP meeting.  Additionally, a school district must ensure that the parents of a handicapped child have an opportunity to participate in the IEP meeting and

participate in planning the child's education.  However, should the parents refuse to attend or take actions that are tantamount to a refusal to attend such IEP meetings, the district may hold an IEP meeting and develop a child's IEP without the parent's participation.  In such instances, the school district must maintain records of its attempts to arrange a mutually agreeable time for the IEP meeting.  See 34 C.F.R. § 300.322(d).  See also Cordrey v. Euckert, 917 F.2d 1460, 1467 (6th Cir. 1990).

451.  Importantly, under IDEA, parental participation in the IEP meeting and educational plan of their child does not give the parents the right to unilaterally dictate the content of their child's IEP.  Lessard v. Wilton-Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 30 (1st Cir. 2008); Bradley v. Ark. Dep't of Educ., 443 F.3d 965, 975 (8th Cir. 2006) ("[T]he IDEA does not require that parental preferences be implemented, so long as the IEP is reasonably calculated to provide some educational benefit.").  As indicated earlier, "the [parents'] right to provide meaningful input [in the development of the IEP, however] is simply not the right to dictate an outcome and obviously cannot be measured by such." White ex rel. White v. Ascension Parish Sch. Bd., 343 F.3d 373, 380 (5th Cir. 2003). See also L.G v. Fair Lawn Bd. of Educ., Case No. 2:09-cv-6456 (DMC), 2011 U.S. Dist. LEXIS 69232 *15 (D. N.J. June 27, 2011);

and <u>Fitzgerald v. Fairfax Cnty. Sch. Bd.</u>, 556 F. Supp. 2d
543,558 (E.D. Va. 2008).

452.   In this case, the School Board complied with the
notice and participation requirements of IDEA as amplified by
the regulations, in regard to the April 24, 2009, June 7, 2010,
June 21, 2010, and November 17, 2010, IEP meetings.   The notices
of all the meetings stated the purpose, date and time for their
related IEP meetings and otherwise complied with the
requirements of IDEA and the regulations thereunder.

453.   In addition, the evidence was clear that the parent
of ▇▇▇ was given more than ample opportunity to prepare for and
participate in the development of the April 2009, June 2010, and
November 2010 IEPs for ▇▇▇   In fact, except for the
November 17, 2010, IEP meeting which the parent did not attend,
the parent attended the meetings, either in person or by
telephone, and provided input at all of the IEP meetings for
▇▇▇   Additionally, the parent provided a very detailed parent
proposed IEP for ▇▇▇   June IEP meetings.   Moreover, even
though the parent did not obtain all of the parent's demands
regarding ▇▇▇   education, the evidence was clear that the
parent's input was considered by the IEP team and that the
requirements of IDEA and its accompanying regulations was
complied with by the School Board.

454.  As to the November 17, 2010, meeting that the parent did not attend, the School Board properly documented multiple attempts to arrange a mutually-agreeable time for an IEP meeting that the evidence demonstrated was necessary.  Additionally, the parent submitted the Crum evaluation and a very detailed parent proposed IEP for the November meeting.  Both the evaluation and PPIEP were considered by the IEP team at the November meeting. In fact, the evidence showed that the IEP team considered and adopted some suggestions made by the parent and also appropriately disagreed with other suggestions made by the parent.  Again, the evidence was clear that the School Board complied with the requirements of IDEA and the regulations thereunder with regards to the November 17, 2010, IEP meeting.

455.  Petitioner also alleged that the School Board procedurally violated IDEA by preparing drafts of the IEP's prior to the April, June, and November IEP meetings, and otherwise, held meetings to discuss the provisions of such IEPs before the formal IEP meetings occurred.  Petitioner argued that these drafts constituted "predetermination" of ████ IEPs.

456. However, preparing rough drafts of IEPs and/or holding meetings to prepare for a formal IEP meeting does not demonstrate predetermination by the School Board.  In general, predetermination is not synonymous with preparation.  As stated in Nack ex rel. Nack v. Orange City Sch. Dist., 454 F.3d 604,

610 (6th Cir. 2006), "[t]he IDEA prohibits a completed IEP from being presented at the IEP Team meeting or being otherwise forced on the parents, but states that school evaluators may prepare reports and come with preformed opinions regarding the best course of action for the child as long as they are willing to listen to the parents and parents have the opportunity to make objections and suggestions".  See also Deal v. Hamilton Cnty. Bd. of Educ., 392 F.3d 840, 858 (6th Cir. 2004); M. M. v. New York City Dep't of Educ., Case No. 07 Civ. 2265, 2008 U.S. Dist. LEXIS 84483 *17 (S.D.N.Y. Oct. 20, 2008)("So long as they do not deprive parents of the opportunity to meaningfully participate in the IEP development process, . . . draft IEPs are not impermissible under the IDEA."); and S. K. v. Parsippany-Troy Hills Bd. of Educ., Case No. 07-4631 (SRC), 2008 U.S. Dist. LEXIS 80616 *34 (D. N.J. Oct. 9, 2008)("The School District's preparation of a draft IEP does not, without more, indicate that S. K. was excluded from the process.").

457.  In this case, the evidence demonstrated that ████ parent participated in or was provided the opportunity to participate in all of ████ IEP meetings.  Further, there was no competent or credible evidence that the School Board predetermined ████ IEPs.  The evidence showed that the drafts of ████ IEPs were created to prepare for and facilitate the formal IEP meeting.  Further, the evidence demonstrated that

170

██████ IEPs were created at the formal IEP meeting relative to that IEP. Ultimately, the evidence was clear that the School Board did not predetermine ██████ IEPs and, otherwise, complied with the requirements of IDEA and the regulations thereunder with regards to the development of ██████ IEPs.

458. As indicated earlier, FAPE also requires a substantive educational component. The substantive component of IDEA's educational requirement for FAPE is met when the school system offers the disabled student a "basic floor of opportunity consist[ing] of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." Rowley, 458 U.S. at 201-203. A corollary to the above is that such offer must also be implemented by the school.

459. In School Board of Martin County v. A.S., 727 So. 2d 1071 (Fla. 4th DCA 1999), the court discussed the nature and extent of the educational benefits which Florida school districts must make available to exceptional or disabled students. The court stated:

> Federal cases have clarified what "reasonably calculated to enable the child to receive educational benefits" means. Educational benefits under IDEA must be more than trivial or de minimis. J.S.K. v. Hendry County School District, 941 F.2d 1563 (11th Cir. 1991); Doe v. Alabama State Department of Education, 915 F.2d 651 (11th Cir. 1990). Although they must be

171

"meaningful," there is no requirement to
maximize each child's potential.  <u>Rowley</u>,
458 U.S. at 192, 198, 102 S. Ct. 3034.  <u>Id.</u>
at 1074.

Further, the Fifth Circuit in <u>Cypress-Fairbanks Independent</u>

<u>School District v. Michael F.</u>, 118 F.3d 245, 247-248 (Fla. 5th

Cir. 1997), found that the educational benefit, to meet the IDEA

standard must be "likely to produce progress, not regression or

trivial educational advancement."

460.  As indicated earlier, under IDEA, such educational

benefits are provided through a plan of "specially designed

instruction."  Federal regulations under IDEA require that

Petitioner's "specially designed instruction" be adapted, "as

appropriate to the needs of the eligible child . . . in the

content, methodology, or delivery of instruction."  Moreover,

such instruction should "address the unique needs of the child"

and "ensure access of the child to the general curriculum."  34

C.F.R. § 300.26(b)(3).

461.  Further, such instruction must be delivered, where

appropriate, in the least restrictive environment (LRE).

20 U.S.C. section 1412(a)(5)(A) states, in pertinent part:

> To the maximum extent appropriate, children
> with disabilities . . . are educated with
> children who are not disabled, and special
> classes, separate schooling, or other
> removal of children with disabilities from
> the regular educational environment occurs
> only when the nature or severity of the
> disability of a child is such that education

172

in regular classes with the use of
supplementary aids and services cannot be
achieved satisfactorily.

462.   Indeed, IDEA's statutory scheme contemplates a

flexible approach to providing FAPE to a student, requiring

mainstreaming to the maximum extent "appropriate," when

education can be achieved "satisfactorily."   See Daniel R.R.,

874 F.2d 1036 (Fla. 5th Cir. 1989)([s]chools must retain

significant flexibility in educational planning if they truly

are to address each child's needs.")

463.   IDEA's preference is for disabled children to be

educated in the least restrictive environment capable of meeting

their needs.   Walczak v. Fla. Union Free Sch. Dist., 142 F.3d

119, 132 (2d Cir. 1998).   Practically, this means that students

should be mainstreamed in classes with their non-disabled peers

whenever possible.

464.   In fact, the April 2009, June 2010, and November 2010

IEPs mainstreamed ████ and placed Petitioner in ordinary

classrooms with regular education classes.   The evidence

demonstrated that ████ classes included nondisabled students.

Additionally, in order to include ████ in regular education

classes, ████ , among other things, was provided

accommodations such as extended time on assignments, an agenda

book, and preferential seating.   This placement met the

requirements of IDEA.

465.  Moreover, Petitioner failed to produce any credible or competent substantial evidence to support Petitioner's claim that providing ESY services at the Alternative School was inappropriate or that the Alternative School was not the least restrictive environment for ███ during ESY 2009.  Further, based on the evidence in this case, the decision to provide ESY 2009 services at the Alternative School was wholly within the School Board's authority to manage its resources and did not impact the provision of FAPE to ███ under IDEA.

466.  Additionally, Petitioner alleged that the April 2009, June 2010, and November 17, 2010 IEPs did not provide FAPE to ███   Further, Petitioner alleged that the June IEP was not implemented by the School Board.

467.  As indicated earlier, in determining the appropriate educational placement for a student with disabilities, it is essential to look first at that child's specific and unique educational needs.  34 C.F.R. § 300.26(b)(3)(i).  Considerable evidence was presented in this matter relative to Petitioner's educational needs.  Indeed, the expert reports were remarkably consistent in their conclusions regarding the impact of Petitioner's TBI on Petitioner's ability to learn and demonstrate that learning.  The experts also were remarkably consistent in the broad categories of services and accommodations needed to address the impacts Petitioner's

disability had on Petitioner's education.  For example, all agreed that OT was necessary for Petitioner to gain keyboarding and mechanical writing skills.  All agreed that Petitioner required special seating and extended time to complete assignments.  However, the experts differed in their suggestions regarding the methodologies for delivery of Petitioner's services and accommodations and/or the intensity of such delivery.  For example, the experts disagreed regarding the level of technology required to assist ▮ in staying focused and organized, i.e. a pencil, paper and planner versus a PDA, cell phone, I-pod and I-pad.

468.  Notably, IDEA does not require states to develop IEPs that "maximize the potential of handicapped children."  Bd. of Educ. v. Rowley, 458 U.S. at 189, 102 S. Ct. at 3042.  What the statute guarantees is an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents."  Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 (2nd Cir. 1989)(internal citation omitted); see also Carlisle Area School v. Scott P., 62 F.3d 520, 533-534 (3rd Cir. 1995)(school districts "need not provide the optimal level of services, or even a level that would confer additional benefits, since the IEP required by IDEA represents only a 'basic floor of opportunity'" (quoting Bd. of Educ. v. Rowley, 458 U.S. at 201)); Kerkam v. McKenzie, 862 F.2d 884, 886 (D.C. Cir. 1988)

("proof that loving parents can craft a better program than a state offers does not, alone, entitle them to prevail under the Act").  See also Walczak, 142 F.3d at 132.

469.  Indeed, a basic floor of opportunity is provided if a student progresses in a school district's program.  See Rowley, 458 U.S. at 207-208, 102 S. Ct. 3034; O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233, No. 97-3125, 144 F.3d 692, 709 (10th Cir. 1998); Evans v. District No. 17, 841 F.2d 824,831 (8th Cir. 1988).  See also M. H. v. Nassau Cnty. Sch. Bd., 918 So. 2d 316, 318 (Fla. 1st DCA 2005)("A free appropriate public education 'provided under the Act does not require the states to satisfy all the particular needs of each handicapped child, but must be designed to afford the child a meaningful opportunity to learn.")(citation omitted); C. P. v. Leon Cnty. Sch. Bd., 483 F.3d 1151, 1153 (11th Cir. 2007); M. M. v. Sch. Bd. of Miami-Dade Cnty., 437 F.3d 1085, 1101-1102 (11th Cir. 2006).  Importantly, IDEA does not require that such educational progress be maximized by the School Board.  Devine v. Indian River Cnty. Sch. Bd., 249 F.3d 1289, 1292 (11th Cir. 2001); and Doe v. Bd. of Educ., 9 F.3d 455, 459-460 (6th Cir. 1993).

470.  Additionally, "the [law] does not demand that [a district school board] cure the disabilities which impair a child's ability to learn, but [merely] requires a program of remediation which would allow the child to learn notwithstanding

176

[the child's] disability." Indep. Sch. Dist. No. 283, St. Louis
Park. Minn. v. S. D. By and Through J. D., 948 F. Supp. 860, 885
(D. Minn. 1995), aff'd, 88 F.3d 556 (8th Cir. 1996). Moreover,
"[i]t is not necessary for a student to improve in every area or
obtain all educational benefit from his IEP. D. B. v. Houston
Indep. Sch. Dist., Case No. H-06-354, 2007 U.S. Dist. LEXIS
73911 *31 (S.D. Tex. Sept. 29, 2007). Indeed, where a child is
in mainstream classes, such as here, the attainment of passing
grades and regular advancement from grade to grade generally
demonstrates satisfactory progress in that child's education and
compliance with IDEA. Walczak, 142 F.3d at 130.

471. In this case, the evidence demonstrated that ▇▇▇ was
progressing in ▇▇▇▇ education. In fact, in many areas, ▇▇
progressed much more significantly than ▇▇▇▇ evaluators
expected based on the nature of ▇▇▇▇ injuries. Such progress
was not lessened by the fact that on some evaluations ▇▇▇ did
not perform on grade level in math and reading. Moreover, ▇▇▇▇
performance on those evaluations did not demonstrate that ▇▇▇
was not provided FAPE by JCSB. The evidence demonstrated that
▇▇▇ progressed at ▇▇▇▇ individualized pace, albeit not the
pace ▇▇▇▇ parent desired. Moreover, the evidence demonstrated
that ▇▇▇ achieved passing grades in almost all of ▇▇▇▇
coursework and was appropriately promoted from grade to grade.
Given these facts, ▇▇▇▇ IEPs and educational plans provided

177

FAPE to ███ and complied with the substantive requirements of
IDEA.

472.  Further, once an educational program is determined to
provide FAPE, it is not the function of the Administrative Law
Judge, in passing upon the appropriateness of an educational
program, to determine the best methodology for educating the
child.  O'Toole By and Through O'Toole v. Olathe Dist. Schs.
Unified Sch. Dist. No. 233, 144 F.3d 692, 709 (10th Cir. 1998);
see also M.M., 437 F.3d at 1102 (quoting Lachman v. Illinois
State Ed. of Education, 852 F.2d 290, 297 (7th Circuit)).
Consequently, the parents of a special education student do not
have the right to insist that particular methodologies or
strategies be used in educating their child.  Indeed, "Rowley
and its progeny leave no doubt that parents, no matter how well-
motivated, do not have a right under the [statute] to compel a
school district to provide a specific program or employ a
specific methodology in providing for the education of their
handicapped child."  O'Toole, supra.  See also Tucker By and
through Tucker v. Calloway Cnty. Bd. of Educ., 136 F.3d 495, 506
(6th Cir. 1998) ("Case law is clear that the Tuckers are not
entitled to dictate educational methodology or to compel a
school district to supply a specific program for their disabled
child."); Joshua A. v. Rocklin Unified Sch. Dist., Case No. CV
07-01057 LEW KJM, 2008 U.S. Dist. LEXIS 26745 *67 (E.D. Cal.

Mar. 31, 2008)("[A]s long as a district offers an appropriate educational program, the choice regarding the methodology used to implement the IEP is left to the district's discretion.); and Leticia H. v. Ysleta Indep. Sch. Dist., 502 F. Supp. 2d 512, 519 (W.D. Tex. 2006)("Once a court concludes that a student's IEP is reasonably calculated to provide him with a FAPE, the court must leave 'questions of methodology' to the state.").

473.   In this case, there was no competent or credible evidence that any of the methodologies desired by the parent or recommended by a variety of experts were necessary to provide FAPE to ███  In fact, such expert recommendations might provide FAPE to ███  However, there are many ways to provide FAPE to a special education student with expert recommendations representing only some of those ways.  Such expert recommendations, while informative, do not establish that they are required to provide FAPE.  Ultimately, as stated above, the question of methodology in the provision of services and accommodations under an IEP is left to the School Board to determine.  In this case, the School Board properly made that determination and provided FAPE to ███

474.   Petitioner also alleged that ███ was denied FAPE because of alleged bullying by staff and students at school.

475.   Three federal circuits have held that harassment/bullying may be so severe and prolonged that it

179

deprives the child of access to educational benefits, and thus violates IDEA.  See Stringer v. St. James R-J Sch. Dist., 446 F.3d 799 (8th Cir. 2006); M.L. v. Federal Way Sch. Dist., 394 F.3d 634 (9th Cir. 2005); Shore Reg'l High School Bd. of Educ. v. P.s., 381 F.3d 194 (3rd Cir. 2004).  However, in order to violate IDEA, such bullying or harassing conduct must be sufficiently severe, persistent, or pervasive that it creates a hostile environment.  T.K. v. New York City Dept. of Educ., 779 F. Supp. 2d 289,317 (E.D.N.Y. 2011).

476.  Additionally, the School Board's reaction to the alleged bullying determines whether the School Board will be liable for denying FAPE to a special education student.  In T.K., supra., the United States District Court for the Southern District of New York described the standard as follows:

> When responding to bullying incidents, which may affect the opportunities of a special education student to obtain an appropriate education, a school must take prompt and appropriate action.  It must investigate if the harassment is reported to have occurred. If harassment is found to have occurred, the school must take appropriate steps to prevent it in the future.  These duties of a school exist even if the misconduct is covered by its anti-bullying policy, and regardless of whether the student has complained, asked the school to take action, or identified the harassment as a form of discrimination.

Id. at 317.

477.  In this case, Petitioner failed to produce any credible or competent substantial evidence that ▪▪▪ suffered from bullying/harassment or that such bullying/harassment was so severe and prolonged that it created a hostile environment or in any way denied ▪▪▪ FAPE.  Further, the evidence clearly showed that the School Board had an anti-bullying policy in place, maintained anti-bullying posters on the walls of the schools involved in this case, and took each of Petitioner's allegations of bullying seriously by investigating the allegations and reacting appropriately to those allegations.  In fact, even though the parent demanded public apologies and other remedies based on the parent's personal notions of justice, the School Board's actions regarding Petitioner's allegations complied with IDEA and were otherwise appropriate to provide FAPE to ▪▪▪

478.  In addition, Petitioner alleged that ▪▪▪ was denied FAPE because ▪▪▪ was not allowed to participate in band, basketball or on the yearbook committee.

479.  In Florida, a student has no constitutionally protected contract, property, or other economic right to participate in interscholastic sports activities.  Fla. Youth Soccer Ass'n. v. Sumner, 528 So. 2d 4 (Fla. 5th DCA 1988).  See also Fla. High Sch. Activities Ass'n., Inc. v. Bradsha YJ, 369 So. 2d 398 (Fla. 2d DCA 1979).  In fact, participation in extracurricular sports activities is a privilege, not a right.

L.P.M. v. Sch. Bd. of Seminole Cnty., 753 So. 2d 130, 132 (Fla. 5th DCA 2000).

480.   However, FAPE can include participation in interscholastic sports and other extracurricular activities where such participation was included as a component of the student's IEP.  M.B. v. Montana High Sch. Ass'n, 929 P.2d 239, 244 (1996).  In this case, the IEP team did not determine that participation in basketball, band, or yearbook was appropriate. Moreover, the evidence did not demonstrate that inclusion of such activities in ▪▪▪▪ IEP was appropriate or necessary for ▪▪▪▪ to progress in ▪▪▪▪ education.

481.   Further, 34 C.F.R. Sec. 300.107 addresses nonacademic services under IDEA.  It provides:

> (a)  Each public agency shall take steps to provide nonacademic and extracurricular services and activities in the manner necessary to afford children with disabilities an equal opportunity for participation in those services and activities.
> (b)  Nonacademic and extracurricular services and activities may include counseling services, athletics, transportation, health services, recreational activities, special interest groups or clubs sponsored by the public agency, referrals to agencies that provide assistance to individuals with disabilities, and employment of students, including both employment by the public agency and assistance in making outside employment available.

See Indep. Sch. Dist. No. 12 v. Minn. Dept. of Educ., 788 N.W.2d 907, 915 (Minn. 2010) cert. denied, 131 S. Ct. 1556 (U.S. 2011).

482.  In this case, the evidence was clear that the School Board provided ████ with the same access and opportunity to participate in extracurricular activities as all other students. Moreover, the opportunities provided to ████ to participate in band, basketball, and on the yearbook committee complied with IDEA and the requirements of FAPE thereunder.

483.  Petitioner also alleged that ████ was denied FAPE in the services provided during ESY 2009 and 2010.

484.  The regulation under IDEA that addresses ESY is 34 C.F.R. section 300.106.  That regulation provides:

> (l)  Each public agency must ensure that extended school year services are available as necessary to provide FAPE, consistent with paragraph (a)(2) of this section.
>
> (2)  Extended school year services must be provided only if a child's IEP Team determines, on an individual basis, in accordance with §§ 300.320 through 300.324, that the services are necessary for the provision of FAPE to the child.
>
> (3)  In implementing the requirements of this section, a public agency may not-
>
> (i)  Limit extended school year services to particular categories of disability; or
>
> (ii)  Unilaterally limit the type, amount, or duration of those services.

485.  In this case, the evidence demonstrated that appropriate ESY services were developed by ▮▮▮▮ IEP team and were offered to ▮▮▮▮ for ESY 2009 and ESY 2010.  Further, the evidence demonstrated that ▮▮▮▮ parent elected to forego the ESY services established by the IEP team for ESY 2009.  For both years the parent demanded different methodologies be used to provide ESY services and that ESY be provided for a longer period of time.  The evidence did not demonstrate that these parental demands were necessary in order to provide FAPE to ▮▮▮▮ Ultimately, the evidence demonstrated that the services offered to ▮▮▮▮ for ESY 2009 and provided to ▮▮▮▮ for ESY 2010 complied with the requirements of IDEA and provided FAPE to ▮▮▮▮

486.  Petitioner also alleged that ▮▮▮▮ was denied FAPE when an IEE was not provided by the School Board.  Petitioner's allegation related to the events surrounding the uncompleted evaluation by Dr. Passler.

487.  IDEA provides for an independent evaluation to be provided by the local education agency.  The regulation related to such evaluations is 34 C.F.R. § 300.502.  That regulation provides, in pertinent part, as follows:

> Each public agency must provide to parents,
> upon request for an independent educational
> evaluation, information about where an
> independent educational evaluation may be
> obtained, and the agency criteria applicable
> for independent educational evaluations as
> set forth in paragraph (e) of this section.

184

* * *

      (e)  If an independent educational
      evaluation is at public expense, the
      criteria under which the evaluation is
      obtained, including the location of the
      evaluation and the qualifications of the
      examiner, must be the same as the criteria
      that the public agency uses when it
      initiates an evaluation, to the extent those
      criteria are consistent with the parent's
      right to an independent educational
      evaluation.

488.  The purposes of an independent evaluation are "to determine whether a student has a disability ... and the nature and extent of the special education that the student needs. Fla. Admin. Code R. 6A-6.03411(1).  As part of the responsibility to evaluate a student, the School Board must perform an appropriate evaluation, or the parents will have the right to an IEE at public expense.  Fla. Admin. Code R. 6A-6.03311(6)(g).

489.  In this case, the School Board provided appropriate evaluations of ███  However, the School Board offered to provide ███ with an IEE at district expense within the parameters of certain geographic and monetary limits that were reasonable and complied with IDEA.  However, the parent's request that the Morris Center in Gainesville perform the IEE did not meet the same criteria the School Board used when it initiated an evaluation.  Specifically, the location and cost of

185

the Morris Center was well outside the School Board's criteria.
Ultimately, the parent eventually agreed to complete the IEE
with Dr. Passler, but never followed through with the IEE after
accusing Dr. Passler of violating the Health Insurance
Portability and Accountability Act (HIPAA) of 1996.  However,
the evidence was clear that the School Board's actions complied
with IDEA.  More importantly, there was no evidence that
completion of an IEE was necessary in order to provide FAPE to
██████.

490.  Petitioner also alleged that ██████ was denied FAPE
because certain assistive technology services or devices were
not provided to ██████ in order to wean ██████ away from ██████ aide
and help ██████ stay focused.

491.  IDEA defines assistive technology services as "any
service that directly assists a child with a disability in the
selection, acquisition, or use of an assistive technology
device."  20 U.S.C. § 1401(2).  The IDEA defines assistive
technology devices as "any item, piece of equipment, or product
system, whether acquired commercially off the shelf, modified,
or customized, that is used to increase, maintain, or improve
functional capabilities of a child with a disability." 20 U.S.C.
§ 1401(l)(A).

492.  In developing ██████ IEP, the School Board was
required to consider whether ██████ needed assistive technology

devices and services.  20 U.S.C.A. § 1414.  The evidence demonstrated that the School Board met this requirement.  In addition, the School Board made multiple attempts to provide assistive technology devices to help ██ with ██ education. ██ and the parent refused these devices for a variety of reasons.  Further, the evidence did not show that any assistive technology device that was either not provided by the School Board or not used by ██ was required in order to provide FAPE to ██  On the other hand, the evidence demonstrated that the assistive technology provided by the School Board, as well as, the level and amount of assistive technology provided by the School Board complied with IDEA and provided FAPE to ██

493.  Additionally, Petitioner alleged that ██ was denied FAPE because ██ did not receive the appropriate amount of occupational therapy, speech/language therapy, and physical therapy services.  However, the evidence showed that ██ received occupational therapy, speech/language therapy, and consultative physical therapy services, at all times relevant to this proceeding.  Further, the evidence showed that, while the parent may have desired more intense levels of these services, the levels of services ██ received in occupational therapy, speech/language therapy, and physical therapy were appropriate, provided FAPE to ██ and complied with IDEA.

494.   Finally, Petitioner also alleged that the School Board failed to follow the terms of the April 2009 and June 2010 IEPs as written to the letter.  However, deviations from an IEP not resulting in a deprivation of meaningful educational benefit are not a violation of FAPE.  See Sumter Cnty. Sch. Dist. 17 v. Heffernan, 642 F.3d 478, 484 (4th Cir. 2011) ("[T]he failure to perfectly execute an IEP does not necessarily amount to the denial of a free, appropriate public education.").  Moreover, "[t]o prevail on a claim that a school district failed to implement an IEP, a plaintiff must show that the school failed to implement substantial or significant provisions of the IEP, as opposed to a mere de minimis failure, such that the disabled child was denied a meaningful educational benefit." Melissa S. v. Sch. Dist. of Pittsburgh, 183 Fed. Appx. 184, 187 (3d Cir. 2006).  See also ███ v. New York City Dep't of Educ., Case No. 10-cv-6841(BSJ), 2011 U.S. Dist. LEXIS 85995 *26 (S.D. N.Y. Aug. 2, 2011)("[E]ven where a district fails to adhere strictly to an IEP, courts must consider whether the deviations constitute a 'material failure' to implement the IEP and therefore deny the student a FAPE.").

495.   In this case, the evidence demonstrated that the School Board materially provided the services and accommodations contained in ███ IEP.  Further, any occasional failures to

provide such services or accommodations were not material to
███████ education.

496.  Ultimately, the evidence demonstrated that █████
received a free and appropriate public education from the
Jackson County School Board.  The IEPs, including the April 24,
2009, the June 2010, and the November 17, 2010 IEPs, provided
FAPE since they were reasonably calculated to provide and did
provide educational benefit to █████  Additionally, the services
identified within the IEPs were in fact provided.  Petitioner
did not demonstrate by a preponderance of the evidence that █████
was denied any rights or privileges provided by IDEA.
Therefore, the amended petition in this matter should be
dismissed.

<u>ORDER</u>

Based on the foregoing findings of fact and conclusions of
law, it is ORDERED:

That the Jackson County School Board provided FAPE to ██████
and that the Petitioner's Request for Due Process Hearing is
dismissed.


DONE AND ORDERED this 27th day of December, 2012, in
Tallahassee, Leon County, Florida.

_S_ _____

DIANE CLEAVINGER
Administrative Law Judge
Division of Administrative Hearings
The DeSoto Building
1230 Apalachee Parkway
Tallahassee, Florida  32399-3060
(850) 488-9675
Fax Filing (850) 921-6847
www.doah.state.fl.us

Filed with the Clerk of the
Division of Administrative Hearings
this 27th day of December, 2012.


COPIES FURNISHED:

Lindsey Granger, Program Director
Bureau of Exceptional Education
  and Student Services
Department of Education
325 West Gaines Street, Suite 614
Tallahassee, Florida  32399-0400

Rosemary Palmer, Esquire
5260 Pimlico Drive
Tallahassee, Florida  32309

Bob L. Harris, Esquire
S. Denay Brown, Esquire
Messer, Caparello & Self, P.A.
Post Office Box 15579
Tallahassee, Florida  32317

Frank E. Bondurant, Esquire
Bondurant & Fuqua, P.A.
Post Office Box 1508
Marianna, Florida  32447-5508


Charles M. Deal, General Counsel
Department of Education
Turlington Building, Suite 1244

325 West Gaines Street
Tallahassee, Florida  32399

Lee W. Miller, Superintendent
Jackson County School Board
2903 West Jefferson Street
Marianna, Florida  32446


### NOTICE OF RIGHT TO SEEK JUDICIAL RELIEF

This decision is final unless, within 90 days after the date of
this decision, an adversely affected party:

> a)  brings a civil action in the appropriate
> state circuit court pursuant to Section
> 1003.57(1)(b), Florida Statutes (2009), and
> Florida Administrative Code Rule 6A-
> 6.03311(9)(w); or

> b)  brings a civil action in the appropriate
> district court of the United States pursuant
> to 20 U.S.C. § 1415(i)(2), and Florida
> Administrative Code Rule 6A-6.03311(9)(w).